# EXHIBIT  C

               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA


* * * * * * * * * * * * * * * * * * * * * * * *

THE ADMINISTRATORS OF THE
TULANE EDUCATIONAL FUND        NO. 2:21-cv-00820
                                     GGV-JVM
     VS

ILLINOIS UNION INSURANCE COMPANY
WILLIS TOWERS WATSON SOUTHEAST, INC.,
F/K/A WILLIS OF TENNESSEE, INC., and
ABC INSURANCE COMPANY


* * * * * * * * * * * * * * * * * * * * * * * *






     REMOTE VIDEO DEPOSITION OF LOUIS G. FEY, JR.,

          TAKEN ON TUESDAY, JULY 19, 2022




     REPORTED BY:  TAMRA K. KENT  C.C.R.

* * * * * * * * * * * * * * * * * * * * * * * *

        Court Reporters of Louisiana, LLC

         9522 Brookline Avenue, Suite 217

         Baton Rouge, Louisiana 70809

         (225)201-9650 Office * (225)201-9651 Fax

**2**

1                  I N D E X
2                                        Page
3   Caption                              1
4   Appearances                          4
5   Agreement of Counsel                 5
6   Examination
7     BY MR. CARRUTHERS                   7
8     BY MR. BAINES                       245
9
10  Witness' Signature Page              278
11
12  Reporter's Certificate               279/280
13
14          * * * * *
15  EXHIBITS:
16  Exhibit #1... Amended Notice Of Deposition.... 21
17  Exhibit #2... Mr. Fey's June 2, 2022 Report... 24
18  Exhibit #3... Mr. Fey's May 12, 2022 Report... 26
19  Exhibit #4... Numbered Bullet Points of 3A.... 91
20  Exhibit #5... Quotation Number Four.......... 94
21  Exhibit #6... March 29, 2019 E-Mail from Chubb 103
22  Exhibit #7... E-Mail from Brian Smith to Chubb. 104
23  Exhibit #8... 5/17 E-Mail, Number 29........... 109
24  Exhibit #9... 6/23/2019 e-mail, Number30....... 111
25  Exhibit #10.. IEC Endorsement, Number 44...... 123

**3**

1            EXHIBITS (CONTINUED)
2
    Exhibit #11.. March 26, 2020 E-mail, No. 32... 138
3
    Exhibit #12.. May 7, 2020 E-mail, Number 33... 141
4
    Exhibit #13.. May 27, 2020 Chubb Letter....... 156
5
    Exhibit #14.. July 14, 2020 Letter, Number 14. 159
6
    Exhibit #15.. Diane Sirlo's Notes/Worksheet... 199
7
    Exhibit #16.. John Hadden's Notes/Worksheet... 199
8
    Exhibit #17.. Joyce Fred's Notes/Worksheet.... 199
9
    Exhibit #18.. Sept. 18, 2020 E-mail, Number 33 230
10
    Exhibit #19.. April 8, 2019 E-mail............ 260
11
    Exhibit #20.. June 4, 2019 E-mail............. 261
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1
    Representing the Plaintiff:
2
      SHER GARNER CAHILL RICHTER KLEIN & HILBERT
3     Attorneys at law
      909 Poydras Street, Suite 2800
4     New Orleans, Louisiana 70112
5     BY:  MS. MARTHA CURTIS (Via Zoom)
6             -and-
7         MS. MEREDITH WHITTEN (Via Zoom)
          Office of General Counsel, Tulane
8
9   Representing the Defendant: Illinois Union
    Insurance Company:
10
      CLYDE & CO US
11    Attorneys at Law
      340 Mount Kemble Avenue, Suite 300
12    Morristown, New Jersey 07960
13    BY:  MR. THOMAS CARRUTHERS (Via Zoom)
14
    Representing the Defendant, Willis Towers Watson
15  Southeast:
16    SAUL EWING ARNSTEIN & LEHR
      Attorneys at Law
17    1001 Fleet Street, 9th Floor
      Baltimore, Maryland 21202
18
      BY:  MR. EDWARD BAINES (Via Zoom)
19
20  Also Present: Videographer, Chris Hanlon (Via Zoom)
          Ms. Kate Matta, Clyde & Co (Via Zoom)
21        Ms. Kimberly Crampton, Sher Garner (Via Zoom)
22
23  Reported by:  Tamra K. Kent, Certified Court
                  Reporter #83070, in and for the
24                State of Louisiana
25

**5**

1        S T I P U L A T I O N
2
3        IT IS STIPULATED AND AGREED by and among
4   Counsel that the remote testimony (Via Zoom) of the
5   witness, LOUIS G. FEY, JR., is hereby being taken
6   pursuant to Notice under the Federal Rules of Civil
7   Procedure for all purposes permitted under law.
8
9        The witness reserves the right to read and
10  sign the deposition.  The original is be delivered
11  to and retained by Thomas Carruthers, Attorney, for
12  proper filing with the Clerk of Court.
13
14       All objections, except those as to the form
15  of the questions and/or responsiveness of the
16  answers, are reserved until the time of the trial
17  of this cause.
18
19          * * * * *
20       Tamra K. Kent, Certified Court Reporter in
21  and for the State of Louisiana, #83070, officiated
22  in remotely administering the oath to the witness
23  with the same force and effect as if in person.
24
25

6

1      LOUIS G. FEY, JR., to be duly sworn, was
2 examined and testified as follows:
3           EXAMINATION
4      (Commencing at 10:00 a.m.)
5 THE VIDEOGRAPHER:
6      Good morning, we are going on the
7 record. The date today is July 19, 2022.
8 The time is 9:58 a.m. Central time. This
9 is media unit number one of the video-
10 recorded deposition of Mr. Louis Fey, Jr.,
11 taken in the matter of the Administrators
12 of the Tulane Educational Fund versus
13 Illinois Union Insurance Company, et al, in
14 the U.S. District Court for the Eastern
15 District of Louisiana.
16      My name is Christopher Hanlon. I'm a
17 Certified Legal Videographer. Our court
18 reporter today is Tammy Kent, and we are
19 with Veritext.
20      At this time, I would ask counsel to
21 please state your appearances for the
22 record starting with the noticing attorney,
23 please.
24 MR. CARRUTHERS:
25      Thomas Carruthers from Clyde & Co for

7

1 the defendant Illinois Union.
2 MS. MATTA:
3      Katie Matta with Clyde and Co here to
4 assist Thomas Carruthers.
5 MR. BAINES:
6      Ted Baines of Saul Ewing for defendant
7 Willis Towers Watson Southeast.
8 MS. CURTIS:
9      Martha Curtis for the plaintiff,
10 Tulane.
11 THE VIDEOGRAPHER:
12      Thank you, very much, Counsel.
13      At this time, I would ask our court
14 reporter to please administer the oath and
15 we can proceed.
16      (Witness duly sworn.)
17 MR. CARRUTHERS:
18      Martha, it's Tom Carruthers. I heard
19 you but I don't see you on the list of
20 participants.
21 THE COURT REPORTER:
22      I'm ready.
23 MS. MATTA:
24      I'm here with Lou.
25 MR. CARRUTHERS:

8

1      Oh, so you're sitting next to him,
2 okay.
3 THE COURT REPORTER:
4      What's happening?
5 MR. CARRUTHERS:
6      Hello.
7 THE COURT REPORTER:
8      Does anybody hear me?
9 MR. BAINES:
10      Yes.
11 MR. CARRUTHERS:
12      Yes, I think we're good to go.
13 THE COURT REPORTER:
14      Wow, wow, wow, I have nothing.
15 MR. CARRUTHERS:
16      Well, you're cutting out. You're back
17 on now.
18 THE COURT REPORTER:
19      Yeah. Were you asking any questions
20 yet?
21 MR. CARRUTHERS:
22      No.
23 BY MR. CARRUTHERS:
24   Q. Good morning, Mr. Fey. How are you?
25   A. Good morning, how are you?

9

1   Q. Good, thank you.
2      And can you tell us exactly where you're
3 located currently.
4   A. I'm in Martha Curtis's office on Poydras
5 Street in New Orleans.
6   Q. And is Ms. Curtis sitting next to you?
7   A. Yes.
8   Q. Anyone else in the room?
9   A. No.
10   Q. Do you have a cellphone with you?
11   A. I do.
12   Q. Can you please put it somewhere where you
13 can't access it during the deposition?
14   A. All right.
15   Q. Thank you.
16      Mr. Fey, can you tell us who retained you
17 in connection with this case?
18   A. Martha Curtis.
19   Q. When was that?
20   A. I'm not sure. It would have been sometime
21 last year.
22   Q. Do you have a written Retainer Agreement
23 with Ms. Curtis?
24   A. I believe so.
25   Q. I had assumed -- is the agreement with

10

1 Ms. Curtis, or her firm?  I assume it's with her
2 firm, right?
3    A.  Correct.
4    Q.  I'm going to ask you a series of questions.
5 I know you've been deposed many times.  I'm not
6 going to waste time going over ground rules, but
7 just a few.
8       If you don't understand my question,
9 please, let me know and I'll be happy to rephrase
10 or repeat it.
11    A.  Sure.
12    Q.  All right.  Are you represented by counsel
13 today?
14    A.  No.
15    Q.  And you're appearing today as an expert for
16 Tulane, correct?
17    A.  Correct.
18    Q.  And by "Tulane," it's a shorthand for the
19 plaintiff in this Declaratory Judgment action.
20       Do you understand that?
21    A.  Correct.
22    Q.  And throughout the deposition, I'm going to
23 use the term "Chubb" as you've used it in
24 connection with your reports.  You describe
25 Illinois Union's policy at issue in the case, and

11

1 then you refer to it as "Chubb."
2       So you okay with me referring to Illinois
3 Union as "Chubb"?
4    A.  Absolutely.
5    Q.  And the policy at issue is a Premises
6 Pollution Liability Policy, correct?
7    A.  Correct.
8    Q.  And are you okay with me referring to that
9 as a PPL policy?
10    A.  Yes.  Or just "policy" would be fine.
11    Q.  Policy, okay.
12       In connection with your retention in this
13 case, what exactly were you asked to opine on?
14    A.  I was asked to review the handling of the
15 claim by Chubb and also the underwriting of the
16 policy.
17    Q.  And who told you that?
18    A.  Martha Curtis.
19    Q.  Anyone else?
20    A.  No.
21    Q.  Was anyone else present during your
22 discussions with Ms. Curtis?
23    A.  No.
24    Q.  Were you given any documents in connection
25 with your retention?

12

1    A.  I was.
2    Q.  And are those the documents described in
3 your two reports?
4    A.  Well, I only have one report, but yes, it's
5 -- they're listed there.  And then I have received
6 additional documents since.
7    Q.  Okay.  You say you only did one report.
8 Which report are you referring to?
9    A.  June 2, 2022.  The other one I think that
10 you're confusing as a report was for purposes of
11 mediation.
12    Q.  Okay.  So for purposes of your expert
13 testimony in this case, you're only relying upon
14 the June 2, 2022, report; is that correct?
15    A.  Correct.
16    Q.  And what did Ms. Curtis tell you about the
17 case?
18    A.  I don't really recall.  I'd be -- I just
19 would be kind of going off what I know about the
20 case today if I was trying to regurgitate what she
21 told me.  I really don't remember.  It was last
22 year.
23    Q.  Did you take any notes during any meeting
24 or discussions with Ms. Curtis?
25    A.  No.

13

1    Q.  Did you record any discussions with
2 Ms. Curtis?
3    A.  No.
4    Q.  Did Ms. Curtis send you any e-mails about
5 this case?
6    A.  Yeah, I'm sure there were e-mails.
7    Q.  Do you still have those e-mails?
8    A.  Sure.
9    Q.  Did you send Ms. Curtis any e-mails?
10    A.  Well, yeah, there would have been e-mails
11 back and forth between us.
12    Q.  Do you still have those e-mails?
13    A.  I'm sure I do.
14    Q.  Ms. Curtis told you that this case involves
15 a Declaratory Judgment action commenced by Tulane
16 against Willis and Chubb; is that right?
17    A.  Correct.
18    Q.  Did she tell you anything about Tulane's
19 actions in connection with the lawsuit?
20    A.  I mean, that's kind of a vague question.
21 I'm not -- I'm not sure.  Like I said, I really
22 don't remember what our conversations were last
23 year.
24    Q.  Did you have any discussions with anyone
25 else other than Ms. Curtis regarding your retention

14

1  in this case?
2     A.  No.
3     Q.  Did Ms. Curtis tell you anything about
4  Tulane's actions in connection with the procurement
5  of the policy at issue in this case?
6     A.  Well, I mean, she provided me with their
7  notes from the meeting, the procurement meeting
8  with Willis.
9     Q.  When you say "notes," are you referring to
10  a worksheet, a comparison sheet?
11     A.  No.  They were notes that were made on the
12  -- on the presentation that Willis provided them.
13     Q.  Did she provide you with anything else?
14     A.  I have the Affidavits from two of the
15  Tulane people that were at the meeting.
16     Q.  Whose Affidavits do you have?
17     A.  I want to say Joyce, Joyce Fred and John
18  Hadden.
19     Q.  What's the date of Mr. Hadden's Affidavit?
20     A.  March 8, 2022.
21        MR. CARRUTHERS:
22           Martha, could you just confirm whether
23        that Affidavit has been produced.
24        MS. CURTIS:
25           It was an exhibit in connection with

15

1        the Motions for Summary Judgment.
2        MR. CARRUTHERS:
3           Okay.
4  BY MR. CARRUTHERS:
5     Q.  And what is the date of Ms. Fred's
6  Affidavit?
7     A.  June 19, 2022.
8        MS. CURTIS:
9           I think it's the 29th, but it's cut
10        off --
11        THE WITNESS:
12           29th, okay.  June 29, 2022.  It's a
13        little hard to read.
14  BY MR. CARRUTHERS:
15     Q.  When were you provided with a copy of
16  Ms. Fred's Affidavit?  Or I believe it's a
17  Declaration.
18     A.  In the last couple of days.
19     Q.  Before yesterday?
20     A.  I think it was yesterday.
21     Q.  Did you have any discussions with Ms. Fred?
22     A.  No.
23     Q.  Did you see any drafts of Ms. Fred's
24  Declaration?
25     A.  No.

16

1     Q.  Did you have any discussions with
2  Mr. Hadden?
3     A.  No.
4     Q.  Did you have any discussions with anyone at
5  Tulane before you prepared your reports?
6     A.  Before I prepared my report?  No.
7     Q.  Okay.  So let's deal with the June 2, 2022,
8  date.  Have you had any discussions with anyone
9  from Tulane since you prepared your June 2nd
10  report?
11     A.  I was on a conference call this morning
12  with Whitten, Ms. Whitten.
13     Q.  Who else was on the call?
14     A.  Martha Curtis.
15     Q.  How long did the call last?
16     A.  Probably ten minutes.
17     Q.  And what did Ms. Whitten tell you?
18     A.  She didn't tell me anything.  I think it
19  was just a catch-up about what's going on with the
20  case and about the deposition, whether she got the
21  link to the deposition this morning.
22     Q.  Did she say anything about the case?
23     A.  Not that I recall.  There was some
24  discussion about who had best knowledge about the
25  case.

17

1     Q.  And who was that?
2     A.  I couldn't tell you the names.  I didn't
3  write them down.
4     Q.  So you don't recall this call earlier this
5  morning who was mentioned as the most
6  knowledgeable?
7     A.  No.  But I'll tell you right now, I'm
8  horrible with names so it's a weakness of mine.
9     Q.  What did Ms. Curtis tell you about today's
10  deposition?
11     A.  That she wanted me to come down to her
12  office and do it.  That's about it.
13     Q.  Did you discuss any documents during this
14  call?
15     A.  Yeah.  We referenced a couple of e-mails
16  between Willis and Chubb.
17     Q.  Do you recall the dates or approximate
18  dates of those e-mails?
19     A.  Well, yeah, they were in March and April of
20  2022 mostly -- or 2020, I'm sorry.
21     Q.  And they were between Willis and Tulane?
22     A.  No, they were between Willis and -- well,
23  yeah, they were between Willis and Chubb.  And some
24  of them were between Willis and Willis.
25     Q.  Had you seen before that call, had you seen

18

1 copies of those e-mails?
2     A. Sure.
3     Q. And did Ms. Curtis say why she was showing
4 you those particular e-mails or discussing those
5 particular e-mails?
6     A. No. I mean, we didn't have a discussion of
7 why we were discussing them.
8     Q. Mr. Fey, can you give me some approximation
9 of how many hours you've put in so far on this
10 retention?
11     A. I really couldn't tell you. I'd be
12 guessing.
13     Q. Do you submit bills to Ms. Curtis?
14     A. Correct.
15     Q. Can you give me some idea of how many
16 invoices you've submitted to her?
17     A. I believe there's been two invoices so far.
18     Q. And have you previously done work for
19 Ms. Curtis or her firm?
20     A. Yes.
21     Q. How many times?
22     A. I don't know exactly, but I would guess
23 maybe five.
24     Q. Did any of those prior retentions involve
25 PPL policies?

19

1     A. I'm not sure. I don't think so.
2     Q. Have you ever done any expert work for
3 Tulane before this case?
4     A. No.
5     Q. Have you ever done any expert work for
6 Willis, one of the defendants in this case?
7     A. I don't believe so. Possibly. Not off the
8 top of my head.
9     Q. Have you done any prior work for Chubb?
10     A. Once again, it's possible but I couldn't
11 tell you off the top of my head.
12     Q. Now, Mr. Fey, as an experienced expert
13 witness, you understand that you're not permitted
14 to opine on legal issues or legal questions, right?
15     A. Correct.
16     Q. And you're not permitted to provide
17 speculative testimony, correct?
18     A. Correct.
19     Q. In fact, in prior cases, testimony of yours
20 has been prohibited because it was either a legal
21 opinion or speculative, correct?
22     A. Well, I've always been permitted to testify
23 but I've been -- there's been clarification rulings
24 that I shouldn't opine on legal issues which I
25 don't tend to do anyway so...

20

1     Q. But my question is a little bit different.
2 You weren't prohibited from appearing and
3 testifying in a case, but certain portions of your
4 testimony you were not permitted to present,
5 correct?
6     A. Well, I kind of disagree with the way
7 you're phrasing it. But what I will say is that
8 opposing counsel many times will try to have me
9 excluded by representing to The Court that I'm
10 intending to opine on legal issues which is not my
11 intent.
12     So there are clarification rulings issued
13 saying I can't do that, but that's never been my
14 intent. And it's really a matter of what questions
15 are asked by the attorneys when I'm on the stand
16 so...
17     Q. You would agree with me that it's improper
18 for an expert to provide legal opinions, correct?
19     A. Absolutely.
20     Q. And you would agree with me that it's
21 improper for an expert to provide speculative
22 opinions, correct?
23     A. Correct.
24     Q. Do you believe that your June 2nd report,
25 June 2, 2022, contains any speculative testimony or

21

1 opinion?
2     A. I don't believe so. If you want to be
3 specific about something.
4     Q. No, we'll get to that.
5     But, generally, do you believe that the
6 report does not contain any legal opinions or legal
7 conclusions on your part?
8     A. Correct.
9     Q. Okay. Could you please pull up the Notice
10 of Deposition. And let's have that marked as
11 Defendant Exhibit #1, please.
12     (Whereupon, the document was duly marked
13     for identification as "Exhibit #1" and
14     attached hereto.)
15     MR. BAINES:
16     Tom, as a housekeeping matter, would it
17     make sense instead of having Defendant's
18     and Plaintiff's exhibits, just to
19     continuously mark exhibits. I have found
20     sometimes that avoids a lot of duplication
21     of exhibits. Obviously, I'm agreeable to
22     anything but sometimes this consecutive
23     marking without a "Plaintiff" or
24     "Defendant" designation prevents a lot of
25     duplication.

22

1      MR. CARRUTHERS:
2      I'm fine with that.  Let's do that
3  then.
4      Tammy, can you just mark it as Exhibit
5  #1, then, please.  Thanks.
6      THE COURT REPORTER:
7      Yes.
8      MR. CARRUTHERS.
9      Please do that.
10      MR. BAINES:
11      Martha, is that okay with you?
12      MS. CURTIS:
13      Yes.  Okay, just in case sometimes it
14  ends up that you can't remember the number
15  for something and then it ends up getting
16  in twice anyway.  But that's fine.
17      MR. CARRUTHERS:
18      Has it been marked, Tammy?
19      THE COURT REPORTER:
20      Yes, sir, yes.  I'm not doing the
21  actual, physical marking.  I thought
22  Ms. Matta was.
23      MR. CARRUTHERS:
24      Kate, are you doing that?
25      MS. MATTA:

23

1      Yes, I'm just about to share my screen.
2      THE COURT REPORTER:
3      Okay, thank you.
4      THE VIDEOGRAPHER:
5      Just a reminder, the documents will be
6  included in the video so when you move off
7  the document, if you can just instruct to
8  take it down, that would be great.
9  Thanks.
10      MR. CARRUTHERS:
11      Sure.
12  BY MR. CARRUTHERS:
13      **Q.  Mr. Fey, do you see that deposition notice?**
14      A.  I do.
15      **Q.  And you're appearing today in response to**
16  **that Amended Notice of Deposition, correct?**
17      A.  Correct.
18      **Q.  And you're appearing voluntarily; is that**
19  **right?**
20      A.  Sure.
21      **Q.  Okay.  You can take that down.  Kate, could**
22  **you please mark Mr. Fey's June 2, 2022, expert**
23  **report, please.**
24      **Mr. Fey --**
25      **Actually, Kate, I think this has got to be**

24

1  **remarked as Exhibit #2, right?**
2      (Whereupon, the document was duly marked
3      for identification as "Exhibit #2" and
4      attached hereto.)
5      MS. MATTA:
6      Just one second.
7  BY MR. CARRUTHERS:
8      **Q.  So it looks like on the caption of this**
9  **document there's some extraneous marking, but this**
10  **has been marked as Exhibit #2.  And I understand**
11  **that the reference in the caption is not something**
12  **that was part of your original report.**
13      **But, Mr. Fey, could you please take a look**
14  **at this and confirm on the record that this is the**
15  **report that you prepared in connection with this**
16  **case.**
17      A.  Page 1 of the report?  Yes.
18      **Q.  Well, scroll through the rest of it,**
19  **please, and take a look at it.  And Kate can go**
20  **whatever speed you want.**
21      A.  If you can just kind of scroll through it.
22  You can go faster if you want to if you can.
23      Yeah, yeah, that's it.
24      **Q.  Okay.  Is this the report that you prepared**
25  **in connection with your retention in this case?**

25

1      A.  Yes.
2      **Q.  And can we refer to this as your report?**
3      A.  Sure.
4      **Q.  And you told me that the prior March 12,**
5  **2022, report was prepared just for purposes of the**
6  **mediation; is that right?**
7      A.  Correct.
8      **Q.  So I'm going to focus primarily on this**
9  **report, then.**
10      A.  Okay.
11      **Q.  Did you prepare any drafts of this report?**
12      A.  No.  It's basically a living document.
13      **Q.  Well, did you have an initial draft and**
14  **then you made revisions to it?**
15      A.  I don't -- I don't recall if I did it in
16  one sitting or if I went on two different days or
17  how I did it.  I wouldn't have anything different
18  than this.
19      **Q.  So you don't have any drafts of this**
20  **particular report; is that right?**
21      A.  Correct.
22      **Q.  Did you provide any drafts of your report**
23  **to -- to plaintiff's law firm, anyone at**
24  **plaintiff's law firm?**
25      A.  I don't believe so.  I might have -- I

26

1  might have sent a copy just before I signed it.
2      Q.  Did you review the draft before you signed
3  it?  Did you review it with anyone from plaintiff's
4  counsel's office?
5      A.  No.  In fact, now I remember.  Yeah, I just
6  -- I drafted it up in one day, and I signed it and
7  sent it.
8      Q.  Did anyone other than yourself provide any
9  information contained in this report?
10     A.  Well, the documents that I've got listed on
11  there.  And, I mean, when you asked me about draft,
12  the mediation statement was kind of a starting
13  point.
14     Q.  Okay.  Kate, why don't you have marked as
15  Exhibit #3 the May 12, 2022, report.
16         (Whereupon, the document was duly marked
17         for identification as "Exhibit #3" and
18         attached hereto.)
19     MR. CARRUTHERS:
20         Is there some way to give Mr. Fey
21     control of the document?
22     THE WITNESS:
23         I can pull it up on my end but I can't
24         pull that up on my end.
25     THE VIDEOGRAPHER:

27

1         Unfortunately, we can't give permission
2      to other people to control other people's
3      computers.
4  BY MR. CARRUTHERS:
5      Q.  Mr. Fey, my question is just going to be:
6  Is this the May 12, 2022, report that you prepared,
7  as you said, in connection with the mediation?
8      A.  It appears to be, yes.
9      Q.  Okay.  And you just testified that you used
10  this sort of as a basis or a starting point for
11  your June 2nd report; is that right?
12     A.  Correct.
13     Q.  You changed things from this May 12th
14  report to your June 2nd report, right?
15     A.  I'm assuming there were changes.  I was
16  given more documents to review so there are
17  probably more listed there.  And then there is, you
18  know, things that -- I'll take your word for it.
19     Q.  Okay.  And my question is, Why didn't you
20  use this first report as your expert report in this
21  case?
22     A.  Well, I did this in a hurry to have -- give
23  them something to use for the purposes of the
24  mediation.  So it was by no means my final opinion
25  on the case.  In fact, my opinions evolve as the

28

1  case progresses and I'm given more documents.
2      Q.  So do you believe that your June 2nd report
3  is a full and accurate recitation of your opinions
4  in this case?
5      A.  I mean, it's a broad overview of my
6  opinions, but it doesn't have everything I'm
7  prepared to talk about.
8      Q.  Well, what are you prepared to talk about
9  that's not in your June 2nd report?
10     A.  Probably details like some of the -- like
11  maybe a broader overview of my opinions and more
12  details.  You know, you can't possibly put
13  everything in a report.  You know, it's really
14  based on questions I'm asked and, I mean, I reserve
15  the right at the bottom to rebut other experts and
16  supplement my opinions as the case progresses and
17  discovery is completed.
18     Q.  Well, do you anticipate providing any new
19  opinions that aren't reflected in this report?
20     A.  If I'm asked, to I will.
21     Q.  Have you been asked to provide any opinions
22  other than what's contained in this June 2nd
23  report?
24     A.  Not as of today.
25     Q.  Okay.  Kate, let's go back to Exhibit #2,

29

1  which is the June 2nd report, and scroll down to
2  paragraph 1, please.
3         Can you just read to yourself quickly,
4  paragraph 1, Mr. Fey.  I'm going to ask you a
5  question about the first sentence that talks about
6  your retention and why you were retained.
7      A.  Okay.
8      Q.  Now, you say here you were retained to
9  evaluate the handling of Chubb's underlying claim
10  under a policy issued by Illinois Union, as well as
11  the involvement or culpability of Willis Towers
12  Watson, correct?
13     A.  Correct.
14     Q.  Let's start with Chubb's handling of the
15  claim.  Does this June 2nd report contain all of
16  your opinions to date concerning what you believe
17  was either correct or incorrect about Chubb's
18  handling of the Tulane claim?
19     A.  Well, I don't know if I would say all, but
20  it's a good synopsis of my opinions, yes.
21     Q.  Well, is there something that comes to mind
22  that you didn't include in the report but you're
23  prepared to testify about?
24     A.  I think I touched on it all.  I mean, it's
25  kind of hard -- that's kind of a broad question, so

30
1 it's kind of hard to answer.
2     Q. And when you say you were retained to
3 evaluate, what steps did you take to evaluate
4 Chubb's handling of the claim?
5     A. Well, I reviewed all the documents that are
6 listed, and then I compared Chubb's handling to the
7 industry standards that apply, claim handling and
8 underwriting in this case, and Willis's actions
9 compared to the standards of a big retail insurance
10 agency or a wholesale, surplus-lines broker. They
11 serve both markets.
12     Q. Okay. So sticking with your opinions
13 concerning Chubb's handling, are the opinions in
14 this report based on anything other than your
15 review of the documents that you've identified in
16 the report?
17     A. No.
18     Q. In your understanding of industry
19 standards, is it based on anything other than that?
20     A. My experience in the industry of over
21 40 years of handling claims. And I don't know if I
22 referenced some exhibits in the opinion. I think
23 there's an Exhibit B and C. I can't remember what
24 exhibits I added to it. But I have listings of
25 industry standards.

31
1     Because I'm always asked, Where can I find
2 these standards? So I put together a document that
3 lists some of the standards that apply to claim
4 handling, as to procurement. I think I attached
5 both as exhibits if I'm not mistaken.
6     Q. Yeah, you're right, there's three exhibits.
7 A C.V. that's Exhibit A. Industry standards about
8 claim handling appears to be Exhibit B. And then
9 industry standards concerning agency relationships
10 appear to be Exhibit C.
11     A. There you go.
12     Q. We'll go over those a little bit. But in
13 turning back to paragraph 1 of this exhibit, you
14 say, "...as well as the involvement for culpability
15 of Willis Towers Watson Southeast.
16     And for purposes of this deposition, are
17 you okay with me just referring to that as
18 "Willis"?
19     A. Yes.
20     Q. Okay. So you say involvement or
21 culpability. Isn't culpability a legal opinion or
22 conclusion?
23     A. No. I think when we're talking about who
24 is to blame for, you know, improper procurement of
25 insurance or improper claim handling -- I mean,

32
1 "culpability" is just a word.
2     Q. So you don't consider that a legal opinion;
3 is that right?
4     A. No, I don't.
5     Q. Okay. In your report, did you include any
6 opinion concerning Willis's culpability in this
7 case?
8     A. Well, it's kind of an offshoot of Chubb's
9 position. Because either Willis didn't procure the
10 proper coverage or Chubb didn't issue the right
11 endorsement.
12     But my overriding opinion is that since the
13 endorsement was issued after the loss had been
14 submitted, that this is a loss under binder.
15     Q. That's not an opinion you had in your first
16 report, right?
17     A. I don't know.
18     Q. Well --
19     A. It wasn't a report. It was a -- it was
20 something I provided to counsel for the purposes of
21 mediation.
22     Q. And you signed it as an expert witness in
23 this case. And you made sure it was truthful and
24 accurate, correct?
25     A. I don't think I signed it. At least my

33
1 copy is not signed. It's kind of a rough draft --
2 it wasn't --
3     Q. So --
4     A. Is your copy signed?
5     Q. Let me -- I'll pull it up in one second
6 here -- yeah, it's signed by you and dated May 12,
7 2022.
8     A. Okay. For some reason my copy is not
9 signed so...
10     Q. You're not trying to say that your May 12th
11 report was just some shoddy job that you were
12 submitting for purposes of the mediation, are you?
13     A. No. I'm saying it wasn't finalized. It
14 was a preliminary -- my preliminary opinions.
15     Q. But you stand by those preliminary opinions
16 as you've called them, correct?
17     A. Well, I stand by my June 2nd report. I
18 don't know what the differences are between the
19 two. But like I keep saying, the first one was for
20 purposes of the mediation for some of the
21 discussions and the second one is my formal report.
22     Q. Okay.
23     A. June 2nd is my formal report and my
24 opinions on the case.
25     Q. Okay. But you're not saying that the

34

1 May 12th report was inaccurate in any way, are you?
2    A. No, when I wrote it, I believed everything
3 was correct.  So I don't know where the differences
4 lie.  I'm assuming you're implying there's some
5 differences there that make a big difference in the
6 case, but I can't recall anything.
7        So if you want to be specific, we can talk
8 about it.  But from a broad generalization, I
9 believe everything in there is accurate.
10       Of course, as I review more documents to
11 find out more information, so that has an impact on
12 my report and my opinions.
13    Q. Now, again, when you talk about the
14 culpability of Willis Towers, did you include any
15 specific opinion in your report concerning quote,
16 unquote, what you view the culpability of Willis?
17    A. Like I said, it's an offshoot of whether or
18 not Chubb issued the correct endorsement.  So there
19 were discussions between Willis and Chubb, and
20 Chubb didn't -- when Chubb issued the policy, they
21 didn't issue the manuscript endorsement.
22       And then, after the loss, they put a
23 pre-existing endorsement on there that they could
24 have easily listed on the quotes.  So there's some
25 unusual activity there on Chubb's end.

35

1       So depending on how all of that comes out,
2 then Willis may or may not have some culpability
3 there.  Because if Willis procured the proper
4 coverage, then there's no issue, is there?
5    Q. So you're not opining -- right now --
6 you're not opining on whether Willis was culpable
7 or not, are you?
8    A. Well, I think there's culpability there in
9 that they didn't get the endorsement put on the
10 policy, and that there's a question of whether or
11 not the endorsement that was eventually put on the
12 policy by Chubb is the correct version or not.
13       And like I keep saying, it's a loss under
14 binder so, you know, it just depends.  I saw -- I
15 saw e-mails from Willis saying that the virus
16 coverage was supposed to be broad with BI and PD.
17       I saw quotes, Quote No. 5 being sent from
18 Chubb to Willis with Willis responding that this
19 wasn't the quote.  What is -- this isn't it.
20       So it's apparent to me that neither side
21 knew what the endorsement was supposed to be, so
22 that's my problem with everybody on this case.
23    Q. Okay.  Well, I just want to focus on your
24 opinion as reflected in the June 2nd report.
25    A. I think that's what we're talking about.

36

1    Q. Yeah, and I'm not talking about what you
2 think might happen down the road or what could have
3 happened or might have happened.  I want to focus
4 on what happened and what your opinion is.
5    A. I think I was just talking about that.  I
6 was referring to specific e-mails between the
7 parties.
8    Q. Okay.  Well, we'll get to those.
9       So is it fair to say that your opinion in
10 this case is based on a couple of underlying
11 premises.  One, that Tulane requested Bacteria and
12 Virus Coverage broader than what's reflected in
13 Endorsement 44?
14    A. Correct.
15    Q. And what's the basis for that?  Did you
16 ever --
17    A. The proposal that said, where they
18 discussed Ebola, whether it was covered for that.
19 There's a comparison of the different coverage
20 proposals that said there was no -- the policy was
21 silent on communicability.
22       There was an e-mail from Willis to Chubb
23 saying coverage is supposed to include BI and PD.
24 There was an e-mail from Chubb to Willis saying,
25 Here's Quote 5 when all he was asking for was the

37

1 endorsement.
2       So there's a lot of -- there's a lot of --
3 there's a lot of documentation to show that neither
4 Chubb nor Willis were sure of what the coverage
5 should have been at the time the loss was
6 submitted.
7       The BI and PD proposal that was presented
8 to Tulane by Chubb also says no BI and PD; whereas,
9 the Willis e-mail says BI and PD should be included
10 so...
11    Q. Okay.
12    A. There's lot of discrepancies in the
13 records, and that's what I'm talking about.
14    Q. Well, let's break it down.  You said a lot
15 of things there, so I want to break it down a
16 little bit.
17       What documents have you seen showing
18 exactly what coverage Tulane requested Willis to
19 procure?
20    A. The quotes.
21    Q. So the quote?
22    A. Quote No. 4 to be specific.
23    Q. Did Tulane write that quote?
24    A. No, but they accepted that quote.
25    Q. Did they write the quote?

**38**

1    A.  No.
2    **Q.  So my question is, What documents have you**
3 **seen that show what Tulane told or advised Willis**
4 **about what coverage it wanted?**
5    A.  So I saw the notes on the proposals, what I
6 just discussed, and the Affidavits from the two
7 Tulane people to support that.
8    **Q.  Anything else?**
9    A.  From Tulane?
10    **Q.  From Tulane.  Because it's two steps, isn't**
11 **it?  Tulane requests Willis to procure coverage,**
12 **right?**
13    A.  Right.
14    **Q.  And then Willis advises Chubb what coverage**
15 **Tulane wanted, right?**
16    A.  Right.
17    **Q.  So on the first step, what you're saying is**
18 **you're going off the notes -- as you call them --**
19 **and those were notes from a presentation or meeting**
20 **between Willis and Chubb?  That's your**
21 **understanding?**
22    A.  Yes.  The way it works is when you're
23 getting ready to put coverage in place, you meet
24 with the client, sit down and go through the
25 proposal.  And the client will ask questions about

**39**

1 the different coverages.
2        And in this case, there were two people at
3 Tulane at the meeting that were putting notes down
4 on their proposals as they were discussing.  And
5 now we have the Affidavits to back that up.
6        So it pretty much shows me that, in the
7 comparison chart that Willis produced, that there
8 was no human-to-human contagion requirement on the
9 policy as indicated.
10        And it also shows me that -- and also Chubb
11 provided or Willis provided, somebody provided
12 three prior endorsements from Chubb that has the
13 language that it is now on the Tulane policy at
14 issue.
15        Whereas, the quote had Form MS-0000 on it.
16 Which if they had intended to put one of those
17 prior endorsements on the quote, they would have
18 listed the endorsement.  Not MS-0000.
19        MS-0000 means that they were manuscripting
20 coverage specifically for Tulane, and they were not
21 intending to use the prior endorsements they had on
22 hand.
23        Also, there's e-mails referring to legal,
24 Chubb's legal counsel, Legal -- I can't remember --
25 Legal Department being involved in the process

**40**

1 which also tells me that there's -- they were going
2 to manuscript coverage for this particular policy
3 for Tulane specifically, and they did not intend to
4 use the prior endorsements.
5    **Q.  Okay.  Well, again, there's a lot there.**
6 **We need to break it down.**
7        **When you say "manuscript," that was the**
8 **"MS" that you're referring to, right?**
9    A.  Right.
10    **Q.  And was it your understanding that the**
11 **manuscript would be because the coverage was going**
12 **to be retro to 2/27/19, or something else?**
13    A.  No.  "Manuscript" it meaning that they were
14 going to tailor coverage to Tulane's needs.
15    **Q.  That's your assumption, isn't it?**
16    A.  Well, we don't know because Chubb didn't
17 issue the endorsement until after the loss.
18    **Q.  Well, so you're assuming --**
19    A.  That's the problem with the whole case.
20 Chubb didn't issue the endorsement until after the
21 loss.  You can't do that.
22    **Q.  Okay.  Well, I'm trying to focus on**
23 **specifically what Tulane told Willis it wanted by**
24 **the way of coverage from Chubb.  And you mention**
25 **the two Affidavits, correct?**

**41**

1    A.  Correct.
2    **Q.  And you mention the handwritten notes,**
3 **right?**
4    A.  Correct.  On the proposals, correct.
5    **Q.  Right.  Anything else in your opinion that**
6 **form the basis for you to conclude and make the**
7 **conclusions and render the opinions you did in your**
8 **June 2nd report about what Tulane specifically**
9 **asked Willis to provide, procure coverage for?  Any**
10 **other documents?**
11    A.  Yes.  There were some e-mails from Willis
12 to Chubb saying attached -- the attached reflects
13 the coverage we intended to -- Chubb offer to
14 Tulane and was bound.
15    **Q.  You're on the second step of this equation.**
16 **I'm focussing on the first step which is, What did**
17 **Tulane advise Willis?**
18    A.  Well, like we talked about, the Affidavits
19 and the proposals and the notes on the proposals
20 and the comparison charts is what we had to work
21 with.
22    **Q.  Okay, we'll get to those in the deposition,**
23 **but I just want to make sure that's what you're**
24 **relying upon for that first underlying premise.**
25        **The second premise is that Willis told**

42

1  Chubb what coverage that Tulane wanted, right?
2      A.  Correct.
3      Q.  Okay.  So what are you relying upon to make
4  the -- or render the opinion about what
5  specifically Willis told Chubb?
6      A.  There was e-mails from Willis to Chubb
7  saying the attached reflects the coverage that's
8  supposed to be on the policy.
9      Q.  Anything else?
10     A.  Well, there's the quote which tells --
11     Q.  Again, I'm asking you what Willis advised
12  Chubb; not what Chubb wrote or anything else.  I'm
13  asking you what --
14     A.  So far all we have is the e-mails, but I
15  don't think there's been any depositions taken yet
16  so we'd like to see the depositions.
17         But we've got a lot of e-mails between
18  Willis and Chubb stating that the coverage, you
19  know -- after the loss, it's odd because Chubb
20  sends Quote No. 5 to Willis and says, This is it or
21  something to that effect.  And Willis responds
22  with, No, that's not it.
23         Willis had asked Chubb for the endorsement
24  and repeatedly, repeatedly, and then over a month
25  or a year and two months later, they're still

43

1  talking about it.  And a new regional manager,
2  underwriting manager at Chubb sends a Quote No. 5
3  which up until that point doesn't appear to have
4  even existed, which didn't have any virus coverage
5  on it.  And the Willis broker said, No, that's not
6  it.  So he asked for an endorsement, and he gets a
7  quote that he's never seen before.
8         So, you know, that's what I'm talking about
9  with all this.  There's e-mails.  There's the
10  quotes.  There's the exchange between Chubb and
11  Willis.  There's the Tulane stuff we already talked
12  about, so there's a lot of stuff.  We've got a
13  paper trail here.
14     Q.  Okay, good, we're going to talk about that
15  paper trail.
16         Turning back to your report, in that first
17  paragraph, you talk about universally accepted
18  insurance industry standards, correct?
19     A.  Correct.
20     Q.  And can you explain to me what you mean by
21  "universally accepted insurance industry
22  standards"?
23     A.  Yeah.  So these are the industry standards
24  that insurance professionals are taught when
25  they're being trained in the industry.  And if they

44

1  take continuing ed, they're reflected in a lot of
2  continuing-ed courses.  They're reflected in the
3  textbooks used by the industry to teach
4  professionals.
5      Q.  Okay.  In connection with your report, you
6  have included opinions concerning claim handling,
7  correct?
8      A.  Correct.
9      Q.  Do you consider yourself to be an expert in
10  claim handling?
11     A.  Absolutely.
12     Q.  Do you consider yourself to be an expert in
13  claim handling of claims submitted under a PPL
14  policy?
15     A.  I'm an expert in claim handling which would
16  include all different kinds of policies.  I'm a
17  multiline adjustor.  I've handled all lines of
18  coverage at one time or another during my career.
19     Q.  I appreciate that, but that wasn't my
20  question.
21         My question is, Do you consider --
22     A.  Yes.
23     Q.  Let me ask the question so the record is
24  clear.
25         Do you consider yourself an expert on claim

45

1  handling of claims submitted under a PPL policy?
2      A.  Yes.
3      Q.  Do you consider yourself an expert on the
4  procurement of PPL policies?
5      A.  Yes.
6      Q.  Do you consider yourself an expert on the
7  underwriting of PPL policies?
8      A.  Yes.
9      Q.  Okay.  Kate, can you please scroll down to
10  Paragraph 7 in this June 2nd report, please.
11         Do you see that, Mr. Fey?
12     A.  I do.
13     Q.  And scroll down a little bit more so
14  Mr. Fey can see the rest of the bullet points.
15         Okay.  Now, do those bullet points in
16  Paragraph 7 reflect the universe of documents that
17  you reviewed or are relying upon in connection with
18  your report in this case?
19     A.  In connection with the report, yes.  I
20  received more documents since then.
21     Q.  Well, that's my next question.  Since the
22  preparation of this June 2nd report, have you
23  received any additional documents?  And, if so,
24  what are they?
25     A.  There was some discovery responses.  There

46
1 were the two Affidavits we talked about.  There's
2 five expert reports with their exhibits that Chubb
3 Willis experts Ledy and others.
4      THE COURT REPORTER:
5        I'm sorry, sir, what did you just say?
6      THE WITNESS:
7        Ledy.  L-E-D-Y.  I think that's it off
8      the top of my head.  I'm trying to
9      remember.
10 BY MR. CARRUTHERS:
11      Q.  Okay.
12      A.  Yeah, I think that's about it.
13      Q.  Based on those additional documents you
14 just described, do you intend to change your
15 opinions in any way?  And I'm referring to the
16 opinions contained in your June 2nd report.
17      A.  I'm not going to change my opinions.  If
18 I'm asked to supplement them, I will.
19      Q.  Well, you haven't been asked to supplement,
20 right?
21      A.  Not at this time.
22      Q.  So the additional documents didn't change
23 your opinions at all in any way as reflected in
24 your June 2nd report, correct?
25      A.  Correct.  If anything, it just fortified my

47
1 opinions.
2      Q.  Now, scroll up a little bit, please, Kate.
3        Do you see where it says "WTW" and it has
4 got some numbers, and then below that "Chubb 001";
5 do you see those two entries?
6      A.  Yes.
7      Q.  Is it your understanding that Tulane also
8 produced documents in this case?
9      A.  I don't know what Tulane has produced.  Let
10 me see what I have here.  Hang on.
11      Q.  Well, the reason I ask is "WTW" reflects
12 documents that were produced by Willis in this
13 case, correct?
14      A.  Correct.
15      Q.  And then the Chubb numbers indicate a
16 production by Chubb in this case, right?
17      A.  Correct.
18      Q.  What I don't see is any production by
19 Tulane.  So my question -- that's why I asked the
20 question -- did you review any documents that were
21 produced by Tulane?
22      A.  Well, I have some Tulane documents.  I have
23 the -- the two Affidavits we talked about.  I have
24 the -- I'm trying to remember what they call them
25 exactly.  The proposals, the two proposals with the

48
1 notes on it.  And then, of course, I saw e-mails
2 between Willis and Tulane from the Chubb documents.
3      Q.  Well, why isn't Mr. Hadden's Affidavit
4 referred to as one of the bases for your opinion?
5      A.  Because I just received it yesterday.
6      Q.  I'm talking about Mr. Hadden's -- which I
7 believe is dated March 8, 2022.
8      A.  Yes.  So I just received it yesterday.
9      Q.  Okay, so -- and the same with Ms. Fred's
10 Affidavit, you just got that yesterday?
11      A.  Correct.
12      Q.  Okay.  And these handwritten notes on the
13 proposals, are they referenced somewhere on this
14 list?  Just can you just point out where they're
15 referenced?  I don't see that.
16      A.  Let me see what I called them here.  So I
17 think they should be called proposal notes, and
18 I've not gotten those are proposal notes dated
19 February 12, 2019.
20      Q.  So is your testimony that you received
21 those before this report was prepared?
22      A.  I know I had them, so I'm assuming yes.
23      Q.  Well, you don't know for sure one way or
24 the other?
25      A.  I couldn't tell you when I got them.  I

49
1 remember seeing them so I must have had them.
2      Q.  Based on what you've told me so far, you're
3 relying on those documents for the opinions set
4 forth in this report, right?
5      A.  Right.  So I had proposal notes.  They were
6 one page.  And then over I think -- over the
7 weekend, I received the entire proposals.
8      Q.  What do you mean "the entire proposals"?
9      A.  Well, there's 82 pages in the proposals, so
10 I received John's proposal and Joyce's proposal.
11      Q.  Okay.
12      A.  At least 82 pages long.  What I had was
13 just the one page with the notes on them.  I got
14 that yesterday or over the weekend.
15      Q.  I'm just a little confused.  When you say
16 John and Joyce's proposals, are you -- you mean the
17 Affidavits or Declarations?
18      A.  No, these are copies of their -- the full
19 proposal that each of them had in front of them at
20 the meeting.
21      Q.  Okay.
22      A.  Eighty-two pages each.
23      Q.  So you relied upon those in preparing this
24 report?
25      A.  I relied upon the one page with the notes

50

1  on them in preparing my report.
2      Q.  But I don't -- it's not shown on here,
3  right?
4      A.  Let me see if I can pull up my copy of the
5  report.
6      MS. CURTIS:
7          Tom, if I may.  He cites the Petition,
8      and they're actually quoted in the Petition
9      and I think they're an exhibit to the
10     Petition, as well so -- also he cites
11     the Summary Judgment pleadings which John
12     Hadden's Declaration is part of the Summary
13     Judgment pleadings.
14         So it may not have been specifically
15     listed, but if you read the Petition and
16     you read all the Summary Judgment
17     information, it's all in there.
18     MR. CARRUTHERS:
19         I'm sorry.  Who was just speaking?
20     MS. CURTIS:
21         I'm sorry.  It was Martha Curtis.
22     MR. CARRUTHERS:
23         Okay.  And, Martha, are you saying that
24     the one-page proposal that Mr. Fey is
25     referring to, are you saying that was part

51

1      of the Summary Judgment papers?
2      MS. CURTIS:
3          No, I'm saying it's absolutely quoted
4      and PDF'd inside of the Petition which is
5      in one of his listed documents.  I'm saying
6      John Hadden's Declaration was part of the
7      Summary Judgment documents.
8  BY MR. CARRUTHERS:
9      Q.  Okay.  So, Mr. Fey, you did have
10  Mr. Hadden's Affidavit before you prepared this
11  report, right?
12     A.  Yeah.  If it was part of the Summary
13  Judgment Motion, then yes.
14     Q.  Okay.  Now, focussing on this list of
15  documents, did you discuss any of these documents
16  with Tulane's counsel before you prepared your
17  report?
18     A.  No.
19     Q.  Did you discuss these documents with anyone
20  else before you prepared your report?
21     A.  No.
22     Q.  Before preparing your report, did you ever
23  have any discussions with anyone at Willis?
24     A.  No.
25     Q.  Before you prepared this report, did you

52

1  have any discussions with anyone from Chubb?
2      A.  No.
3      Q.  And before you prepared this report, did
4  you have any discussions with anyone from Tulane?
5      A.  No.
6      Q.  So am I fair to conclude that you're just
7  relying upon the documents, then?
8      A.  Everything I've already talked about, my
9  experience in the industry, industry standards, and
10  documents.
11     Q.  I got that.  I just want to make sure I'm
12  not missing.  You didn't have any oral
13  communications with anyone concerning this case
14  that in any way contributed to or formed the basis
15  for your opinions in the report, right?
16     A.  Correct.
17     Q.  I'm going to turn to your C.V.  Before I
18  do, do you want to take a break?  Are you okay?
19     A.  I'm okay.
20     Q.  Anyone else?  I'm fine to continue.
21         Let's turn to Exhibit A which is your C.V.
22  Are there any changes to this C.V. or the
23  information reflected on this C.V. since you
24  prepared your report?
25     A.  Well, actually, the -- scroll down a little

53

1  bit to my work history.  Well, I'm not sure what
2  date this was, what the date of this C.V. was.
3  There might be some additional cases at the end.
4      But under "BXS Insurance" it's now called
5  Cadence Insurance.
6      Q.  How do you spell that?  C-A --
7      A.  C-A-D-E-N-C-E.
8      Q.  Okay.  So BXS Insurance is now Cadence.
9          Do you still work for them?
10     A.  Yes.
11     Q.  Okay.  Scroll back up a little bit.
12     A.  I'm here today as Fey Consulting.
13     Q.  I'm sorry.  I missed that?
14     A.  I'm here today as Fey Consulting; not as
15  Cadence Insurance.
16     Q.  Okay, okay.  You have a heading below your
17  address up near the top on Page 1, it says
18  "Business."  Can you explain for me what this is
19  intended to convey?
20     A.  What I do as a consultant.
21     Q.  Okay.  So this is work that you've done to
22  date; is that what this is?
23     A.  Well, I mean, I've done a little bit of all
24  that stuff, but that's kind of the areas that I
25  serve as an expert on.

54
1    Q.  Okay.  So which of those entries really
2  have any application to this case?
3    A.  Well, underwriting, claims, multiline,
4  underwriting standards and practices.
5    Q.  Well, that was a bad question.  Let me go
6  through.  So the first one in your view applies
7  here, correct?
8    A.  Sure, correct.
9    Q.  Coverage expert.  You're not testifying as
10  a coverage expert in this case, are you?
11    A.  I am a coverage expert.  If you ask me any
12  questions about it, I would be happy to answer them
13  but...
14    Q.  You're not --
15    A.  I'm not here to declare it as claim
16  coverage for the loss.  I'm here to talk about how
17  policies are put together and what the policies
18  say.  So from that perspective, yes.  But I draw
19  the line at declaring or disclaiming coverage.
20    Q.  So in this case, you're not presenting any
21  opinion about whether there was coverage or not
22  coverage under this policy, correct?
23    A.  Correct.
24    Q.  Let's go to the next sentence.  Multilane
25  claim -- I'm sorry -- Multiline Claim Issues and

55
1  Disputes, are you testifying about anything
2  concerning that in this case?
3    A.  Sure.  The pollution claim.
4    Q.  So you consider the pollution claim to be
5  under that multiline claim, right?
6    A.  Correct.  "Multiline" is all lines.
7    Q.  All right.  Are you testifying about
8  Business Interruption Coverage in this case?
9    A.  I don't think it's been an issue up to this
10  point.
11    Q.  Okay.  Fair Claim Handling Standards and
12  Practices, are you testifying about that?
13    A.  Sure.
14    Q.  Industry Standards, you are testifying
15  about that, correct?
16    A.  Sure.  Underwriting Standards, Business
17  Interruption.  I didn't get into the damages
18  aspects of the claims.  Those are other people to
19  discuss.
20    Q.  And then you talk about defense strategy.
21  You're not talking about that in this case,
22  correct?
23    A.  Correct.
24    Q.  And you're not talking about contractual
25  provisions and CRT analysis, are you?

56
1    A.  Correct.
2    Q.  And you're not testifying about errors-
3  and-omissions issues, are you?
4    A.  Yes, I am.
5    Q.  Okay.  So tell me specifically what
6  opinions you have about -- with respect to errors
7  or omissions in this case?
8    A.  Well, I think we kind of touched on it
9  already.  But to the extent that Chubb, Chubb's
10  endorsement's found to be valid, I think Willis has
11  a problem on their hands regarding the coverage
12  that it procured for Tulane based on their
13  discussions.
14    Q.  And that's dependent on what happens in
15  this case, right?  So you're not rendering an
16  opinion at this point, right?
17    A.  Well, I am rendering.  That's my opinion.
18  What I just stated is my opinion.
19    Q.  And it begins with an "if," right?
20    A.  Well, it's an either/or.
21       So either Chubb issued an endorsement that
22  didn't reflect the intent of the bargain that they
23  quoted, or Willis didn't procure proper insurance
24  coverage.  So it's one or the other.
25    Q.  Isn't there another?  "Or," or Tulane

57
1  didn't request the proper coverage?
2    A.  I think we know what Tulane requested.
3  We've got that document.
4    Q.  You're talking about that one-page sheet,
5  right?
6    A.  And the Affidavits.
7    Q.  Okay.
8    A.  Well, actually, two 82-page proposals at
9  this point.
10    Q.  Okay.  So in your mind there's no
11  discrepancy.  Tulane specifically requested
12  coverage that wasn't provided; is that right?
13    A.  Correct.
14    Q.  Okay, let's scroll down, please.
15  Education, where it says, "2014 Certified Risk
16  Manager," do you still have these certificates?
17    A.  They're not certificates.  They're
18  designations.
19    Q.  Okay.
20    A.  But yes, I have all -- all of them.
21    Q.  Because I see 1985, it says "Certificate in
22  General Insurance."
23    A.  Yeah.
24    Q.  So all these are still in effect, right?
25    A.  Yes.

58

1    Q.  In the paragraph below, "2014, Certified
2  Risk Manager," you talk about countless hours of
3  study; do you see that?
4    A.  Yes.
5    Q.  And did you study PPL policies as part of
6  that education?
7    A.  Tangentially.  I think they're discussed in
8  some of the courses, but my experience with
9  pollution policies are from a claims- and
10 underwriting-experience perspective.
11   Q.  But not --
12   A.  And as an agent.  And as an agent that
13 writes.  I'm a licensed life and health and
14 property casualty producer in the State of
15 Louisiana.
16        And we write -- at one time, we were the
17 largest agency for pollution for AIG.  Back when
18 they were pollution.  They've kind of gotten away
19 from it a little bit.
20   Q.  I appreciate that, but I'm focussing on
21 this one paragraph where you talk about "countless
22 hours of study, ten courses."
23        Did any of those courses relate
24 specifically to PPL policies?
25   A.  Probably not.  But they have to do with the

59

1  industry standards that apply to claim and
2  underwriting.
3    Q.  Okay.  And then turning further down,
4  that's on the top of Page 2, you talk about your
5  CPCU designation; do you see that?
6    A.  Yes.
7    Q.  And did that designation relate
8  specifically in any way to PPL policies?
9    A.  Well, it gets into almost every aspect of
10 the insurance industry, so I -- you know, it's been
11 awhile since I took the courses so I don't recall
12 the exact content of each course.  But, you know,
13 I've been schooled on pollution policies over the
14 years.
15        In fact, I was asked by Travelers at one
16 point to go in to evaluate a company that they had
17 picked up through a transaction that did nothing
18 but sell pollution policies, to evaluate whether or
19 not Travelers should spin it off or keep it.
20   Q.  Continuing down where it says, "...deemed
21 qualified to testify"; do you see that?
22   A.  Yes.
23   Q.  Does that mean there was a specific ruling
24 saying you were qualified to testify?  Or was it
25 that you weren't excluded and there was no ruling

60

1  to that effect?
2    A.  These are cases I testified on the stand.
3  And this isn't a complete list.  This is just -- I
4  started keeping track a couple of years ago, but a
5  lot -- there's a lot of Daubert rulings out there
6  that I'm -- I've never been found unqualified to
7  testify about anything.
8    Q.  But are you saying that in every case you
9  listed there, there was a finding by The Court that
10 you were deemed qualified?
11   A.  Well, either a ruling by The Court that's
12 written or during the trial, when I was put on the
13 stand, I'm qualified by The Court.
14   Q.  Let's continue further down.  Experience,
15 2007 to present, Fey Consulting.  That's your
16 company, right?
17   A.  Correct.
18   Q.  Are you the sole owner?
19   A.  Correct.
20   Q.  Sole employee?
21   A.  Principal, correct.
22   Q.  What do you mean "principal"?
23   A.  I'm the principal on the managing member of
24 the LLC.  I'm the sole managing member.
25   Q.  Do you have any employees?

61

1    A.  No.
2    Q.  Do you have any independent contractors
3  that you use in connection with your work?
4    A.  Yeah, there's a couple but not involved in
5  this case.
6    Q.  Okay.  So in your position, Fey Consulting,
7  can you tell me how many retentions you've had that
8  dealt specifically and exclusively with PPL
9  policies?
10   A.  I couldn't tell you.  I mean, I've had
11 cases involving PPL policies, but I couldn't tell
12 you a number.  Not very much.  It doesn't come up
13 that often.
14   Q.  Well, that's my question.  I mean, how many
15 cases were you retained to render expert opinions
16 on underwriting claim handling and procurement of
17 PPL policies?
18   A.  I couldn't give you a number.
19   Q.  Well --
20   A.  It's been an issue in cases I've handled,
21 but I couldn't tell you.
22   Q.  Has there been a single case where you've
23 been retained to opine exclusively on underwriting,
24 claim handling and/or procurement of PPL policies?
25 I'm not asking whether it's an issue.  I'm asking

62

1 specifically retained for.
2    A.  I don't know.  I can't -- I can't give you
3 an answer on that.
4    **Q.  All right.**
5       THE VIDEOGRAPHER:
6          This is the videographer.  I'm sorry to
7       interrupt.  We have about ten minutes to a
8       media-change break.
9 BY MR. CARRUTHERS:
10    **Q.  Now, from 2007 to the present, you've been**
11 **an employee of -- it was BXS, and you told us it's**
12 **now Cadence?**
13    A.  Correct.
14    **Q.  When did it change?**
15    A.  About two or three weeks ago.
16    **Q.  And are you currently the VP of Risk**
17 **Management?**
18    A.  I am.
19    **Q.  And how long have you served in that**
20 **position?**
21    A.  Since 2007.
22    **Q.  Are you currently certified as a Risk**
23 **Manager?**
24    A.  Yes.
25    **Q.  Is that a full-time position?**

63

1    A.  Yes.
2    **Q.  Do you have any ownership interest in BXS**
3 **or Cadence?**
4    A.  No.
5    **Q.  Do you receive a salary from Cadence?**
6    A.  I do.
7    **Q.  Should I refer to it as Cadence or BSX now?**
8 **Just Cadence?**
9    A.  Cadence.  That's the name at this point
10 so...
11    **Q.  Is Cadence aware that you do expert work on**
12 **the side?**
13    A.  Sure.  It's part of the deal when I hired
14 on in 2007.
15    **Q.  Okay.  Do you have to get their permission**
16 **to take on a retention in a particular case?**
17    A.  No.
18    **Q.  Do you have to notify them at all?**
19    A.  No.
20    **Q.  So Cadence isn't aware of the specifics of**
21 **the particular retention you take, are they?**
22    A.  No.
23    **Q.  Is it industry standard for Vice-Presidents**
24 **of Risk Management to take on expert work and**
25 **testify against insurance companies?**

64

1    A.  Is it industry standard?  Am I allowed to
2 opine on industry standards on behalf of and on
3 both insureds and insurers?  Yes.
4    **Q.  Well, that really wasn't my question.  My**
5 **question was having to do with the industry**
6 **standard.  In other words, you talk a lot about**
7 **industry standards and what's typical in the**
8 **industry.**
9       **Is it typical in the industry for**
10 **Vice-Presidents of Risk Management of a particular**
11 **company to testify about and against insurance**
12 **companies?**
13    A.  I don't think it has anything to do with
14 industry standards.  But if you're acting as an
15 expert, you need to be fair and unbiased, so that
16 includes being an expert for and against insurance
17 companies.  And my work is about 50-50.
18    **Q.  Do you consider it to be a good business**
19 **practice?**
20    A.  Sure.
21    **Q.  Does Cadence do any work with Willis?**
22    A.  Very limited because they're both brokers.
23    **Q.  Does Cadence do any work with Chubb?**
24    A.  I'm sure they do.
25    **Q.  Well, do you know?  Not whether you're sure**

65

1 or not; do you know?
2    A.  No.  I mean, we're a multibillion dollar
3 insurance agency.  We have policies with almost
4 every carrier out there.
5    **Q.  Do you have PPL policies with Chubb?**
6    A.  I don't know if we have any PPL policies
7 with Chubb or not.
8    **Q.  Do you see any conflict of interest in your**
9 **work for Cadence and you testifying as an expert**
10 **against insurance companies or brokers?**
11    A.  No.
12    **Q.  Continuing in your work experience, you**
13 **have 1996 to 2000, Lumber Mutual Company.  Did any**
14 **of that work involve PPL policies?**
15    A.  Yeah.  We wrote pollution as part of our --
16 we were a direct writer.
17    **Q.  I'm talking specifically about PPL**
18 **policies.**
19    A.  Correct.
20    **Q.  Okay.  How about your work for Ohio**
21 **Casualty, did that involve PPL policies?**
22    A.  It was so long ago I'm having trouble to
23 remember.  I know I did have some pollution claims
24 back then, but I can't remember the specifics.
25       I remember one had to do with a gas

66

1 station. I was able to find a university that was
2 producing like a germ that would be injected into
3 the ground to clean up oil spills. That's the only
4 one I remember, but I do know we had them. I just
5 don't remember the specifics.
6      Q. Okay, turning to Page 6 of your C.V., it
7 says, "Seminars Given on Insurance Coverage and
8 Related Issues," and you list a number of seminars
9 that you've given.
10      Can you point me to the ones that deal
11 specifically with underwriting, claim handling, and
12 procurement of PPL policies?
13      A. Well, it wouldn't be anything that
14 specific. Claim handling and underwriting
15 standards apply across the board regardless of the
16 line of coverage.
17      And then same thing with errors and
18 omissions. Insurance agents are held to the same
19 standards regardless of the line of coverage.
20      Q. But your report doesn't contain any
21 opinions about errors and omissions, does it?
22      A. I think it's mentioned in there. I mean,
23 we've talked about it a couple of times already.
24 But it depends on what the finding is with regard
25 to Chubb's issuance of that endorsement.

67

1      Q. Okay. So going back to the seminars, I'm
2 talking about PPL policies specifically, have you
3 given any seminars specifically on PPL policies?
4      A. No.
5      Q. Turning to articles, on Page 7, you list a
6 few articles. Have you ever written any articles
7 on PPL policies?
8      A. No.
9      Q. "Continuing Education," you list two pages
10 of Continuing Education. Have you taken any
11 courses specifically and exclusively dealing with
12 PPL coverage?
13      A. I have taken some Ruble seminars that -- I
14 try to look for Ruble graduate seminars that are
15 kind of out of the mainstream. So they talk about
16 pollution coverage and E&O, those types of
17 coverages that aren't part of the ones you deal
18 with every, single day. So yes, I've been -- I've
19 taken seminars on pollution coverage.
20      Q. But when is the last time you took one of
21 those courses?
22      A. I take one every year.
23      Q. Well, I'm talking specifically about PPL
24 policies.
25      A. I couldn't say exactly.

68

1      Q. Past two years?
2      A. I don't know. Not the past two years; I
3 will say that.
4      Q. Past five years?
5      A. I don't know.
6      Q. Past ten years?
7      A. I don't know.
8      Q. Okay. Continuing to Page 10, "Expert
9 Testimony in the Last Four Years." You've
10 identified, by my count, at least 46 different
11 times where you've presented either deposition
12 and/or trial testimony.
13      Does that seem about right?
14      A. How many did you come up with?
15      Q. I came up with 46. I mean, I'll withdraw
16 the number. It's on 10 and 11.
17      A. Well, I'll take your word for it. I don't
18 keep track of the numbers. But, I mean, the list
19 is what it is.
20      Q. Okay.
21      A. The top case can be deleted now because we
22 just settled.
23      Q. Okay. I don't want to waste a lot of time
24 going through these other cases. There's a lot of
25 them, but can you -- let's just focus on the ones

69

1 where you specifically testified about claim
2 handling under a PPL policy, just focus on those
3 cases.
4      A. Well, you'll have to scroll down -- and
5 keep in mind, this is just testimony. This is not
6 all the cases I worked on, and this is just the
7 last four years.
8      Well, hang on. Go back up. Stop it there.
9 Let's see. Okay, you can go down a little bit,
10 down at the top of the page and let me read that.
11      Okay, you can scroll down. Keep going
12 down. Okay, you can go down. Keep going down.
13 Stop right there. Let's see. Keep going down.
14 Keep on going. Keep on going. Keep on going.
15 Okay, keep on going. Keep on going. There's none
16 on the list.
17      Q. Maybe this is a good time for the
18 videographer to take that break. How long do you
19 want to take?
20      THE VIDEOGRAPHER:
21      Is it okay if I just get us off the
22 record?
23      MR. CARRUTHERS:
24      I'm sorry.
25      THE VIDEOGRAPHER:

70

1          Thank you. The time is 11:31.
2          We're going off the record. This ends
3   media file 1.
4          (Brief recess was taken.)
5          The time is 11:43 and we're back on the
6   record. This begins media file 2.
7   BY MR. CARRUTHERS:
8     Q. Mr. Fey, just a couple of follow-up
9   questions on your expert testimony that's listed in
10  your C.V.
11         A lot of those cases you say plaintiff's
12  expert on bad faith. You're not testifying in this
13  case on bad faith, are you?
14    A. No, I testify on industry standards. I use
15  "bad faith" because that's what people search for
16  when they're looking for an expert.
17         I will add, though, I thought about a
18  pollution case I was reminded of on the break. I
19  set to -- I was set to be an expert on a case very
20  similar to this one where the policy hasn't been
21  produced.
22    Q. What's the name of the case? I'm sorry.
23    A. Settoon Towing versus St. Paul Insurance
24  and State National.
25    Q. Is that on your list?

71

1     A. No, it was back -- well, it's a 5th Circuit
2   opinion in June 18, 2013. So it would have been
3   before that, so I didn't remember it right off the
4   top of my head.
5     Q. And how did you --
6     A. I've been involved in various pollution
7   claims over the years.
8          Settoon was actually the largest oil spill
9   in Louisiana history until the BP spill.
10    Q. And what jogged your memory about that?
11  Did somebody tell you anything?
12    A. Martha reminded me of it.
13    Q. Okay. Let's go to Exhibit B to your
14  June 2nd report.
15    A. Okay.
16    Q. Can you tell me briefly what this exhibit
17  is intended to convey?
18    A. Yes. So when I get deposed on cases,
19  generally they go to, Where can I find the industry
20  standards that you talk about?
21         And rather than trying to regurgitate
22  everything every time, I developed this as an
23  exhibit to my reports. When I'm talking about
24  claim handling -- and it's Exhibit B -- or Exhibit
25  C I guess -- on this case is on agency standards.

72

1          So I attach them to kind of make the report
2   shorter and to answer that question about, Where
3   can I find these industry standards? And I have a
4   lot of quotes from different textbooks in here,
5   footnotes.
6     Q. So you prepared this document; is that
7   correct?
8     A. Correct.
9     Q. When did you prepare it?
10    A. It's kind of a -- it's kind of been an
11  evolving document probably for the last couple of
12  years.
13    Q. Okay.
14    A. I don't remember when I initially started
15  it, but my opinions were getting kind of long so I
16  thought I wanted to cut this whole section out,
17  just put it in as its own document and that way I
18  don't have to try to redo it every time I do a
19  report.
20    Q. So this exhibit is not unique to this case,
21  correct?
22    A. Correct.
23    Q. You attach it to your reports in various
24  cases, correct?
25    A. Correct. In answer to the question of:

73

1   Where can I find these industry standards?
2          And if I talk about one of the standards
3   that's referenced in this document, generally I'll
4   try to footnote it to refer to Exhibit B or C or
5   whatever the case might be.
6     Q. So this exhibit, Paragraph 1, second line,
7   it says, "...developed by the industry over many
8   years that apply to claim handling"; do you see
9   that?
10    A. Yes.
11    Q. The industry standards that you've attached
12  as Exhibit B don't apply to underwriting, correct?
13    A. Well, there might be some issues that apply
14  to underwriting. But, generally speaking, this is
15  geared towards claim handling.
16    Q. And it's not geared toward procurement of
17  policies, right?
18    A. No, that would be Exhibit C.
19    Q. Turning to Page 2, Paragraph 5, you say,
20  "Where I comment on coverage, I do so only to
21  discuss the industry intent behind coverage forms";
22  do you see that?
23    A. Correct.
24    Q. So, again, you're not presenting any
25  opinions and don't plan to present opinions in this

74

1  case about coverage, correct?  Whether there is --
2     A.  Whether it's covered or not covered,
3  correct.
4     Q.  But you say you are planning to discuss
5  industry intent.  What do you mean by that?
6     A.  Well, that really doesn't apply here.
7  There's some forms that -- like the ISIC standard
8  forms for various lines of coverage, there's a lot
9  of history and detail behind them.  When you're
10  dealing with pollution coverage, they're kind of
11  carrier-specific forms.
12        So that particular reference is to industry
13  standard forms; not this particular case.
14     Q.  Okay.  And then continuing down in
15  Paragraph 6, you quote some language out of a book
16  by James Markham; do you see that?
17     A.  Correct.
18     Q.  And then further down you make reference to
19  Page 13.  And you say, "The primary duty of the
20  claim representative is to deliver the promise to
21  pay."  Do you see that?
22     A.  Correct.
23     Q.  And you're not saying there -- oh, I guess
24  it's Mr. Markham's language -- but you're not of
25  the opinion that in every case the insurer should

75

1  pay; is that right?
2     A.  No.  But when an adjustor evaluates
3  coverage, they should approach it in a way to try
4  to find coverage; not in a way to try to find
5  exclusion or limitation to exclude coverage.
6     Q.  So there's a difference between a promise
7  to pay and whether there's actually coverage under
8  the particular policy, correct?
9     A.  Well, I mean, the promise to pay would be
10  the coverage under that particular form.  So now
11  whether or not a law is to cover it or not, that's
12  a different issue.
13     Q.  Well, that I guess is a poorly worded
14  question then.  But I'm trying to figure out, in
15  your mind, there's a difference between language
16  that says a promise to pay and actual coverage in a
17  particular case, right?
18     A.  Well, a promise to pay is the insurance
19  policy.  So whatever the policy says, that's the
20  promise.
21        So now I'm not saying every claim is
22  covered.  I'm just saying that policies are a
23  promise to pay and, therefore, when adjustors
24  evaluate coverage, you need to approach that
25  evaluation with an eye trying to find coverage and

76

1  not trying to find coverage controversy.
2     Q.  It's a promise to pay subject to other
3  terms and conditions of the policy, correct?
4     A.  Subject to all terms and conditions of the
5  policy, correct.
6     Q.  Okay.  And further down you talk, you refer
7  to Page 29 in Markham's book, you talk about an
8  investigation, an investigation must often be
9  undertaken.
10        So are you saying here you're relying upon
11  this that -- are you saying that an investigation
12  has to be undertaken every case?  Or you say -- or
13  you say --
14     A.  Correct, you have to do an investigation --
15     Q.  Let me just finish so that the record is
16  clear.
17     A.  Sure.
18     Q.  Are you saying that an investigation must
19  be undertaken in every case?
20     A.  Some investigation, correct.
21     Q.  Okay.  And continuing on in that same
22  quote, "...good-faith-claim practices require that
23  this investigation be objective, thorough, and
24  timely."
25        What is your understanding of what Markham

77

1  meant by "objective"?
2     A.  Well, you approach every claim with a clean
3  slate.  You don't go in with any preconceived
4  notions.  So the adjustor is not supposed to
5  approach a claim with a preconceived opinion that
6  he's going to deny coverage -- which seems to be
7  what happened in this case.  The adjustor denied
8  the claim even before he had the entire policy.
9  And before he did any investigation other than
10  looking at the policy he was provided that didn't
11  have any endorsement on it.
12     Q.  Well, what do you know about what Chubb did
13  or didn't do with respect to its investigation?
14  You didn't have any discussions with Chubb.  You
15  didn't see any documents describing what they did.
16     A.  So here's the way it works.  An adjustor is
17  supposed to keep file notes of anything significant
18  that happens in the life of a claim so when you
19  review a claim file, you can reconstruct the claim
20  activity.
21        In this case, you've got a multimillion-
22  dollar loss with two pages of file notes.  It's
23  actually four pages, but two of them are almost
24  completely blank.
25     Q.  Well, doesn't it depend on the facts and

78

1 circumstances of each case and the particular
2 policy at issue?
3   A. It does. Absolutely.
4   Q. Some investigations will be more thorough
5 and lengthy than others, right?
6   A. Yes. So I go into this in my report,
7 binder procedure, when you've got a case where the
8 policy hasn't been issued -- or in this case where
9 an endorsement wasn't issued prior to the loss --
10 you have to do what's called binder procedure.
11       And that is you go and you interview the
12 underwriting. You interview the agent, and you
13 interview the insured, and you find out what the --
14 what was sold to the insured and what was contained
15 on the quote in the binder, and then you try to
16 make a call based on that.
17       So if a policy is issued -- in the industry
18 if the policy is not issued before the loss, you
19 know, you kind of have to look at the quote to see
20 what promise was made to the insured. A lot of
21 times it's fairly easy because it will be GL
22 coverage or property coverage or what have you, and
23 it will be outlined pretty clearly.
24       But in this case, you can only go by what
25 was on the quote. And the quote didn't have

79

1 anything about human -- transmittable from human to
2 human in any of the language on the quote, in the
3 form manuscript endorsement and the original.
4   Q. Well, that's your opinion and that's your
5 assumption and we'll get to that.
6       But as far as investigations are concerned,
7 each case is different, right?
8   A. That's correct. That's what I just said.
9   Q. Okay. And Markham says here it's got to be
10 timely, right?
11   A. Correct.
12   Q. What is your understanding of what he meant
13 by "timely"?
14   A. Well, you know, you've got a rule of thumb
15 is when you do your initial investigation, you
16 should have a pretty good idea of what the case is
17 about in 14 days to do a preliminary report.
18       And then by 30 days, you should have pretty
19 much your -- the bulk of your investigation
20 completed depending on the facts and circumstances.
21 But then you do a more formal report. And you
22 would list what steps you still need to investigate
23 or what the issues are and what your path forward
24 to and then your resolution strategy.
25       And you don't see any of that in the Chubb

80

1 file. This was pretty much a knee-jerk denial
2 without any investigation at all.
3   Q. And you're basing that solely on what you
4 saw in the claim file, right?
5   A. Well, there's a saying in the industry. If
6 it's not noted in the claim file, then it didn't
7 happen.
8   Q. I want understand to what your opinion is
9 based on.
10   A. All the documents I reviewed.
11   Q. With respect to the investigation conducted
12 by Chubb, you're basing your opinion solely on what
13 was in the claim file or not in the claim file,
14 right?
15   A. Correct.
16   Q. You didn't have any discussions with Chubb
17 about the investigation, did you?
18   A. No, but that's what I'm saying. If it
19 doesn't appear in your notes, the industry saying
20 is, If it's not in your notes, it never happened.
21   Q. So you're saying --
22   A. There should be some documentation.
23 Especially when you're dealing with a multimillion-
24 dollar claim, you'd better document your file and
25 your investigation.

81

1   Q. So what you're saying here is that, based
2 on your review of the claim file, you're assuming
3 that the investigation was not made in compliance
4 with industry standards; is that what you're
5 saying?
6   A. That's what I'm saying.
7   Q. And you based it solely on the lack of
8 documentation, correct?
9   A. I based it on the totality of all the
10 documents that I reviewed, my experience in the
11 industry, and the industry standards.
12   Q. Nothing else, right?
13   A. Yeah, correct.
14   Q. Continuing on to Page 6, Paragraph 13, you
15 talk about National Insurance -- I'm sorry --
16 National Insurance Industry Standards. And then
17 you say, "I used these standards to evaluate the
18 handling of claims." Do you see that?
19   A. Yes.
20   Q. Isn't it true that the language of the
21 policy controls and not industry standards in every
22 case?
23   A. Now you're talking about coverage versus
24 industry standards. Totally different. Totally
25 different.

82

1    Q. Well, you say you evaluate the handling of
2  claims. As part of that evaluation, you look at
3  the policy, don't you?
4    A. Sure.
5    Q. And the language of the policy controls,
6  correct?
7    A. Controls coverage.
8    Q. Right.
9    A. Correct.
10   Q. So as far as handling of the claim, you say
11  there are considerations of insured's obligations.
12       Insureds and insurers both have
13  obligations, correct?
14   A. Correct.
15   Q. And you're opining in this case as to what
16  Chubb's obligations were; is that what you're
17  saying in your report?
18   A. What I'm saying is I evaluated the claim
19  handling, and I felt that Chubb's claim handling
20  was deficient and that it was -- deviated from the
21  industry standards.
22   Q. Well, here you're talking about, in
23  Paragraph 13, obligations. That's a legal issue,
24  isn't it?
25   A. No.

83

1    Q. So you don't consider obligations under the
2  policy to be a legal issue; is that right?
3    A. No, you have -- I mean, as an insurance
4  adjustor, you have -- I mean, it's an insurance
5  company. You have certain obligations to your
6  insured that have nothing to do with contract or
7  legal issues.
8       And you guys are free to talk about all the
9  legalities and case law and statutes all you want.
10  I'm talking about insurance industry standards and
11  practices and how adjustors are supposed to
12  approach claims and investigate claims.
13   Q. But that has nothing to do with the
14  particular obligations under the policy, does it?
15   A. Well, obviously you have to comply with the
16  terms of the policy.
17   Q. Both the insured and the insurer, correct?
18   A. Sure.
19   Q. The insured has obligations, correct, such
20  as reviewing the policy? That's an obligation,
21  isn't it?
22   A. Yeah. Let me say this. Once a claim is
23  denied, the insured becomes a free agent. So you
24  can't hold the insured to the terms of the policy
25  if you're saying there's no coverage under the

84

1  policy.
2    Q. Well, let's --
3    A. So that's kind of a known thing in the
4  industry. If you deny a claim, you'd better be
5  right. You'd better get it right the first time.
6    Q. Well, let's talk about the pre-denial
7  period. What obligations does the insured have
8  prior to issuance of the policy and upon issuance
9  of the policy?
10   A. Well, you have a duty to read the policy as
11  an insured. And what happened here was the policy
12  was issued and it was missing an endorsement.
13       And some broker with Chubb said, Delete
14  these two endorsements and give us the this, the
15  pollution, the coverage endorsement. And that's
16  0000. And so that didn't happen for over a year
17  until after the claim was submitted.
18   Q. I move to strike the last portion.
19       I asked you a simple question. And the
20  simple question was, What are the insured's
21  obligations before issuance of the policy and upon
22  issuance of the policy?
23   A. Well, I don't think they have any
24  obligations before issuance of the policy other
25  than to be honest and forthright with the

85

1  information provided that the underwriting is based
2  upon. But after issuance, they would have to
3  comply with the terms of the policy.
4    Q. They also have to read the policy, right?
5    A. Correct, I said that. That's the first
6  thing I said.
7    Q. And don't you think it's industry standard
8  that the insured has an obligation to understand
9  the policy?
10   A. Yeah. If the policy is complete and
11  they're given an opportunity to read it.
12   Q. So that was a yes?
13   A. Yeah, that's a yes.
14       That's the problem with this case; they
15  didn't have the entire policy.
16   Q. Are you done? I didn't ask a question.
17   A. I'm done.
18   Q. Continuing on under Paragraph 14, you talk
19  about Reservation of Rights letters and Denial
20  letters; do you see that?
21   A. Yes. Well, I don't see it. Yeah, there
22  you go. Got you.
23   Q. There's no Reservation of Rights letter
24  issued in this case? Yes or no?
25   A. No, they went straight for the denial.

86

1    Q.  Continuing on, Paragraph 16, you talk about
2  burden of proof.  So the insured has an obligation
3  and has the burden of proof of submitting a claim
4  substantiating the claim, correct?
5    A.  Correct.
6    Q.  Let's move to Page 11, please.  At the
7  bottom, you talk about Claims Operations Practical
8  Guide.  You talk about -- you say down where you
9  have highlighted and bolded, "As soon as the
10  adjustor is in a position to formulate a coverage
11  opinion," and then you go on, "this should be no
12  longer than 30 days from the initial claim report
13  date."  Do you see that?
14    A.  Correct.
15    Q.  So you're saying a Reservation of Rights
16  letter should be issued within 30 days after the
17  claim was submitted, correct?
18    A.  Well, this is a quote from the Claims
19  Operation Practical Guide.  It's a book.
20    Q.  Well, you're relying upon it, aren't you?
21    A.  I'm talking about this is what the industry
22  standards are for Reservation of Rights letters
23  which doesn't apply in this case.
24    Q.  Okay, so let's go on to Page 13 where it
25  says "Denials."

87

1    A.  Okay.
2    Q.  In your view, is there an industry standard
3  as to when timing-wise, when a Denial letter should
4  be issued if applicable?
5    A.  Yeah, only after a thorough and prompt
6  investigation with all facts being developed and
7  the carrier is certain of their position should
8  they issue a denial.  And that needs to be thorough
9  and complete and lists all the bases for denial.
10  And it shouldn't include provisions that are not
11  even applicable to the claim.
12    Q.  My question was, Is there an industry
13  standard about the timing, when the Denial letter
14  should be issued if applicable?
15    A.  I just laid it out, right?
16    Q.  Excuse me?
17    A.  Well, I just said after a prompt and
18  thorough investigation.
19    Q.  So there's no time limit?  It could be a
20  week?  It could be a month?  It could be two
21  months?  You're saying there's no specific time
22  period, correct?
23    A.  Well, not -- it depends on the claim and
24  what should be investigated for that particular
25  claim.

88

1    Q.  Let's turn to Exhibit C in your June 2nd
2  report, please.  And this is a standard, nonunique
3  exhibit that you include in your reports, correct?
4    A.  Correct.  Well, any claim involving agency
5  issues and terminations.
6    Q.  In this case, you're not claiming that
7  Willis was an agent for Chubb in connection with
8  the procurement of the policy, are you?
9    A.  You're talking about legal agency?
10    Q.  "Agency" as you use it here in Industry
11  Standards.
12    A.  Okay, when I talk about an agent, insurance
13  agent, it's different than the legal standard of
14  agency, and I just want to make that clear upfront.
15    But Willis was acting as a wholesale
16  surplus-lines broker in this case who the industry
17  considers working on behalf of the insurance
18  company if they -- especially if they have power to
19  bind coverage on the insurance company's behalf.
20  And it was also working as the insurance agent for
21  Tulane.  So it had a dual obligation here.
22    Q.  And that's --
23    A.  When you're dealing with wholesale and
24  surplus-lines insurance, there's an extra company
25  involved there which is the wholesaler and surplus-

89

1  lines broker.  Willis has their own wholesale and
2  surplus-lines brokerage, so it was all under the
3  Willis umbrella.
4    Q.  You're not rendering a legal opinion about
5  the relationship between Willis and Tulane, are
6  you?
7    A.  No, and I think -- I think they've asked
8  for the contract in discovery, and they haven't
9  received it yet.
10    Q.  Let's turn to your report, and particularly
11  let's refer to Paragraph 10 of your report.  And in
12  here you're saying you're not giving any opinion
13  about coverage or no coverage, correct?
14    A.  Correct.
15    Q.  And in this Paragraph 10, you bolded and
16  underlined certain language.  Do you see that?
17    A.  I do.
18    Q.  Why did you do that?
19    A.  It added emphasis to it.
20    Q.  There was a concern on your part that you
21  might be giving coverage opinions in this case?
22  Why did you have to bold and highlight it?
23    A.  To make it clear that I'm not.  Because I
24  get challenged on rendering legal conclusions from
25  time to time, and so I'm trying to make it clear in

90

1 every opinion that I'm not doing that; that I'm
2 talking about highlight coverage issues, but I'm
3 not going to make a determination of whether or not
4 there's coverage or not coverage.
5     Q. Okay. In the second sentence, you say,
6 "Where I discuss particular policy provisions or
7 the intent behind coverage forms or exclusions, I
8 do so from an insurance industry perspective."
9 Do you see that?
10    A. Yes.
11    Q. In this case, you're not testifying about
12 the intent of any of the policy provisions, are
13 you?
14    A. Well, I highlight some language I think,
15 but I'm not -- I'm not discussing intent behind the
16 language.
17    Q. Let's move to your opinions.
18        And, Kate, at this point could you please
19 mark as Exhibit #4 -- I guess you can do it as
20 Exhibit #4 or #3A -- it's a version of your
21 "Opinion" section of your June 2nd report that our
22 firm has numbered the bullet points. You have, by
23 our count, 26 different bullet points. And I
24 thought it would be easier if we could refer to the
25 bullet points by number rather than reading the

91

1 language in every bullet point.
2        So is that okay with you if we refer to
3 that? That's the only thing we added was the
4 numbers.
5     A. Yeah, sure. I actually started numbering
6 or lettering them.
7        (Whereupon, the document was duly marked
8        for identification as "Exhibit #4" and
9        attached hereto.)
10        Let's turn to Page 6, please. Okay, you
11 see under "Opinion," you have these bullet points.
12 The numbers to the left of the bullet points I'll
13 represent to you were inserted by our firm just for
14 ease of use at the deposition. So let's start with
15 opinion one.
16        That's not really an opinion, right?
17    A. Well, it's a fact I think but, you know,
18 I'm trying to build up to where I'm trying to go so
19 it's a starting point.
20    Q. All right. And Paragraph 2 -- or number
21 two -- you say, "Willis acted as Tulane's insurance
22 agent."
23        That's correct, right, in your view?
24    A. Correct.
25    Q. Okay. Paragraph 3 you say, "Willis likely

92

1 operates under an Agency Agreement with Chubb."
2        That's speculation, right?
3    A. No. I mean, generally --
4    Q. You know --
5    A. -- in the insurance industry, there's
6 Agency Agreements between all surplus-line brokers
7 and the carriers they represent, so it's an
8 informed opinion. And my understanding is they've
9 asked for the Agency Agreement but it hasn't been
10 produced yet.
11    Q. As you sit here today, can you testify
12 under oath that there's an Agency Agreement between
13 Willis and Chubb?
14    A. I can testify that it's more probable than
15 not that there's an Agency Agreement between Willis
16 and Chubb.
17    Q. I didn't ask you that question. It's yes
18 or no. Do you know, in fact, whether there's an
19 Agency Agreement?
20    A. I'm not going to answer yes or no. I'm
21 going to say that it's more probable than not that
22 there's an Agency Agreement between Willis and
23 Chubb.
24    Q. Well --
25    A. That's my opinion.

93

1    Q. Okay. It's your speculation is what it is,
2 but okay.
3    A. No, it's more probable than not.
4    Q. Have you seen the agreement?
5    A. No. Because you guys haven't produced it
6 yet.
7    Q. Okay, so you haven't seen it. And you're
8 giving opinions on speculation, so let's --
9    A. No, I'm not.
10    Q. Let's turn to the next paragraph. You say
11 Chubb's final quote, this is number four, when you
12 say "final quote," what quote number are you
13 referring to?
14    A. Quote -- it should be Quote No. 4.
15    Q. Okay. You say, "...documents the coverage
16 accepted by Tulane and bound by Chubb."
17        I want to focus on that first part where
18 you say, "...documents the coverage accepted by
19 Tulane..." Okay? "...and bound by Chubb."
20        What exactly were the terms and conditions
21 that were accepted by Tulane and bound by Chubb?
22    A. Well, as it relates to this case, they
23 bought Virus Coverage subject to a $10 million
24 sublimit.
25    Q. And what were the other terms and

94

1 conditions?  You say "...the coverage accepted by
2 Tulane..."  What were the terms and conditions of
3 that coverage?
4    A.  Well, based on the quote, they have
5 coverage for virus.
6    Q.  Kate, can you please mark as Exhibit #5
7 Quotation No. 4, please.
8       (Whereupon, the document was duly marked
9       for identification as "Exhibit #5" and
10      attached hereto.)
11   A.  And I will say that there's e-mails from
12 Willis to Chubb saying that this is -- this
13 reflects the coverage we sold to them.
14   Q.  Okay.  Mr. Fey, I direct your attention to
15 what has been marked as Exhibit #5.  This is
16 Quotation No. 4.  This is the final quote that
17 you're referring to in your opinion?
18   A.  Correct.
19   Q.  Let's go through the quote.  You said that
20 this was the coverage accepted by Tulane.  And you
21 said there was what you said is virus coverage.
22 Let's go through this quotation.
23      Looking at the first page of the coverage
24 quotation, what terms and conditions about the
25 virus coverage, as you termed it, do you see on

95

1 Page 1?
2    A.  Other than the policy inception and
3 expiration dates, it doesn't address virus
4 coverage.  It does on Page 5, I believe.
5    Q.  Let's go to the list of endorsements on
6 Page 5, then, MS-0000.
7    A.  Correct.  Number 30?
8    Q.  Correct.  Do you see that?
9    A.  I do.
10   Q.  What exactly were the terms and conditions
11 of the coverage that you believe Tulane accepted
12 based on this quotation?
13   A.  That they were providing coverage for
14 bacteria and virus subject to sublimits of
15 $10 million with a retroactive date of 2/27/19.
16   Q.  What were the terms and conditions of the
17 Indoor Environmental Conditions Amendatory Bacteria
18 and Virus Endorsement?  Did your client --
19   A.  They don't have an endorsement.  It wasn't
20 issued until after the loss.
21   Q.  So when you wrote this Paragraph 4 in your
22 report, you refer to "coverage accepted."  And are
23 you basing your opinion on coverage accepted on
24 this notation after No. 30?
25   A.  I'm basing it on the totality of everything

96

1 I reviewed, including the handwritten notes on the
2 proposals.  And the Affidavits now.
3    Q.  And my question to you, sir, is what were
4 the exact terms and conditions that you believe was
5 accepted by Tulane?
6    A.  They were given $10 million worth of Indoor
7 Environmental Coverage.  And the only limitation
8 was -- I can't remember the wording -- but required
9 reporting to a government entity.
10   Q.  Are those the only terms, conditions,
11 provisions of the coverage that you're aware of?
12   A.  Those are the only ones that were available
13 prior to the loss.
14   Q.  So you're basing your opinion about virus
15 coverage on this No. 30, correct?
16   A.  Well, correct, because that's what's
17 displayed on the Declarations page.
18   Q.  Okay.  Now let's turn to Page 7 of the
19 policy -- the quotation.  It's after the first
20 seven pages, it starts again with a "1" and let's
21 turn to Page 7.  It's where the definition of
22 Indoor Environmental Condition is.
23      Keep going.  Keep going.  Keep going.
24 Okay, right here.  Do you see the definition Z?
25   A.  Correct.

97

1    Q.  Do you see any reference to "virus" there?
2    A.  No.
3    Q.  Okay.  Go back to Page 6, please,
4 definitions U and V.
5       Do you see where it says "First-Party Claim
6 and First-Party Remediation Costs"?
7    A.  I do.
8    Q.  Do you see any reference to "virus" there?
9    A.  No.
10   Q.  Let's turn to page -- definition NN,
11 "Remediation Costs."  Do you see that?
12   A.  Yes.
13   Q.  Do you see any reference to "virus" there?
14   A.  No.  Indoor Environmental Conditions are
15 referenced.
16   Q.  Right.  So your opinion in Paragraph 4 of
17 your report -- "paragraph" meaning the numbered
18 bullet points -- is based, at least in this quote,
19 based only on that reference to Endorsement 30,
20 correct?
21   MS. CURTIS.
22       I'm just going to object, Tom, because
23 I think by reading 4 separate from 5, it's
24 misleading.
25   MR. CARRUTHERS:

98
1      Okay, he can respond.
2      THE WITNESS:
3         The quote was conveyed to them, and
4      Tulane accepted the quote.
5 BY MR. CARRUTHERS:
6      Q.  Okay.  So let's turn to the last -- next to
7 the last line in bullet point four.  You say it was
8 Chubb's underwriting intent to provide coverage for
9 IEC.  Can we refer to the IEC --
10     A.  That's fine.
11     Q.  Okay.  And what exactly was the
12 underwriting intent in your opinion?
13     A.  To give coverage for bacteria and virus and
14 include that under the definition of IEC.
15     Q.  Okay.  But those are the only terms and
16 conditions you're aware of at that point, correct?
17     A.  Correct.
18     Q.  Now, in your bullet point five, you say the
19 final quote -- again, referring to quote four --
20 reflects that Chubb agreed to expand coverage.  Do
21 you see that?
22     A.  Correct.
23     Q.  What's the basis for your statement that
24 they agreed to expand the coverage?
25     A.  Bullet 30 on the quote.  And on the dec

99
1 page, the form MS-0000.
2      Q.  Okay.  And when you say "expand coverage,"
3 that implies that there was existing coverage,
4 right?
5      A.  Correct.
6      Q.  What existing coverage?
7      A.  There's -- I don't know that "existing
8 coverage" is the right word.  But there's base
9 coverage.
10     Q.  What was --
11     A.  That's how I would put it.  That's what I
12 would say.  Once the policy goes into effect.
13     Q.  What was the base coverage that was, in
14 your view, provided that this expanded in this
15 opinion number five?
16     A.  I think environmental, Indoor Environmental
17 Conditions as defined without the virus and
18 bacteria included in the definition.
19     Q.  So it's your opinion that there was some
20 sort of base or existing coverage, and that Chubb
21 agreed to expand it; is that right?
22     A.  It wasn't existing.  It's like every
23 policy.  You build upon it.  You have a main
24 coverage form, and then you can add or subtract
25 coverage based on endorsements that are added to

100
1 the policy.
2      So there was a manuscript endorsement that
3 was supposed to be added to the policy that added
4 coverage for virus and bacteria subject to a
5 $10 million limit.  And it put that coverage under
6 Indoor Environmental Conditions.
7      Q.  Now, when you say "agreed to expand," what
8 was the expansion that you're referring to?
9      A.  That Indoor Environmental Conditions
10 included bacteria and virus.
11     Q.  Any other terms and conditions --
12     A.  So when you read the policy and you read --
13 anytime you read "Indoor Environmental Conditions,"
14 you have to include virus and bacteria in that
15 reading.
16     Q.  What terms and conditions were there in
17 your view that related to bacteria and virus?
18     A.  That there was $10 million limit for
19 coverage for bacteria and virus.
20     Q.  Any other?  Anything else?  Any other
21 specifics?
22     A.  Well, the provisions of the policy.  When
23 you insert "virus" into the definition of Indoor
24 Environmental Conditions, whatever the coverage
25 results when you read the policy using that term is

101
1 the coverage that was provided on a quote for
2 Tulane subject to a $10 million limit.
3      Q.  Now, when you say "expands coverage," in
4 your view, that's not a legal opinion?  You're
5 opining on coverage there, aren't you?
6      A.  I'm not saying there's coverage or not for
7 the claim.  I'm talking about how the policy is put
8 together.  Kind of have to do that if we're going
9 to explore underwriting here.
10     Q.  Okay.  So you're saying the endorsement
11 expands coverage to include virus remediation, so
12 you've included some terms there.
13     Q.  What other terms and conditions, other than
14 the sublimits that you mentioned, in your view
15 constituted the agreement to expand coverage?
16     A.  The definition of Indoor Environmental
17 Conditions was expanded to include bacteria and
18 virus.
19     Q.  And where exactly was that?
20     A.  On the dec page, on the -- on the Quote
21 No. 30.  On the dec page MS-0000.
22     Q.  Okay.  Let's turn to opinion number six.
23 You're talking about Brian Smith of Willis.  You
24 say, "After receipt of the policy..."
25     Do you know when the policy was sent by

102

1 Chubb to Willis?
2    A.  It was -- I don't remember the exact date
3 off the top of my head, but it was early.  It was
4 February or March of 2019.  I believe.  I'm just
5 going off the cuff.  I don't know for sure.
6    Q.  And you say here that, "Tulane's producer/
7 agent Brian Smith discovered that the coverage was
8 not added as agreed upon and immediately
9 requested..."
10        When did he make that request?
11    A.  Shortly after they received the policy.
12 Probably when they were checking it over.  But
13 there was an e-mail from his office from a -- I
14 can't remember her name.  One of the people in his
15 office sent an e-mail pretty much setting it all
16 out.  And he sent an e-mail, also.
17    Q.  Kate, can you mark please as exhibit
18 number -- what number are we up to?
19    MS. MATTA:
20        We're up to #5.
21    MR. CARRUTHERS:
22        We've marked Exhibit #5.  Let's mark
23 this as Exhibit #6.
24    MR. BAINES:
25        Actually, we're on #6.  I had Exhibit

103

1 #4 as being the numbered opinions.
2    MS. MATTA:
3        Yes.
4    MR. BAINES:
5        It was never marked.
6    MS. MATTA:
7        I've marked Exhibit #4.
8    MR. BAINES:
9        All right.
10    MR. CARRUTHERS:
11        The next one will be Exhibit #6, right?
12    MS. MATTA:
13        That's what I have.
14    MR. CARRUTHERS:
15        Please mark as Exhibit #6 the March 29,
16 2019, e-mail from Chubb.
17 (Whereupon, the document was duly marked
18 for identification as "Exhibit #6" and
19 attached hereto.)
20 BY MR. CARRUTHERS:
21    Q.  Mr. Fey, do you see the e-mail that's been
22 marked as Exhibit #6?
23    A.  Yes.
24    Q.  Have you seen this document before?
25    A.  Yes.

104

1    Q.  Okay.  Does this refresh your recollection
2 as to when the policy was sent from Chubb to
3 Willis?
4    A.  Yes, March 29, 2019.
5    Q.  Now, Kate, can you please mark as Exhibit
6 #7 the e-Mail from Brian Smith to Chubb.
7 (Whereupon, the document was duly marked
8 for identification as "Exhibit #7" and
9 attached hereto.)
10    MS. MATTA:
11        Tom, could you refresh my memory which
12 number that is?
13    THE COURT REPORTER:
14        Exhibit #7.
15    MR. CARRUTHERS:
16        It's Exhibit 36.
17 BY MR. CARRUTHERS:
18    Q.  Mr. Fey, we've marked as Exhibit #7 an
19 e-mail string.  The top one is September 1, '20 --
20 September 1, 2020 -- e-mail from Matt Thompson.
21 And then if you scroll down to the next e-mail
22 below that, one more down, it's -- continue down,
23 up, a little up -- there's an e-mail from Brian
24 Smith dated May 17, 2019, to Matthew Thompson at
25 Chubb.

105

1        It says, "Matthew, good morning.  Follow up
2 on a few endorsements for the attached policy.
3 Deletion of Endorsement 27 and 29.  Addition of
4 Virus/Bacteria Coverage Endorsement."
5        Do you see that?
6    A.  Yeah.
7    Q.  Have you seen this document before?
8    A.  I have.
9    Q.  Is that the document you're referring to in
10 your opinion that we've marked as Exhibit #6?
11    A.  Not really.  This is one of them, but there
12 was an e-mail from somebody that works with Brian,
13 a lady -- and I can't remember her name --
14 basically saying the same thing.
15    Q.  Well, Exhibit #6 says it's from, the e-mail
16 is from Brian Smith; not some woman.
17    A.  Correct.
18    Q.  So you say, "Brian Smith discovered that
19 the coverage was not added as agreed upon and
20 immediately..."
21        So are you saying that this May 17th wasn't
22 the e-mail that you're referring to in #6?
23    A.  Well, I said in part.  But there was this
24 e-mail, and there was another one from a lady in
25 his office.  For the life of me, I can't remember

106

1 her name.  I want to say Gay but --
2      MS. CURTIS:
3       Tom, I know the name off the top of my
4      head if you want me to say it.  If you
5      don't, I'm fine not saying.
6      MR. CARRUTHERS:
7       Go ahead.  You can say it.
8      MS. CURTIS:
9       I think it's Donna Bell.
10      THE WITNESS:
11       That's it, Donna Bell.
12 BY MR. CARRUTHERS:
13    Q.  So you're not referring to Ms. Bell's
14 e-mail in this Exhibit #6, are you?
15    A.  I think -- well, can I see Exhibit #6
16 again?  Let me see what I'm saying.
17      Okay, yeah, it's Exhibit #6 I'm talking
18 about -- well, let's see.
19      MS. CURTIS:
20       You see "Donna Bell"?  You wrote it
21      there.
22      THE WITNESS:
23       Yeah, next one down, May 17th, Donna
24      Bell.  So I was talking about both of them.
25 BY MR. CARRUTHERS:

107

1    Q.  Okay.  So the policy was sent to Willis on
2 the 29th of March, and the e-mails that you're
3 referring to are six weeks later, May 17th.
4      In your Paragraph 6 -- or number six -- you
5 say "immediately requested."  Are you considering
6 six weeks to be immediately?
7    A.  Well, compared to when the endorsement was
8 actually issued, yes.
9    Q.  Okay.  So that's what you're referring to,
10 the May 17th e-mail?  And can you point me to the
11 language in that e-mail where it said, "Add
12 Manuscript Endorsement 44" -- go back to the
13 report, please -- "Add Manuscript Endorsement 44 so
14 that the policy would mirror the terms of Chubb's
15 final quote dated February 26, '19.  The terms
16 accepted by Tulane and bound by Chubb."
17      That's not in the e-mail anywhere, is it?
18    A.  Not in that e-mail.  They're asking for the
19 virus -- the addition of the virus coverage, and
20 then there's -- there's other e-mails also
21 referring to -- referencing that the quote
22 contained the coverage that was bound.
23    Q.  Well, in this Exhibit #6, you're referring
24 to one e-mail.  And you're saying, "...so that the
25 policy would mirror the terms of Chubb's final

108

1 quote."
2      Now, that's you embellishing what was
3 actually said in the e-mail, correct?
4      MS. CURTIS:
5       Object to the form of the question.
6      THE WITNESS:
7       Yeah, no, I mean, he's asking for the
8      virus coverage to be added.  And in the
9      quote, we know what the quote says, and
10      we've talked about that ad nauseam.
11       And what I'm saying is that he was
12      asking for Endorsement 44 at that point.
13      And it wasn't called Endorsement 44 at that
14      point, but that's what he was asking for.
15      And it wasn't issued until over a year
16      later.
17 BY MR. CARRUTHERS:
18    Q.  Well, my question has to do with your
19 language talking about so that the policy would
20 mirror the terms.
21      He didn't ask that in his e-mail.
22      MS. CURTIS:
23       Object to the form.
24      THE WITNESS:
25       That goes without saying.  I mean, you

109

1      have to provide the coverage he quoted.
2 BY MR. CARRUTHERS:
3    Q.  Okay.  So you'll admit that's not in the
4 e-mail; that's what you added in your description
5 of the e-mail, correct?
6    A.  Yeah, by applying the standards required of
7 underwriting, when you quote coverage, then you
8 have to issue the policy that mirrors that quote.
9    Q.  Okay, let's turn to Exhibit #7.
10      And, Kate, could you please mark this 5/17
11 e-mail which is No. 29, please?
12      THE COURT REPORTER:
13       That will be Exhibit #8.
14      (Whereupon, the document was duly marked
15      for identification as "Exhibit #8" and
16      attached hereto.)
17 BY MR. CARRUTHERS:
18    Q.  Okay.  Do you see what's been marked as
19 Exhibit #8?
20    A.  Yes.
21    Q.  Have you seen this document before?
22    A.  Yes.
23    Q.  And this is Donna Bell of Willis sending
24 the Chubb policy and another policy to Mr. Hadden
25 at Tulane, correct?

110

1    A.  Correct.
2    Q.  And, again, this is about six weeks after
3 Chubb sent the policy to Willis.
4        And scroll down a little bit.  It says,
5 "There are a few endorsements/corrections that have
6 been requested from the carriers.  We will forward
7 the endorsements to you as soon as they are
8 received and reviewed for correctness."
9        Do you see that?
10   A.  Yep.
11   Q.  And then further down, under the redaction,
12 it says, "We request that you also review the
13 policies and advise if you find any discrepancies."
14       Do you see that?
15   A.  Yes.
16   Q.  Do you know whether Tulane reviewed the
17 policy after it received it from Willis?
18   A.  I don't know whether they did or not, but
19 they were already advised that the -- they were
20 working on trying to get the virus endorsement
21 added to the policy.  I mean, she says it right
22 there in the e-mail.
23   Q.  Okay.  Kate, could you mark as the next
24 exhibit, it's No. 30.
25       (Whereupon, the document was duly marked

111

1    for identification as "Exhibit #9" and
2    attached hereto.)
3    THE COURT REPORTER:
4        That's Exhibit #9.
5 BY MR. CARRUTHERS:
6    Q.  Okay.  On the screen in front of you, do
7 you see what's been marked as Exhibit #9?  It is an
8 e-mail string.  Top one is dated June 3, 2019.
9        If you can scroll down a little bit.
10 There's an e-mail dated May 31, 2019, from John
11 Hadden to Jack Wallace and Bert McKeand at Willis.
12       And Mr. Hadden says, "I have reviewed both
13 policies and have provided my notes below."
14       Do you see that?
15   A.  I do.
16   Q.  And then the Allianz policy, whatever he
17 wrote is redacted.  And then if you continue down,
18 there's a heading "Chubb Policy."  And then he
19 lists in bullet-point fashion his comments.
20       Do you see that?
21   A.  Correct.
22   Q.  Do you see anything in there where he
23 comments on Endorsement 30 that was identified in
24 the quotation and in the policy?
25   A.  Does he reference No. 30?  He references

112

1 No. 44.
2    Q.  He talked about retro date, correct?
3    A.  Correct.
4    Q.  Do you see any other comments from him
5 about either Endorsement 44 or No. 30 as it's
6 listed in the quote?
7    A.  No.
8    Q.  Do you know why he didn't provide any
9 comments about that endorsement?
10   A.  Well, I'm assuming because he's already
11 requested it and he hasn't got it yet.
12   Q.  I'm not asking what you assume.  Do you
13 know?
14   A.  Do I know what?
15   Q.  Why he didn't list any additional comments
16 regarding Endorsement 30 or Endorsement 44.
17   A.  Well, I mean, you're asking me to say why
18 he didn't do something, but you don't want me to
19 assume anything, so you would have to ask him.
20   Q.  Okay, I will ask him.
21       I'm asking you, Do you know?  The answer is
22 either yes or no.
23   A.  Well, I can -- I can, based on the other
24 e-mail exchanges, I know that he requested that
25 endorsement already.

113

1    Q.  So the answer is no; you don't know?
2 Correct, Mr. Fey?
3    A.  Why he didn't -- well, I mean, sure.  Okay.
4    Q.  All right.
5    MR. CARRUTHERS:
6        Martha, how about a lunch break?
7    Anybody else ready for a lunch break?
8        Let's go off the record for a second.
9    Sorry.
10   THE VIDEOGRAPHER:
11       Thank you.  The time is 12:48, and
12   we're going off the record.  This ends
13   media file two.
14   (Recess was taken.)
15       The time is 1:17 p.m.  We're back on
16   the record.  This begins media file three.
17 BY MR. CARRUTHERS:
18   Q.  Mr. Fey, earlier today I asked you about
19 what you relied upon in reaching your opinion about
20 what Tulane specifically requested from Willis, and
21 you mentioned three things.
22       One, Mr. Hadden's Affidavit.  Ms. Fred's
23 Affidavit.  And then you said a one-page proposal
24 sheet.  Do you remember that?
25   A.  Yeah, the one page from two proposals.  Two

114

1  copies of the proposals.
2      Q.  Okay, so two separate pages?
3      A.  And I have all 82 pages that goes to those.
4      Q.  Now, you also told me that you first
5  received Ms. Fred's Affidavit this past weekend.
6  So my question to you is, How could you have relied
7  upon that particular Affidavit in preparing your
8  report with the opinions that they set forth?
9      A.  I don't think I said I relied on the
10 Affidavits.  I said the Affidavits support my
11 opinion.
12     Q.  Okay.  So you didn't rely upon them; is
13 that what you're saying?
14     A.  I didn't have the Affidavits at the time.
15 But my understanding of what happened is supported
16 by those Affidavits.
17     Q.  And you've reviewed Ms. Fred's Affidavit?
18 Have you?
19     A.  I'm sorry.  Whose Affidavit?
20     Q.  Ms. Fred.
21     A.  Yes.
22     Q.  And do you recall her stating in that
23 Affidavit that she used the term "it was my
24 understanding" when she talked about what coverage
25 was being discussed at that February 12, 2019,

115

1  meeting with Willis.  Do you remember that?
2      A.  Correct.
3      Q.  Do you recall her saying anything
4  specifically about exactly what was discussed and
5  what led her to come to that understanding?
6      A.  Well, I think -- I think the Affidavit was
7  to document what her understanding was of the
8  meeting, what was discussed.  So that's what she is
9  saying she understood, she came away with.
10     Q.  She didn't detail anything that was told to
11 her about potential coverage from Chubb, did she?
12     A.  I don't -- I don't know.  I'd have to go
13 back and look at the thing.
14     Q.  Okay.  And she didn't mention any
15 discussions and details of any discussions she had
16 with Willis, did she?
17     A.  No.  I'm sure you have got someone covering
18 this in the deposition.  That's kind of the weird
19 part of this.  I don't have any deposition
20 testimony yet.  I normally like to see the
21 depositions before I render an opinion, but I
22 haven't.  Usually I have.
23     Q.  Okay.  And you read Mr. Hadden's Affidavit,
24 correct?
25     A.  Correct.

116

1      Q.  And do you recall that, in that Affidavit,
2  he relied upon the handwritten notes of Ms. Fred?
3      A.  Correct.  In part.
4      Q.  And do you recall that, in that Affidavit,
5  he didn't provide any details about anything that
6  was discussed at the February 12, 2019, meeting?
7  And he said his understanding -- his understanding
8  was based on Ms. Fred's notes, correct?
9      A.  I'll let the Affidavits speak for
10 themselves.
11         THE COURT REPORTER:
12             Mr. Fey, could you get a little closer
13         to the computer screen.  You kind of
14         mumble.  Thank you, sir.
15 BY MR. CARRUTHERS:
16     Q.  Kate, could you please bring back up the
17 June 2nd report, please.
18         Mr. Fey, I want to talk to you about number
19 11, bullet point number 11.  You say, "One month
20 after Tulane filed its claim, Chubb amended its
21 policy by endorsement -- adding Endorsement
22 MS-300274."  Do you see that?
23     A.  I do.
24     Q.  So it's your opinion that the endorsement
25 that was sent to Tulane represented an amendment?

117

1  Is that your opinion testimony?
2      A.  Well, it's usually what you say when you
3  add an endorsement.  You amend coverage with it.
4  So it's kind of a term of art.  But they were
5  providing the endorsement that was supposed to be
6  on the original policy allegedly.
7      Q.  Well, Endorsement 30 that was identified in
8  the quote and was identified also in the policy
9  that was sent to Tulane had the reference to the
10 coverage that was going to be provided, correct?
11         And so my question to you is, How could
12 this be --
13         MS. CURTIS:
14             Tom, could you bring up what you're
15         talking about, the Endorsement 30?
16         THE WITNESS:
17             It's not an endorsement; it's a list --
18         MR. CARRUTHERS:
19             It's a list of endorsements.
20         THE WITNESS:
21             No, it's not.  It's a list of terms.
22         MR. CARRUTHERS:
23             Okay.  Well, why don't we do it this
24         way.  Why don't we mark Endorsement 44 --
25         THE WITNESS:

118

1        An endorsement is an endorsement.
2    Endorsement 44 is an endorsement.  The
3    listing on the quote are additional terms
4    and conditions, No. 30.
5  BY MR. CARRUTHERS:
6    Q.  So while she's marking that, my question
7  is, How could Endorsement 44 be an amendment as you
8  call it?
9    A.  That's what you call it when you put an
10  endorsement on a policy.
11    Q.  Every endorsement is, in your view, called
12  an amendment?
13    A.  Well, let's put it this way.  The policy is
14  supposed to be issued originally with all the
15  endorsements that are supposed to be on it.  So
16  then if you're subtracting an endorsement or adding
17  an endorsement, you call it an amendment to the
18  policy.
19        In this case, it wasn't originally provided
20  so I'll grant you, it's not an amendment.  It's
21  actually part of the original policy; however, we
22  don't know what the terms were supposed to be that
23  were on that endorsement since it was allegedly --
24  well, it wasn't manuscripted.  They just used the
25  form that they had on hand rather than manuscript

119

1  one as had been agreed upon.
2        And there's indications that there was
3  confusion inside of Chubb of exactly what was
4  agreed to.
5    Q.  That's your opinion on review of the
6  documents?
7    A.  Yeah.  I mean, there's e-mails where the
8  regional underwriting manager sent a Quote 5 to
9  Willis.  Willis responded and said, This isn't it.
10  I don't know what this is.
11        They had to get Legal involved, Chubb
12  Legal.  And it took them, even after the claim was
13  submitted, it took them a month to get an
14  endorsement.
15        Now, if you're going to use an endorsement
16  that already exists, it wouldn't take but a second
17  to attach that endorsement and issue it.  Which
18  they could have done back in 2019 and anytime in
19  between prior to the loss.  But they didn't.
20    Q.  And what exactly is your point there,
21  Mr. Fey, because --
22    A.  My point is --
23    Q.  -- because you -- let me finish -- you told
24  me before that the List of Conditions, No. 30,
25  outlined what the terms and conditions were to be

120

1  of that particular endorsement, correct?
2    A.  Correct.  And then so, based on that,
3  you're providing virus and bacteria coverage under
4  the existing policy under the term of "Indoor
5  Environmental Condition."
6        So here's the thing.  If you're going to
7  quote the coverage provided by forms you already
8  have on hand, you list it in your quote.  You don't
9  list it as MS-0000.
10        "MS-0000" denotes a manuscript endorsement
11  that had yet to be developed.  But then the loss
12  comes along and they haven't issued the endorsement
13  yet.  They consult with Legal.  And then they end
14  up issuing an endorsement that they had on hand
15  already that they previously used.  So there's a
16  problem there.  I mean, that's a discrepancy.
17    Q.  Is it your opinion that Endorsement 44 is
18  not a manuscript endorsement?
19    A.  It's supposed to be a manuscript
20  endorsement.
21    Q.  Is it or isn't it?  Not what it's supposed
22  to be.  My question is, In your opinion, is it a
23  manuscript endorsement?
24    A.  Is it a manuscript -- well, hang on.  Yes,
25  it's a manuscript endorsement that was developed in

121

1  April of 2020 based on verbiage from prior
2  endorsements that they had on hand.
3    Q.  And what was the inception date of the
4  policy, do you recall?
5    A.  It was --
6    Q.  It was February --
7    A.  Late February of '19.
8    Q.  So your opinion is that this was a
9  manuscript policy that existed.  You said it was
10  developed in 4/20 -- April of '20, and the policy
11  had already been issued back in February of 2019.
12    A.  Exactly.  That's your problem right there.
13    Q.  Well, how is it that you claim that this is
14  not really a manuscript endorsement?  You said it
15  existed when the policy started.
16    A.  I didn't say it was not a manuscript
17  endorsement.  I'm saying it's an endorsement that
18  they issued after the date of loss, and they used
19  the language from previous endorsements that they
20  had on hand.
21        And if they had those endorsements, they
22  could have just listed those endorsements on the
23  quote.  But, instead, they indicated that they're
24  going to draft something up special for Tulane.
25  And that's not what happened.

122

1    Q.  Now, you say they said they were going to
2  draft something up special for Tulane?
3    A.  Yeah, that's what "MS-0000" means.  It's a
4  manuscript endorsement that they were going to
5  develop specifically for Tulane.
6    Q.  So in your view, the term "manuscript"
7  means that they were going to develop something
8  special for Tulane, and was that something special
9  for Tulane other than the sublimits and the retro
10  date?
11    A.  Correct, subject to a $10 million policy
12  limit.
13    Q.  Okay.  So what was the something other than
14  the retro date and the sublimits and the total
15  policy limit that you believe indicated should have
16  been included on the manuscript form?
17    A.  I'm not sure I follow that question.  Do
18  you want to ask it again?
19    Q.  Okay, sure.  You agree that this was a
20  manuscript form, right?
21    A.  Correct.
22    Q.  And you said it wasn't developed until
23  April of '20, correct?
24    A.  Well, the language had been developed that
25  was on -- contained on I think three prior

123

1  endorsements that they had used in the past.
2      So my point is if they were going to use
3  that same language, they could have just used one
4  of those prior endorsements on the policy and
5  listed it on the quote.
6      Since they didn't and they listed MS-0000,
7  that says to me that they were going to do
8  something special for Tulane.  And since they
9  didn't do it until after the claim, you guys have
10  got a problem on your hands.
11    Q.  Well, my question to you is, What is the
12  "something special" as you call it?
13    A.  Well, we don't know because it wasn't done
14  before the loss.
15    Q.  Okay.
16    A.  So we're left to guess at this point.
17    Q.  Okay.  In front of you we've got
18  Endorsement 44 marked as Exhibit #10.
19      Do you see that?
20      (Whereupon, the document was duly marked
21      for identification as "Exhibit #10" and
22      attached hereto.)
23    A.  I see it.
24    Q.  And in your report, bullet point 11, you
25  mention, "One month after Tulane filed its claim,

124

1  Chubb amended."  And we talked about the fact that
2  it's not really an amendment.
3      But the question I have is, Why did you
4  highlight this "One month after Tulane filed its
5  claim"?
6    A.  Because it was one month after Tulane filed
7  its claim, that's important.  If you get a claim
8  and you manuscript an endorsement, you can kind of
9  do whatever you want, right?
10      If you're sitting there and you're the
11  carrier, Oh, we've got this $10 million claim
12  staring us in the face.  What should we say on this
13  endorsement?  I think we want to kind of draft it
14  in a way that, uh, maybe we won't provide that much
15  coverage, or maybe we can deny the claim.
16      So that's the problem you have.  You're
17  creating the endorsement after the fact.  You can't
18  do that.
19    Q.  You just told me a minute ago that the
20  endorsement was created much earlier.
21    A.  I said they used language from an
22  endorsement that had been created much earlier.
23  And if they intended to use that language, they
24  could have just put those endorsement numbers on
25  the quote.  And they didn't do it.

125

1    Q.  And it was --
2    A.  They didn't put it on the policy, either.
3    Q.  And it was the same language, correct?
4    A.  They pulled the old language and put it on
5  the new endorsement after the fact.
6    Q.  But that language already existed, correct?
7    A.  We're going round and round on this --
8    Q.  Yeah, well --
9    A.  -- I think I answered that question.
10    Q.  No, you keep telling me that it was
11  manuscript created after the claim was submitted.
12  But that contradicts what you said earlier about it
13  was created a lot earlier.
14    A.  So they had three different endorsements
15  with the same language -- MS-206584 3 which was
16  created in May of 2017; MS-263678 10 which was
17  created on August 2018; and PF-450423A which was
18  created on January 2017 -- they could have listed
19  any one of those three endorsements on the dec, on
20  the quote.
21      And then on the dec sheet when they issued
22  the policy and included them when they issued the
23  policy, but they didn't.  They waited until after
24  the loss, and then they created this allegedly new
25  manuscript endorsement where they pulled the same

126

1 language off those old endorsements and put it on
2 the new one. And just changed the date -- the
3 number and the date on it.
4    Q. So didn't you --
5    A. I don't see -- I don't see any rationale
6 why, if the underwriter intended to use that same
7 language, he wouldn't have just used one of those
8 three endorsements that they already had on hand.
9    Q. Didn't Tulane insist on the inclusion of
10 retro dates and other provisions such as policy
11 limit or sublimits?
12    A. There's a $10,000 -- $10 million sublimit
13 on it, and there's a retro date on it. Doesn't
14 have anything to do with the claim.
15    Q. So that's not --
16    A. It's the fact that the claim was after the
17 retro date.
18    Q. That's not a form, is it? A policy with
19 retro dates and sublimits, are you -- is it your
20 testimony that's a form?
21    A. I don't know who came up with the retro
22 date. I mean, it could have been Chubb. I don't
23 know.
24    Q. So you're guessing? You don't even know if
25 it was Tulane that insisted on it?

127

1    A. I don't really care, because the retro date
2 didn't have anything to do with the claim.
3    Q. Okay. Is it your testimony it has nothing
4 to do with the endorsement, either?
5    A. It doesn't have -- the loss is after the
6 retro date. It has nothing to do with the claim.
7    Q. Scroll down to the next number 12. You
8 say, "While Endorsement 44 expands the policy
9 definition of 'Indoor Environmental Conditions,' it
10 also alters and narrows the existing coverage."
11    What existing coverage was there? We went
12 over this before, and you said there was no
13 existing coverage.
14    A. For a virus there wasn't any existing
15 coverage.
16    Q. So how could it alter and narrow if there
17 was no existing coverage for virus?
18    A. It made -- it made the coverage provided
19 for bacteria and virus subject to those limiting
20 terms.
21    Q. Terms that you said existed well before the
22 policy incepted, correct?
23    A. They weren't on the policy. They existed
24 but they weren't on the policy.
25    Q. Okay. And do you know whether Tulane was

128

1 aware of the existence of those particular form
2 endorsements?
3    A. They didn't know what was going to be on
4 their policy. Willis provided them with a sample
5 of that language in late March. The policy already
6 started of 2/2020 and, like, a week before they
7 submitted the claim. I'm sure that had something
8 to do with the claim that they were getting ready
9 to submit.
10    Q. How do you know what Tulane knew back in
11 the period prior to February of 2019?
12    A. I didn't say I did.
13    Q. No, you just did.
14    A. No, I said March of 2020. It was late
15 March of 2020, like the 29th or something like
16 that, Willis sent them a copy of that language.
17 Probably an endorsement that they had on hand.
18    Q. I don't know. But based on what you're
19 saying, it sounds like you're making a lot of
20 assumptions.
21    A. No. I mean, I've got a copy of the e-mail.
22 It's dated March 26, 2020, and it's a copy of
23 Endorsement PF-45042A issued January of 2017 which
24 is one of the ones I just read I think. Yeah, it's
25 one of the ones I just read.

129

1    It's the language that pre-existed the
2 policy that, if the underwriter had intended to put
3 that language on the policy, they would have just
4 merely listed that endorsement on the quote and on
5 the policy, on the dec page when the policy was
6 issued. But they didn't do it.
7    Q. So we can agree that you do not know? You
8 don't have any basis in fact to say what Tulane
9 knew or didn't know as of February 27, 2019,
10 regarding the scope of any bacteria virus coverage?
11    A. Well, we can use the notes that they
12 scribbled at that meeting to read into what their
13 mindset was. And now we have Affidavits discussing
14 that, so obviously the Affidavits to speak for
15 themselves and those notes speak for themselves.
16    Q. Okay.
17    A. I'm not reading minds. I'm reading the
18 notes.
19    Q. Okay, we'll get to the notes. And you must
20 be a good reader, but okay.
21    Paragraph 13, or bullet point number 13,
22 you again talk about coverage that was previously
23 agreed to. And at the end, you say, "...it was not
24 the virus coverage originally agreed to..."
25    A. According to Tulane and Willis.

130

1    Q. And what specifically did Tulane say to
2  that effect?
3     A. They thought they had coverage for human-
4  to-human transmission. Because they had put the
5  notation of "Ebola" on there, the note on the
6  sheet, on the proposal.
7    Q. Anything else with respect to Tulane?
8     A. Well, yeah, the -- well, with respect to
9  Tulane, all they had was the proposal and the
10  coverage comparison that Willis provided to them.
11  And the coverage comparison said that the policy
12  was silent on contagiousness, human-to-human
13  transfer.
14    Q. So for bullet points 13 and 14, when you
15  talk about what was agreed to, you're relying upon
16  that one-page worksheet with handwritten notes,
17  correct?
18     A. No. I'm relying on the handwritten notes.
19  I'm relying upon the policy-comparison worksheet.
20  And I'm now relying upon two Affidavits that's been
21  submitted.
22    Q. Okay.
23     A. And I'm also relying on e-mails that Willis
24  sent to Chubb that show that -- I don't think
25  Willis or Chubb knew what they had sold by the time

131

1  they developed the endorsement.
2     Because you've got Chubb sending Quote
3  No. 5 to Willis, and Willis saying, This isn't it.
4  The coverage we sold is reflected on the quote.
5  And then he says it includes BI and PD. Which even
6  the notes on the sheet say it doesn't include BI or
7  PD, so if you want to accept the notes on the
8  worksheets, let's accept them.
9     Or if you don't, then according to Willis,
10  the coverage was even broader and it applies to BI
11  and PD. That's Bodily Injury and Property Damage.
12    Q. Let's turn to bullet point 16 of your
13  opinion. You say, "While Chubb added the
14  endorsement that should have been on the policy at
15  inception, coverage for virus as agreed when it
16  bound coverage, it altered the terms of the
17  coverage actually provided by the endorsement."
18     And then you say, "...that was a serious
19  deviation from industry standard and practice known
20  as post-loss underwriting."
21     Now, this post-loss underwriting is a
22  concept you didn't include in your first report,
23  right?
24     A. It wasn't a first report. It was a
25  mediation -- it was something I drafted for

132

1  purposes of the mediation.
2    Q. Okay. And this June 2nd report postdated
3  The Court's decision and ruling on the Summary
4  Judgment Motion, right?
5     A. I don't know. Maybe. What was the date?
6    Q. The Court's --
7     A. Yeah, so it was -- postdated that. I'm not
8  sure what day I received that, but it was after
9  that. The Court's ruling was May 16th, and my
10  report was June 2nd.
11    Q. So on this issue of what you call "post-
12  loss underwriting," I didn't see that term in your
13  industry standards that you said was an overview of
14  claim-handling standards.
15     A. Well, it's not an industry standard. It's
16  the deviation from industry standards. You can't
17  have --
18    Q. I didn't --
19     A. -- you can't underwrite a policy after a
20  claim has been submitted.
21    Q. Well, did you make any reference to post-
22  loss underwriting, the concept that you said in
23  this No. 16 was industry standard? I didn't see it
24  in the standards you submitted.
25     A. Well, let me just say my exhibits are

133

1  examples of industry standards. They're not all
2  inclusive of all industry standards. There's
3  textbooks written on industry standards, so it
4  wasn't -- I couldn't possibly include them all in
5  those documents.
6    Q. Okay. Can you explain for me exactly what
7  you view as "post-loss underwriting" to be?
8     A. Right. So when an insurance company gets a
9  claim in, they attempt to go back and change the
10  terms of the policy.
11     And, actually, I have another case where
12  that's happening up in North Carolina, where they
13  left off an endorsement almost exactly like this
14  one, and then, after the fact, they're going back
15  and trying to draft something that would take away
16  the coverage for the claim.
17    Q. So you can --
18     A. You can expand coverage after the fact, but
19  you can't narrow coverage after the fact.
20    Q. So it's your opinion as you sit here today
21  that Chubb engaged in post-loss underwriting; is
22  that true?
23     A. I think I said -- I'll let my -- I'll let
24  my -- I'll let that 16th bullet speak for itself.
25  But yeah, it sure looks like post-loss underwriting

134
1 to me.
2    Q. Is it your testimony that they
3 intentionally engaged in post-loss underwriting?
4    A. It gives the appearance of impropriety.
5 I'll leave it at that.
6    Q. Well, do you have an opinion one way or the
7 other whether it was intentional?
8    A. I can't -- I can't testify on intent.
9    Q. So this concept of post-loss underwriting
10 does not have an element of intent; is that what
11 you're telling me?
12    A. It can.
13    Q. But in this case, does it?
14    A. I don't know. You would have to ask the
15 underwriter that or, like, senior managers. There
16 was Chubb Legal. There was a regional manager and
17 the underwriter that wrote the policy were all
18 involved in huddling up and trying to figure out
19 what the endorsement was going to say after the
20 fact. So it gives the appearance of impropriety.
21    I don't know whether they did it
22 intentionally or not, so I'll just leave it at
23 that. That's what happened. That's what is
24 documented. It's not for me to say whether it was
25 intentional or not. I'll leave that up to you guys

135
1 and The Court to figure it out.
2    Q. When you say it was documented, what
3 documents are you referring to?
4    A. I have all kinds of e-mails talking about
5 who was involved between March and April of 2020
6 looking at that endorsement and involved in the
7 process. There were senior managers. There were
8 regional managers. There was Chubb claim -- Chubb
9 Legal was involved in it. And it still took them
10 until May 7th, a month after the claim was
11 submitted, to figure out what they were going to
12 issue on the policy.
13    And then, and then when Willis got it,
14 their response was -- on WTW-0001144 -- an e-mail
15 from Brian McBride to other people inside Willis
16 dated May 6, 2020.
17    Amendment to the IEC definition and not a
18 give-back for cleanup costs only? No COVID
19 exclusion or specific carve out for the Primate
20 Center? Not sure what took them so long on this.
21 Quote, unquote.
22    Q. And why are you citing that? What's
23 important about that?
24    A. Well, because they had so many people
25 involved in issuing this endorsement. You guys

136
1 want to say, Oh, well, it's just the language we
2 already had on file. All we had to do is transfer
3 over to this new document.
4    Well, if the underwriter intended to
5 provide that coverage and they had the endorsements
6 there, it would have been on the quote, and it
7 would have been on the dec sheet of the policy when
8 it was issued.
9    So, I mean, you guys can try to explain
10 that away to the jury when we get there. But good
11 luck.
12    Q. Now, Mr. Fey, you talked earlier about some
13 form endorsements that you claim Chubb had prior to
14 the issuance of Endorsement 44; do you recall that?
15    A. I do.
16    Q. And do you know whether any of those
17 endorsements were ever sent to Tulane prior to the
18 issuance of Endorsement 44?
19    A. Only one was sent, and it was in late
20 March, and it was at PF-45042 3A, January of '17,
21 2017. Sent late March of 2020 by e-mail.
22    Q. And what was Tulane's response to receiving
23 that endorsement language?
24    A. I don't know.
25    Q. Do you know if they were surprised?

137
1    A. I don't know.
2    Q. Do you know if it was consistent with what
3 they expected?
4    A. I believe it was not.
5    Q. What's the basis -- do you know for a fact
6 whether it was --
7    A. Well, they're disputing Chubb's denial and
8 we're in litigation over it, so I think I have a
9 pretty firm basis to say they don't agree.
10    Q. So I'm asking you what you know; not what
11 you assume or what you speculate about --
12    A. I know they filed suit against Chubb --
13    Q. Let me finish. Let me finish.
14    After Tulane received that language for the
15 IEC endorsement you say in late March, what was
16 their response?
17    A. I don't know. You can take the deposition.
18    Q. Kate, could you please mark No. 32, please.
19 This will be Exhibit #11.
20    Mr. Fey, while they're marking that
21 exhibit, I see that you're looking at your
22 computer. What is contained on your computer that
23 you're looking at?
24    A. My opinion and the e-mails we were just
25 talking about.

138
1   Q. So you have on your computer documents that
2 are listed in your report?
3   A. Correct.
4   Q. Do you have any notations on them?
5   A. No.
6   Q. Do you see what's been marked as Exhibit
7 #11 here? It's a March 2016 e-mail -- March 26,
8 2020, e-mail from Bert McKeand to John Hadden at
9 Tulane. Do you see that?
10      (Whereupon, the document was duly marked
11      for identification as "Exhibit #11" and
12      attached hereto.)
13   A. Yeah, I referenced that a few minutes ago.
14   Q. Okay. I was just going to ask you is that
15 the one?
16   A. That's the one.
17   Q. And this is essentially the same language
18 as Endorsement 44, correct?
19   A. Correct. What's interesting is this was
20 sent by Willis to Tulane prior to May 1st, wherein
21 Matthew Cluffy -- I don't know if I'm pronouncing
22 that correct, but I believe he's the regional
23 underwriting manager at Chubb -- sent an e-mail to
24 Brian McBride at Willis saying, "Brian, we have
25 received the draft from Chubb Legal and are

139
1 processing the endorsement on a rush basis. Please
2 let me know if you have any questions or need
3 anything else. Have a great day."
4      So they hadn't even decided what language
5 they were going to put on there yet. They were
6 still -- it still took another month and a few
7 days, a month and a week to figure out what they
8 were going to put on their endorsement.
9   Q. Now, Endorsement 44 was sent to Willis in
10 early May of 2020, correct?
11   A. Yeah, I think it was May -- May 5th.
12   Q. So prior to May 5th, do you have an opinion
13 about whether Willis was aware of the terms and
14 conditions and the language contained in
15 Endorsement 44?
16   A. No, they had no idea. Chubb management and
17 Chubb Legal were involved in trying to figure out
18 what wording they were going to put on the
19 endorsement. And that's what took so long; that
20 was the delay. And there's a string of e-mails
21 talking about it between Willis and Chubb.
22   Q. Well, my question was, Did Willis -- do you
23 believe Willis knew what the terms and conditions
24 would be and the exact language of Endorsement 44
25 prior to its issuance?

140
1      MR. BAINES:
2      Objection, asked and answered.
3      THE WITNESS:
4      No, I think by that point --
5 BY MR. CARRUTHERS:
6   Q. Go ahead.
7   A. I think by that point everybody was
8 confused. Because there's an e-mail from Brian
9 Smith on 4/13/2020 sent to -- I think he sent it to
10 Brian Smith from Willis to Brian McBride at Willis
11 saying, "E-mail trail below contains further intent
12 of Virus Bacteria Endorsement. Exclusion of
13 legionella because it gets full BI/PD coverage.
14 Brian Smith, South Regional Team Leader."
15   Q. Do you know for a fact what Willis expected
16 Endorsement 44 to read like prior to its issuance?
17   A. What did Willis expect it to read like; is
18 that what you're asking?
19   Q. Yes.
20   A. Well, there's a couple of e-mails where
21 Brian McBride attached -- here; hang on one
22 second -- so Brian, Brian Smith of Willis responded
23 to Matthew Cluffy on April 1st.
24      "Matt, these don't look familiar. Can you
25 send me the e-mail. Can you send the e-mail to me

141
1 on 3/28/2019?"
2      So that's Brian Smith the team leader at
3 Willis communicating with Matthew Cluffy the
4 underwriting regional manager at Chubb.
5      Look, after Chubb had sent them the No. 5
6 quote, and he's referencing an e-mail from
7 March 28, 2019, and there's other e-mails reflected
8 that say the coverage sold is reflected by the
9 binder. I'm trying to find those.
10      But, anyway, they -- they were referencing
11 -- Willis was referencing the binder. Matthew
12 Smith at Willis was referencing it should include
13 BI and PD coverage.
14      And then you've got Chubb sending Quote
15 No. 5 which wasn't even in the picture, out of the
16 blue which didn't have any virus coverage at all,
17 so no, I don't think anybody had a clue of what
18 they had sold to anyone at that point in time.
19   Q. Kate, could you please mark as Exhibit #12
20 No. 33.
21      (Whereupon, the document was duly marked
22      for identification as "Exhibit #12" and
23      attached hereto.)
24      Now, Mr. Fey, there's an e-mail that's been
25 marked as Exhibit #12. It's dated May 7, 2020,

142
1 from Donna Bell at Willis to John Hadden at Tulane.
2    Have you seen this document before?
3    A. Yes.
4    **Q. Did you rely upon it in preparing your**
5 **report?**
6    A. Well, I mean I saw it so it's something I
7 considered.
8    **Q. Okay. Now, with this e-mail, Ms. Bell is**
9 **attaching Endorsement 44 and sending it to**
10 **Mr. Hadden, correct?**
11    A. Correct.
12    **Q. And in her e-mail, she says, "The attached**
13 **endorsement referenced above has been reviewed. It**
14 **appears to be correct." Do you see that?**
15    A. I do.
16    **Q. Is it your opinion that Ms. Bell was saying**
17 **that Willis had received Endorsement 44 from Chubb,**
18 **had reviewed its provisions, and is advising Tulane**
19 **that Endorsement 44 appears to be correct?**
20    A. That's what she's saying.
21    **Q. Do you know whether Mr. Hadden responded to**
22 **Ms. Bell after receiving this e-mail?**
23    A. I don't know.
24    **Q. So what it says appears to be correct? Is**
25 **it your opinion that Willis, after receiving**

143
1 **Endorsement 44, was advising Tulane that this is**
2 **what they expected Endorsement 44 to say?**
3    A. No, I wouldn't say that. I think she
4 looked at the endorsement number and matched it to
5 the policy, and that's about as far as her review
6 went --
7    MS. CURTIS:
8       Can you pull up the document so we can
9       get signature, please? Thank you.
10 BY MR. CARRUTHERS:
11    **Q. Let's go back to your report, bullet point**
12 **17. And, here again, you're talking about this**
13 **concept of post-loss underwriting, correct?**
14    A. Correct.
15    **Q. And you say --**
16    A. Well, it's in four; you can expand coverage
17 after the fact but you can't narrow coverage.
18    **Q. Okay. So is it your opinion that Chubb**
19 **narrowed coverage after the claim had been**
20 **submitted?**
21    A. Based on what Tulane says their
22 expectations were and what the endorsement says, it
23 gives the appearance that Chubb narrowed the
24 coverage after loss.
25    **Q. Well, when you say "it gives the**

144
1 **appearance," what's your opinion? Did they or**
2 **didn't they narrow coverage?**
3    A. I don't think that's for me to decide. I
4 think that's for you guys to argue to The Court and
5 let The Court decide that.
6    **Q. Well, you say right here, "...by narrowing**
7 **coverage..." So you're saying they narrowed**
8 **coverage?**
9    A. Right, I did.
10    **Q. Well, I just asked you the question, and**
11 **you said you couldn't answer it.**
12    A. Well, I mean, it gives -- my answer is it
13 gives the appearance that they underwrote the
14 endorsement after the fact. They had senior
15 managers involved. They had claim legal -- or
16 Chubb Legal involved. They had the regional
17 underwriting manager involved. There was some
18 discussions about the regional underwriting manager
19 who had left recently.
20       So you wouldn't have all those hands
21 involved in this thing if it was just using the
22 same language they used previously. And there's no
23 reason in the world to have all those people
24 involved in this process after a loss.
25       So yeah, I think they narrowed the coverage

145
1 that they were providing on that endorsement. And
2 whether it was intentional or not, I don't think --
3 my personal opinion is I don't think Chubb had a
4 clue of what the coverage was supposed to be. I
5 think Willis and Chubb had no idea what coverage
6 they were -- they had agreed to provide.
7       But I think they did note what they were
8 doing when they turned it over to Legal to come up
9 with some language to put on the endorsement.
10    **Q. But you do, you do believe -- you're of the**
11 **opinion that Tulane had an idea of what it wanted,**
12 **right?**
13    A. Yes.
14    **Q. And that was the understanding that's**
15 **reflected in and referred to in the two Affidavits**
16 **that you reviewed from Mr. Hadden and Ms. Fred,**
17 **correct?**
18    A. Correct.
19    **Q. And do you know what the basis of their**
20 **opinion or understanding was other than the**
21 **reference to a worksheet and handwritten notes on**
22 **it? Do you know what the basis for their**
23 **understanding was?**
24    A. Well, they were in the meeting.
25    **Q. And what else? What was discussed at the**

146

1  meeting specifically; do you know?
2      A.  Oh, I wasn't at the meeting, so why don't
3  we take their deposition?
4      Q.  That's my point.  You don't know what was
5  discussed at the meeting.
6      A.  I've already told you what I base my
7  opinion on.  There's documentation, and we've
8  talked about it ad nauseam.
9      Q.  Well, let's go back to your report,
10  paragraph or bullet points 18 through 19.  You're
11  talking about misrepresentations allegedly made by
12  Chubb.  Do you see that?
13      A.  I do.
14      Q.  You don't consider "misrepresentation" to
15  be a legal term and a legal opinion that you're
16  presenting here?
17      A.  No.
18      Q.  So in Chubb's Denial letter, you believe
19  they made a misrepresentation; is that correct?
20      A.  I don't believe that they did.  I mean,
21  it's -- it's documented.  They didn't quote the
22  correct language.  And they also said -- well, that
23  was the initial denial.
24          And then they did it again in the second
25  denial.  And they misrepresented the language of

147

1  the Endorsement 44 even as issued which says
2  "...are not the result..."
3          "Such bacteria and viruses are not the
4  result of the communicability through human-to-
5  human or bodily-fluid contact."
6          They said that the claim was the result of
7  human-to-human, bodily-fluid contact, and that's
8  not what the claim was.
9      Q.  So are you saying that you're a medical
10  expert now?
11      A.  No, I'm saying -- no more than the adjustor
12  that improperly denied coverage here.  The claim
13  was for COVID contamination.  And Chubb denied it
14  based on human-to-human contact when, clearly,
15  everybody that's gone through COVID understands
16  this; that it's surface to human, surface -- human
17  to surface.  There's all different variations on
18  the thing.
19          You don't necessarily have to catch it from
20  another person.  It's on gasoline gas-pump handles.
21  It's on handles on doors that you open and shut.
22  It's in the air.  There's all different kind of
23  ways to get COVID, and everybody kind of knows what
24  they are.  So I don't think I have to be a medical
25  expert to figure that one out.

148

1      Q.  So were you retained to give an opinion on
2  transmission of COVID virus?
3      A.  I'm talking about the way the claim was
4  denied and what was represented in the Denial
5  letter which was just incorrect.
6      Q.  That's not what I asked you, Mr. Fey.  I
7  asked you, Were you retained to give an opinion on
8  COVID transmission?
9      A.  No.
10      Q.  You're not qualified to give a medical
11  opinion, are you?
12      A.  I'm not giving a medical opinion.
13      MS. CURTIS:
14          Object to the form.
15  BY MR. CARRUTHERS:
16      Q.  You're not giving an opinion as an expert,
17  are you?
18      A.  I'm giving an opinion regarding Chubb's
19  Denial letter.  So don't try to twist it into
20  something it's not.  I'm talking about the denial
21  and the facts of the case when they denied the
22  coverage.  Both times.
23      Q.  We'll get to those.  Let's turn to bullet
24  point 22.  You're referring to the date on
25  Endorsement 44.  And you said, "This denotes the

149

1  month and year the endorsement was developed."
2  Do you see that?
3      A.  Correct.
4      Q.  What do you mean by "developed"?
5      A.  That's when they wrote the endorsement.
6      Q.  They wrote it?  They issued it?  What
7  exactly do you mean?
8      A.  All that.  They developed it and they
9  issued it.
10      Q.  I thought you told me that these, that the
11  language that's reflected in Endorsement 44 was in
12  existence long before April 20th.
13      A.  Yeah, it was.  They used the language from
14  other endorsements and put a new number on it and a
15  new date, April of 2020.
16      Q.  So does the --
17      A.  They developed it in April of 2020, and
18  they issued it -- I think it was May 6th of 2020.
19      Q.  So it's your opinion that Endorsement 44
20  was written in April of 2020, correct?
21      A.  That's not my opinion.  That's a fact.  I
22  mean, the documents make that very clear.
23      Q.  Let's turn to bullet point 23.  "In short,
24  we know that Chubb did not complete its drafting of
25  the endorsement until after Tulane's claim had

150

1 already been submitted."
2        What's the basis for that statement?
3    A. Because the endorsement wasn't issued until
4 May 6, 2020, and it was dated April of 2020.
5    Q. Well, I thought you just told me it was
6 developed and written in April of 2020 which is
7 before 4/7/20, isn't it?
8    MS. CURTIS:
9        Object to the form.
10   THE WITNESS:
11       No, okay, whatever. I mean, you're
12   just trying to twist things, so I'll just
13   -- I'll let my opinion speak for itself,
14   and I'll let the document speak for itself.
15   And I'll let all the e-mails between the
16   parties speak for themselves.
17 BY MR. CARRUTHERS:
18   Q. Well, we're looking forward to that.
19   A. Good.
20   Q. It says in 23, "The documents give the
21 appearance that Chubb intentionally altered its
22 coverage."
23       Is that your opinion, they did it
24 intentionally?
25   A. It gives the appearance of that.

151

1    Q. My question is, Did they intentionally
2 alter or not?
3    A. And my opinion is the documents give the
4 appearance that Chubb intentionally altered its
5 coverage after a claim had been submitted to
6 exclude coverage. A serious deviation from
7 insurance industry standards.
8    Q. So you're not saying they did or they
9 didn't; you're just saying it gives the appearance,
10 right?
11   A. It's not for me to decide whether they did
12 or didn't intentionally. That's something for The
13 Court and jury.
14   Q. Now, in bullet point 24 you talk about the
15 fact that -- what you say, "Chubb quickly denied
16 Tulane's claim ten days after Endorsement 44 was
17 issued." Do you see that?
18   A. Yeah, the thing about that is they denied
19 the claim --
20   Q. Let me ask a question first. Let me ask
21 the question. Do you see that?
22   A. I see that.
23   Q. Okay. My question is, When we went over
24 the industry standards, you said there was no
25 timeframe or limit for industry-standard denial

152

1 letters. What was wrong with the fact that they
2 denied over a month after the claim was submitted?
3    A. Okay, so first off, I said it depends on
4 the claim on how fast the denial would be issued.
5 And I also talked about binder procedures and what
6 investigation should have taken place.
7        So Chubb denied the claim and they didn't
8 even have the endorsement. The denial wasn't even
9 based on the endorsement. It was -- it was based
10 on the policy without the endorsement.
11       And then they -- then they realized that,
12 the adjustor realized -- I mean, had the adjustor
13 done any investigation at all, had he talked to the
14 insured, or had he talked to Willis, he would have
15 understood that they were waiting on an endorsement
16 to come through, and he would have taken that into
17 consideration.
18       But he apparently didn't talk to anybody,
19 and there's no indication in the claim-file notes
20 that he talked to anybody outside of Chubb.
21   Q. When you say "apparently," you're
22 speculating?
23   A. No. I'm saying the claim-file notes show
24 that he did not speak to anybody. There's no
25 indication in the claim-file notes of any

153

1 conversation with anybody. The only indication in
2 those claim-file notes is he left a message for
3 Tulane on a certain date. There's no follow-up.
4 There's no notes saying, I spoke with the insured
5 on this date and this is what they told me. It
6 doesn't look to me like they spoke -- he spoke with
7 Chubb -- with Tulane at all.
8        So, I mean, there's nothing documented in
9 the claim file that they had any conversation. So
10 I go back to the industry saying, If it doesn't
11 appear in the claim-file notes, it didn't happen.
12   Q. Well, if Chubb believed the basis of its
13 denial, that there was no coverage under the policy
14 for COVID 19 was articulated in their Denial
15 letter, what difference does it make if it was done
16 quickly or 60 days down the road?
17   A. Well, it was done quickly because they
18 didn't investigate the claim is my point.
19   Q. Well, what's the problem if the basis of
20 their denial is articulated in their Denial letter?
21 What difference does it make if it was quickly or
22 six months down the road?
23   MS. CURTIS:
24       I'm sorry, Tom, you said based on the
25       Denial letter. You're talking about the

154

1    initial Denial letter?
2    MR. CARRUTHERS:
3       Yeah.
4    THE WITNESS:
5       You're dealing with a multimillion-
6    dollar claim that would have a serious
7    impact on your insured. What's the rush to
8    judgment here? Why wouldn't you conduct a
9    thorough investigation and talk with all
10   the players prior to making any kind of
11   decision to deny a multimillion-dollar
12   claim?
13 BY MR. CARRUTHERS:
14   Q. Well, if it was -- if it was Chubb's
15 position that there's no coverage, why shouldn't
16 they send the Denial letter?
17   MS. CURTIS:
18      Again, we're talking about the initial
19   Denial letter?
20   MR. CARRUTHERS:
21      I'm sorry.
22   MS. CURTIS:
23      The problem is there are two denial
24   letters, and they're different bases for
25   denial of each one. So I'm asking, you

155

1    know, to be -- to have the record correct
2    which Denial letter are you talking about?
3    MR. CARRUTHERS:
4       Well, I'll talk about the first one
5    first.
6    MS. CURTIS:
7       Okay.
8 BY MR. CARRUTHERS:
9    Q. Kate, why don't you bring it up so we avoid
10 any confusion here.
11   A. Well, to answer the question --
12   Q. No, no answer until there's a question,
13 please.
14   A. Well, you did ask a question.
15   Q. Will you bring up number 12, please.
16   MS. CURTIS:
17      We already have Exhibit #12. It's the
18   Donna Bell e-mail.
19   MR. CARRUTHERS:
20      It's not Exhibit 12; it's 12 --
21   MS. CURTIS:
22      I'm sorry. I'm sorry, Tom. I'm just
23   trying to help. It's how it looks.
24 BY MR. CARRUTHERS:
25   Q. Okay. Mr. Fey, do you see the letter dated

156

1 May 27, 2020, from David Klink of Chubb to Tulane
2 University?
3       (Whereupon, the document was duly
4    marked for identification as "Exhibit #13"
5    and attached hereto.)
6    A. Yes.
7    Q. You've seen that before, right?
8    A. Correct.
9    Q. The first Notice of Loss was submitted on
10 April 7, 2020, correct?
11   A. Correct.
12   Q. So we're talking a period of almost seven
13 weeks, right?
14   A. Sure.
15   Q. So it's your opinion that this was, this
16 Denial letter that was sent out was done quickly,
17 right?
18   MS. CURTIS:
19      Object to the form, Tom. You just read
20   his opinion. He said it was quickly after
21   the issuance of the endorsement; not after
22   the Notice of Claim.
23   MR. CARRUTHERS:
24      Well, I'm getting to that.
25 BY MR. CARRUTHERS:

157

1    Q. So you said it was done quickly, correct?
2    A. After the issuance of the endorsement.
3    Q. Okay. So typically when you're looking at
4 timeframes and you're making expert opinions on
5 whether something was quick or timely or not
6 timely, you're looking at the first Notice of Loss
7 and then any response to that Notice of Loss,
8 correct?
9    MS. CURTIS:
10      Object to the form.
11   THE WITNESS:
12      Well, you have to look at the claim and
13   the facts of the claim and what
14   investigation should have taken place.
15   There's a lot of different factors. You
16   have got to take each claim on its own
17   merits as we've discussed.
18 BY MR. CARRUTHERS:
19   Q. So is it your opinion that the Denial
20 letter dated May 27th from Chubb in response to the
21 first Notice of Loss dated April 7, 2020, was too
22 quick?
23   MS. CURTIS:
24      Object to the form.
25   THE WITNESS:

158

1      I think my criticism is that they
2   didn't investigate the claim before they
3   issued the denial. And then when they did
4   issue the denial, their Underwriting
5   Department had issued the endorsement
6   finally, but they didn't even consider it
7   or quote it in their Denial letter.
8      So they didn't do any investigation.
9   Had he talked to anybody, he would have
10   known that this -- everybody was waiting on
11   this endorsement. But it wasn't even a
12   consideration in this denial because he
13   didn't investigate the claim. It was just
14   a straight-out denial.
15 BY MR. CARRUTHERS:
16   Q. I appreciate --
17   A. His denial was that the term "virus" is not
18 within the Indoor Environmental Condition
19 definition in the policy. And then he threw in a
20 bunch of exclusions that have nothing to do with
21 the claim.
22   Q. So could you please answer my question.
23 Are you of the opinion that the Denial letter was
24 issued too quickly?
25   A. Yes.

159

1   Q. Kate, could you please mark number 14,
2 please.
3      THE COURT REPORTER:
4      Number 14 is Exhibit #14.
5   (Whereupon, the document was duly marked
6   for identification as "Exhibit #14" and
7   attached hereto.)
8 BY MR. CARRUTHERS:
9   Q. Now, Mr. Fey, we've marked as Exhibit #14 a
10 letter dated July 14, 2020, from David Klink of
11 Chubb to Ms. Meredith Whitten at Tulane.
12   You've seen this before, right?
13   A. Yes.
14   Q. And this is a letter from Chubb maintaining
15 its position that there's no coverage for the
16 Tulane claim, correct?
17      MS. CURTIS:
18      Object to the form.
19      THE WITNESS:
20      Well, this is the second Denial letter,
21   and in this one, they incorporate
22   Endorsement 44. But they also say that the
23   initial denial stands and this merely
24   supplements it, supplements and
25   incorporates on May 27, 2021.

160

1 BY MR. CARRUTHERS:
2   Q. My question to you, sir, is, Are you of the
3 opinion that this July 14, 2020, letter was issued
4 too quickly?
5   A. Yes.
6   Q. And why is that?
7   A. Because they didn't conduct their
8 investigation.
9   Q. So if Chubb was of the position that there
10 was no coverage based on whatever internal
11 investigation or exploration of policy terms or
12 other documents that it wanted to do, you still
13 think that this is too quick of a denial; is that
14 right?
15   A. Yeah.
16   Q. And you say that because, in your opinion,
17 they didn't do a thorough investigation; is that
18 right?
19   A. That's correct.
20   Q. So is it your opinion that, in accordance
21 with insurance industry standards, once a carrier
22 makes a decision about whether there is or is not
23 coverage, that it should wait some period of time
24 after making that decision before it issues its
25 Denial letter?

161

1      MS. CURTIS:
2      Object to the form.
3      THE WITNESS:
4      No. My opinion is that an insurance
5   company is required to do a prompt and
6   thorough investigation. And only after
7   conducting that prompt and thorough
8   investigation can you even think about
9   denying a claim. They need to gather all
10   the facts and talk to all the witnesses or
11   people involved and get all the relevant
12   information together before issuing a
13   denial. My opinion is they manufactured a
14   basis for denial before they even
15   investigated the claim.
16 BY MR. CARRUTHERS:
17   Q. So it's not so much the timing of the
18 letter, is it? It's more that you disagree where
19 you believe they didn't conduct a thorough
20 investigation, at least thorough in your opinion,
21 correct?
22   A. I guess you could phrase it that way. The
23 issue is they didn't conduct any investigation and
24 they denied it once. And then they realized that
25 they made a mistake, and so they denied it a second

162

1  time.
2     Q.  And the basis for denial in both letters
3  was the same, right?  That there was no coverage
4  under the Indoor Environmental Conditions
5  Endorsement, correct?
6     MS. CURTIS:
7        Object to the form.  That was not the
8  denial in the first one as they didn't even
9  mention the endorsement in the first one.
10    THE WITNESS:
11       Yeah, it was -- well, they
12 incorporated.  "Supplement" is their words.
13    MS. CURTIS:
14       But the first Denial letter said there
15 no virus coverage under the policy and did
16 not acknowledge the endorsement had been
17 fully --
18    MR. CARRUTHERS:
19       Please, please, please.  If you have an
20 objection, please, object --
21    MS. CURTIS:
22       Object to the form.
23    MR. CARRUTHERS:
24       No coaching the witness, please.
25    MS. CURTIS:

163

1        He doesn't need my coaching.
2     MR. CARRUTHERS:
3        Well, then, you don't need to make your
4  statement.  Just say --
5     MS. CURTIS:
6        Then don't say they denied it for the
7  same reason in both letters because that's
8  patently incorrect.
9     MR. CARRUTHERS:
10       Okay.
11 BY MR. CARRUTHERS:
12    Q.  Now, Mr. Fey, the opinion about there not
13 being a proper investigation is just -- now, I just
14 want to be a hundred percent clear -- it's based
15 solely on your review of what was in the claim
16 file, correct?
17    A.  No, it's not based solely on that.  It's
18 based on the binder procedure I talked about
19 earlier.  If you've got a claim submitted where the
20 policy is either not been issued or was not
21 complete, you have to talk with the insured, the
22 broker or agent.  If there's a broker and an agent,
23 well, you talk to both of them and you talk to the
24 underwriter.
25       And you interview all those parties and try

164

1  to get to the bottom of exactly what happened and
2  what the intent was.
3        There's no discussion of any of that in the
4  claim file.  They didn't do any investigation.
5  From the claim file, all I can determine is that
6  they left a message for somebody at Tulane at one
7  point.  And there's no indication they ever talked
8  to anybody.  And I know they didn't talk to anybody
9  at Willis.
10       Now, if you're denying coverage on a big
11 account like Tulane, the proper procedure would be
12 for the adjustor to call the agent and talk to him
13 about it before you issue a denial and provide the
14 agent with a copy of the Denial letter so they can
15 take a look at it.
16       They didn't do any of that.  Had they done
17 it, they would have understood that there was an
18 endorsement missing from the policy that hadn't
19 been issued yet that Chubb Legal was still working
20 on, and they wouldn't have denied it.
21    Q.  So do you believe that the basis for denial
22 of coverage as set forth in the July 14, 2020,
23 letter was the result of an improper or inadequate
24 investigation?
25    A.  Yes.  I think that the basis for their

165

1  denial is wrong in both letters.
2     Q.  Let's focus on the second letter.  What's
3  wrong with the basis for denial in your opinion?
4     A.  So they admit that, it says, "Chubb agrees
5  that COVID-19 meets the requirements of subpart 2B,
6  but COVID-19 does not meet the requirements of
7  subpart 2A which requires that the virus not be the
8  result of communicability through human-to-human or
9  bodily-fluid contact.
10       And that's not what the endorsement says.
11 It says, "...such bacteria and viruses are not the
12 result of communicability through human-to-human or
13 bodily-fluid contact."
14       So the claim was for COVID contamination of
15 the campus; not sickness of some human through --
16 human-to-human contact.  It was broader than that.
17 And they didn't do any investigation to nail down
18 that fact.
19    Q.  So what exactly is your understanding of
20 what Tulane's claim was as submitted to Chubb by
21 way of the April 7, 2020 -- or 2020 notice letter?
22    A.  Well, they had contamination of their
23 campus.  They had students that were ill that they
24 had to quarantine.  They were taking steps to
25 decontaminate the campus.  There was a lot of

166
1 things. I mean, had Chubb done the investigation,
2 they would have gotten all that out in front.
3 That's why you do an investigation.
4    Q. So your understanding of the claim
5 submitted by Tulane appears, at least to me, to be
6 slightly different than what Chubb -- that Tulane
7 submitted in their April 7th letter.
8    MS. CURTIS:
9        I'm sorry.  Could you pull down the top
10       of the -- okay.  I'll just object because
11       there was a separate letter.
12   THE WITNESS:
13       Is there a question?
14 BY MR. CARRUTHERS:
15    Q. Yeah.  Is the notice that was submitted to
16 Chubb consistent with what you just testified about
17 the scope of the claim that Tulane submitted?
18   MS. CURTIS:
19       Objection.  Incomplete hypothetical
20       because of subsequent letter before the
21       July 14, 2020, denial.
22 BY MR. CARRUTHERS:
23    Q. Go ahead, Mr. Fey.
24    A. Well, I mean, the Notice letter is a Notice
25 letter.  That's the beginning of the whole thing,

167
1 and that's when you conduct an investigation.  The
2 investigation would have revealed the full scale of
3 what was being claimed.  Once again, that's why you
4 investigate claims before you make any kind of
5 denial.
6    Q. So is it your opinion that the claim was
7 more for property damage?  What exactly is your
8 understanding of what the claim was for?
9    A. It's a claim.  I mean, had he jumped on the
10 investigation, it would have been documented in
11 their claim file.
12    Q. My question to you is, What's your
13 understanding of Tulane's claim and the scope of
14 that claim?
15    A. Well, there's all kinds of things.  There's
16 decontamination of the -- of the campus.  There's
17 remediation.  There's quarantine and expenses in
18 testing students.  I think vaccinations.  There's a
19 whole litany of different things.  But I'm not on
20 the damage side of this.  That's not for me.
21    Q. Well, you're aware that The Court made a
22 ruling on the Summary Judgment Motions in this
23 case, right?
24    A. Correct.
25    Q. And ruled that certain components of

168
1 Tulane's claim were -- their Summary Judgement,
2 Tulane's Summary Judgment Motion was denied on the
3 remediation costs, correct?
4    A. Correct.
5    MS. CURTIS:
6        Objection.  As limited to what is in
7        the Order, that's all.
8 BY MR. CARRUTHERS:
9    Q. So other than your opinion that there was
10 not a proper investigation, do you take issue with
11 the grounds upon which Chubb has denied coverage?
12    A. Yes.
13    Q. And can you explain exactly what you take
14 issue with?
15    A. All right.  From starting with the first
16 letter, they didn't quote the endorsement at all.
17 They denied it because they said virus wasn't
18 covered by the policy.
19       And in addition to that, it listed the
20 contractual liability exclusion which is insane.  I
21 mean, how does that come into play in this claim?
22 Employer's liability, first-party property damage,
23 insured's internal expenses or workers'
24 compensation.
25       So, I mean, they threw policy exclusions in

169
1 there that had nothing to do with the claim
2 whatsoever, and they didn't -- and they said that
3 there was no virus coverage provided by the policy.
4       And then we go to the second letter, and
5 while they admit that requirements of subpart 2B,
6 therefore -- let's see -- "Therefore, the
7 requirements of subpart 2B in subparagraph 2 are
8 not met and coverage for COVID is not extended by
9 Endorsement 44."
10       They admit that -- excuse me; I'm getting
11 choked up here.  Hang on -- here is the part I was
12 looking for.  "Chubb agrees that COVID-19 meets the
13 requirements of subpart 2B, but COVID-19 does not
14 meet the requirements of subpart 2A."
15       Well, 2A is the human to human.  So putting
16 aside the post-loss-underwriting issue and whether
17 or not the endorsement was correct or not, but just
18 taking the endorsement at face value, the loss was
19 broader than human-to-human contact.  It was
20 surface-to-human, human-to-surface, air, whatever.
21 So it's -- it's not correct.
22    Q. So your position is that Chubb's
23 interpretation and application of Endorsement 44 is
24 wrong?
25    A. Yes.

170
1    Q.  And explain to me every reason why you
2  believe it's wrong.
3    A.  I just did.
4    Q.  That's the scope of it right there?
5    A.  Well, the only basis that they denied the
6  claim on is that Chubb agrees that COVID-19 meets
7  the requirements of subpart 2B, but COVID-19 does
8  not meet the requirements of subpart 2A, so it's
9  being denied based on subpart 2A.
10      Of course, you know, they included the
11  original Denial letter and all those things that
12  are inapplicable.  But 2A is -- are not the result
13  of communicability through human-to-human or
14  bodily-fluid contact.
15      So if it's the result of communicability
16  through human to surface or surface to human or
17  through the air, it's not excluded.  So they
18  applied the exclusion for the limitation much more
19  broadly than it was written.
20    Q.  It's not an exclusion, is it?  It's not
21  termed --
22    A.  A limitation.
23    Q.  Okay, you said exclusion or limitation.
24  It's not an exclusion, correct?
25    A.  Yeah.  I said "exclusion" and then I

171
1  corrected myself and said "limitation."
2    Q.  Let's look at -- Kate, could you pull up
3  going back to the report, please.
4      Look at Paragraph 24 -- not the bullet
5  points, okay -- in this paragraph, Mr. Fey, you
6  talk about this claim could be considered to be a
7  loss under binder.  Do you see that?
8    A.  Correct.
9    Q.  Now, you're not saying it is a loss under
10  binder, correct?
11    A.  I think it is a loss under binder.
12    Q.  Well, that's not what you say in your
13  report.  You say it could be considered.
14    A.  Well, I'm changing my opinion to I think it
15  is a loss under binder.
16    Q.  And explain to me what you mean by "loss
17  under binder"?
18    A.  A loss under binder is when a claim is
19  submitted where the policy hasn't been issued
20  yet -- or in this particular case where the
21  endorsement hasn't been issued yet -- that was
22  supposed to be on the policy.  So at that point,
23  you do the binder procedure which I've laid out a
24  couple times already.
25    Q.  So you say "...coverage would therefore

172
1  need to be evaluated based on Tulane's reasonable
2  expectations."  Correct?
3    A.  Yes.  So you interview the insured, the
4  agent, the broker and the underwriter and you try
5  to figure out what the intent was.
6      And if -- if the insured had an expectation
7  that was broader than what the policy might provide
8  but within the realm of what was stated on the
9  binder, then you've got a problem on your hands,
10  and you have to -- you really have to apply the
11  language of the binder.  And that's why it's called
12  "binder procedure."
13    Q.  So if I have --
14    A.  That's an insurance concept; not a legal
15  concept.  So it's for you guys to argue to The
16  Court whether or not it's -- the loss should be
17  based on the language of the binder or of the
18  endorsement.  That's not my fight.  What I'm saying
19  is that's the way it works in the insurance
20  industry.
21    Q.  So if I understand this binder procedure
22  correctly, you would have to understand what the
23  expectations were of the insured, and what the agent
24  understood those expectations to be, and what was
25  transmitted to the carrier, correct?

173
1    A.  Correct.  But you do that right up front.
2  You do it immediately.  Because the more time you
3  give people to think about things, the more
4  stories can change.  So the adjustor should have
5  been interviewing all these people immediately to
6  find out what they knew.
7      And from what I'm reading in the e-mails
8  that were exchanged after the fact, I don't think
9  Willis or the underwriter knew exactly what they
10  were -- what they involve.
11      If the adjustor interviewed all these
12  folks, we would know.  If a proper investigation
13  had been completed, we would know exactly what
14  everybody was thinking at this point.
15    Q.  So if this is a binder procedure, are you
16  saying that the terms and conditions of the policy
17  and any related endorsements don't control?
18    MS. CURTIS:
19      Object to the form.
20    THE WITNESS:
21      Well, the binder procedure's for what
22  was not issued at the time of the loss.
23  The other provisions of the policy that
24  were issued prior to the loss would still
25  apply, of course.

174
1 BY MR. CARRUTHERS:
2   Q. So is it your position that, in this binder
3 procedure, Endorsement 44 wouldn't be considered?
4   A. Well, it's considered in -- along with the
5 interviews of all people that were involved. But
6 keep in mind, Endorsement 44 didn't exist at the
7 time of the claim so, I mean, that's really what
8 the discussion is about.
9      What was the expectations and what were the
10 discussions? What took place at the proposal? All
11 those kind of things.
12   Q. So you're not saying that if this binder
13 procedure were to apply here, that there would be
14 coverage? You're not saying that, are you?
15   MS. CURTIS:
16      Object to the form.
17   THE WITNESS:
18      You said there would be or wouldn't be?
19 BY MR. CARRUTHERS:
20   Q. Would or would not be, either way.
21   A. No, I'm just saying that a proper
22 investigation in a claim like this would be to
23 conduct a binder procedure. And at that point, we
24 would have documentation because we'd have
25 statements from everybody involved saying exactly

175
1 what they all thought. And then if there's a
2 dispute, after all of that is done, then at least
3 you know where everybody is coming from.
4   Q. Do you know --
5   THE VIDEOGRAPHER:
6      I'm sorry to interrupt. We have about
7      five minutes to a media change. Thanks.
8 BY MR. CARRUTHERS:
9   Q. Mr. Fey, do you know whether Tulane has
10 ever raised this binder procedure in this case?
11   A. Actually, yeah, I saw some correspondence
12 from Tulane pointing out that the endorsement had
13 not been issued at the time of the loss.
14      So, I mean, it wouldn't -- they wouldn't
15 necessarily know the term "binder procedure."
16 That's kind of a claim's thing, but they -- they
17 actually did a pretty good job of understanding the
18 issues in some of their responses.
19   Q. So you're not saying that Tulane or its
20 inhouse or outside counsel have raised this binder
21 procedure, are you?
22   MS. CURTIS:
23      Object to the form.
24   THE WITNESS:
25      I'm sure they've never heard of "binder

176
1      procedure." That's an industry phrase.
2 BY MR. CARRUTHERS:
3   Q. I didn't see that in your industry
4 standards.
5   A. Well, maybe I'll add it.
6   Q. Okay. If we only have five minutes, why
7 don't we break here.
8   THE VIDEOGRAPHER:
9      Thank you, Counsel. The time is 2:46.
10      We're going off the record. This ends
11      media file three.
12      (Brief recess was taken.)
13      The time is 2:55. We're back on the
14      record. This begins media file four.
15 BY MR. CARRUTHERS:
16   Q. Mr. Fey -- Kate, could you put up the
17 report Paragraph 24, please -- Mr. Fey, in the
18 first sentence you say, "Chubb," you said, "erred
19 in issuing its policy."
20      What did you mean by that?
21   A. Well, it means that they issued a policy
22 didn't reflect the agreement of the -- that's
23 documented in the proposal and the quote.
24   Q. And then in the bolded and highlighted
25 language in the center of that paragraph, you said,

177
1 "The endorsement was not issued until a month after
2 it was placed on notice of Tulane's claim. Chubb
3 had an opportunity to add whatever language it
4 desired in order to defeat coverage knowing that a
5 claim had already been asserted."
6      Are you saying there that Chubb did add
7 language to defeat coverage?
8   A. No. I think what I said is Chubb had an
9 opportunity to add whatever language it desired in
10 order to defeat coverage knowing that a claim had
11 already been asserted.
12   Q. So why are you raising that if you're not
13 saying they did it?
14   A. I'm highlighting it.
15   Q. And why is my question.
16   A. Because this is a binder claim, and I think
17 The Court and jury ought to be aware of that.
18   Q. But, again, you're not saying that Chubb
19 did draft anything, add things, delete things, to
20 defeat coverage after the claim came in, correct?
21   A. Well, I think the endorsement was wrong
22 based on the documents of, you know, what they did
23 or didn't do knowing or unknowingly. It's not for
24 me to decide.
25   Q. Okay. So you have no opinion on whether

178

1 they did or didn't draft anything to defeat
2 coverage, correct?
3     A.  All I can do is highlight what happened.
4 You know, it's for the trier of fact to figure out
5 what they're going to do with it.
6     Q.  Now, after Tulane first received the policy
7 which was sent to Willis on March 29th of 2019 and
8 then, in turn, sent it to Tulane in early May of
9 2019, do you know whether Tulane ever requested to
10 see a copy of language that it wanted included in
11 the policy?
12    A.  I don't know what -- if there were any
13 communications.
14    Q.  Before the policy was issued, do you know
15 whether Tulane ever requested to see draft language
16 for the MS-0000 endorsement?
17    A.  I don't know.
18    Q.  Tulane had an opportunity to make that
19 request, didn't it?
20    A.  Sure.
21    Q.  But you're not aware of anything showing
22 they made such a request, correct?
23    A.  No.
24    Q.  Either before or after the policy was
25 issued, right?

179

1     A.  No.  I know that it was communicated to
2 them by Willis that they were trying to get a copy,
3 get the endorsement issued, and it takes a couple
4 of endorsements off the policy.
5     Q.  Okay, let's turn to Paragraph 26, please.
6 Here you've quoted some of the language of the
7 policy concerning first-party remediation costs,
8 and you've highlighted and bolded language.
9         Why did you do that?
10    A.  To highlight it.
11    Q.  What's that?
12    A.  To highlight it.
13    Q.  Why is my question.
14    A.  Just to bring it to the reader's attention.
15 I thought it was important, reasonable and
16 necessary for mediation costs.  And then I've got
17 the definition of "remediation costs" below it.
18    Q.  So you're not opining on those issues;
19 you're just --
20    A.  Having the people reading my reports
21 attention.
22    Q.  And then Paragraph 28 you talk about
23 industry standards, and you say, "Coverage for
24 Tulane's COVID-19 remediation costs under
25 Endorsement 44 is triggered by this insuring

180

1 agreement to the extent that Tulane's remediation
2 costs were in an effort to investigate," and then
3 you go on and on.  Do you see that?
4     A.  Yeah.  I'm basically working the definition
5 into the -- I like to -- a lot of times when I'm
6 looking at coverage issues, I like to insert the
7 language into a sentence so you can see that, if
8 you use it, it's a -- it's a reasonable way of
9 phrasing things.  So that would lead to coverage.
10    Q.  Okay.  And where you talk about coverage
11 being triggered, you're not saying coverage was
12 triggered here?  But you said, "...to the
13 extent..."  Is that what you're -- let me withdraw
14 that.  That's a bad question.
15        When you say coverage under Endorsement 44
16 is triggered, you're not saying here and you're not
17 opining that coverage was triggered under
18 Endorsement 44, are you?
19    A.  Well, I think coverage is triggered by the
20 lead-in language of 44 in the policy, because it
21 basically incorporates the claim into the main
22 policy form and inserts the term "virus" into the
23 policy.  But then there are qualifiers or
24 limitations to the coverage that's being provided.
25    Q.  Well --

181

1     A.  According to Endorsement 44.
2     Q.  Where you say "to the extent," so my
3 question, again, is, You're not opining here that
4 coverage was, in fact, triggered, correct?
5     A.  No, I'm talking about more of the structure
6 of the policy and the way the language interacts
7 with the policy.
8        So you've got -- you've got your main
9 policy insuring agreement, which is what it is.
10 It's really not altered by Endorsement 44.  And
11 then you've got your definitions under the policy
12 of "Indoor Environmental Condition."
13        So basically what they've done is they just
14 insert "virus" into that definition.  So when
15 you're reading through the policy, you have
16 coverage for Indoor Environmental Conditions, but
17 then they put these limitations or qualifiers on
18 coverage of -- in that endorsement, also.
19    Q.  Okay, let's -- I think you're getting down
20 to Paragraph 29.  Let's talk about that.
21        So you say, "While Chubb attempts to make a
22 distinction between exclusions and qualifiers,"
23 that language, you're not saying that the language
24 in Endorsement 44 is an exclusion, are you?
25    A.  No, I'm saying it's a limitation.

182

1    Q.  Is that the same as a qualifier in your
2 view?
3    A.  Not really.  I think limitations are
4 anything that takes away or limits coverage in any
5 way.  And the insurance industry treats them the
6 same way they treat exclusions.  So if you're going
7 to apply those, you have to be able to prove that
8 they -- that the limitation applies.
9    Q.  So is it your opinion that industry
10 standard is that exclusions are exactly the same as
11 qualifiers or limitations?
12    A.  No.  Exclusions are clearly exclusions, and
13 there's some lead-in language that affects their
14 application.
15       You're using the term "qualifiers."  I
16 consider them to be limitations of coverage.  So
17 you've got an insuring agreement of the main policy
18 that triggers coverage for the claim because
19 viruses are part of the Indoor Environmental
20 Condition definition.  And then you've got
21 limitations that are placed upon that coverage for
22 virus and bacteria.
23    Q.  And it's the insured's burden to show that
24 limitations don't apply, correct?
25       MS. CURTIS:

183

1       Object to the form.
2 THE WITNESS:
3       I don't agree with that.  I think it's
4       the adjustor's burden to show that a
5       limitation, a policy limitation is going to
6       apply from an insurance-industry
7       perspective.
8 BY MR. CARRUTHERS:
9    Q.  So if something in a policy is not an
10 exclusion, is it your testimony that the insurer
11 has the burden of proof on that?
12    A.  Yes.  So I think as long as the insured can
13 show an event that falls within the trigger of
14 coverage for the policy, then they've -- and
15 there's damages -- they've done their part.  And
16 then it's up to the insurance company to justify
17 their position if they're trying to eliminate
18 coverage somehow.
19    Q.  A burden of proof is a legal issue,
20 correct?
21    A.  It can be.
22    Q.  Well, it is or it isn't?
23    A.  Well, you know, it's in my -- on my
24 "Industry Standards" page quoted from a textbook,
25 and it's something that adjustors have to be able

184

1 to consider when they're evaluating coverage for a
2 claim.  So I think it could be both a legal and an
3 insurance phrase.
4    Q.  How about in this case, what is it?
5    A.  The way I'm talking about it, I'm talking
6 a -- from an insurance perspective on coverage
7 triggers exclusions and limitations and the
8 obligations of each party.
9       So, I mean, you guys can argue with The
10 Court on how it should be applied, and that's up to
11 you guys and the judge.  I'm just saying from my
12 perspective, as an insurance adjustor, that's the
13 way they're applied.
14    Q.  So in this case, you're not rendering any
15 opinion about whose burden it is with respect to
16 the -- provided that language in Endorsement 44,
17 are you?
18    A.  Well, I am from an insurance perspective
19 but not a legal perspective.  So, I mean, that's
20 what I just said.  You guys can argue to The Court
21 about what the burden of either party is or is not
22 from a legal perspective.
23    Q.  So when you --
24    A.  You have to -- all I can do is talk about
25 industry standards and practice, and then you guys

185

1 have to apply the law to it.
2    Q.  So just so that I'm clear.  Your
3 interpretation of "industry standard" is that this
4 provided that language that's in Endorsement 44
5 would -- the burden of proof would be on the
6 insurer, correct?  Is that your interpretation?
7    A.  Correct.  Because all it's doing is
8 inserting "virus" into the definition of Indoor
9 Environmental Condition.  It's not providing a
10 whole new set of coverage.  It's just modifying
11 that definition in the policy.
12       So coverage is already triggered by the
13 insuring agreement, so at that point, it becomes a
14 limitation under subsection 2A I think.  It is the
15 one at issue.
16    Q.  So you would agree that The Court is going
17 to be the final arbiter on whose burden that is,
18 correct?
19    A.  Sure.  From a legal perspective, correct.
20    Q.  Let's turn to Paragraph 30, and you talk
21 about Chubb's reliance on the human-to-human or
22 bodily-fluid transmission limitation.  You say that
23 basis for denial was inappropriate and
24 misrepresents the provision.
25       And then you say, "Since we're dealing at

186

1 least in part with property transmission, human-to-
2 property transmission or property-to-human
3 transmission; not human-to-human and not bodily-
4 fluid transmission; this coverage limitation
5 doesn't apply."
6     Mr. Fey, how could you possibly render a
7 medical conclusion like that?
8     A. I'm not. It's not a medical conclusion.
9 It's a -- it's contamination of a university, and
10 they're decontaminating their property because they
11 have to -- everybody went through COVID. It's not
12 a medical opinion. Everybody knows you can get it
13 from putting your hands on doorknobs and gas-pump
14 handles. And just any surface that's out there you
15 can get it.
16     So everybody was wearing gloves and masks
17 and -- you know, you went through it. Everybody
18 went through it. It's not a medical conclusion.
19 It's -- we know that they were sanitizing all the
20 surfaces in the campus, and they had remediation
21 contractors in there.
22     Q. So you're saying this claim has nothing to
23 do with human-to-human and not bodily-fluid
24 transmission; is that correct?
25     A. I didn't say that at all. I said at least

187

1 in part.
2     Q. Well, it says here --
3     A. It's not -- when you're dealing, at least
4 in part, with property transmission, human-to-
5 property transmission, or property-to-human
6 transmission, the coverage limitation does not
7 apply.
8     It's not an all-encompassing limitation.
9 It is -- that's what I discussed before. Chubb's
10 trying to apply it in a broader fashion than what
11 it actually says.
12     Q. Well, who are you to say, as an insurance
13 person, what the medical quantity or qualities are
14 of this transmission? You have no medical
15 training, background, experience, or qualification
16 to testify about that.
17     A. And I'm not opining on any kind of medical
18 issue. You're just trying to mischaracterize what
19 I'm saying. I'm saying the claim was for the
20 decontamination of surfaces. That's not human to
21 human. That's surfaces.
22     I mean, we've got invoices galore showing
23 that they decontaminated all the surfaces. How can
24 you ignore that?
25     Q. So let's turn to Paragraph 31. You say,

188

1 "Tulane's claim can easily be described in a
2 reasonable manner which results in a path to
3 coverage as follows," and then you have something
4 in italics here.
5     That's not language in the policy, right?
6     A. Yes, it is. It's using language from the
7 policy and putting it in a sentence that results in
8 coverage.
9     Like I said before, I like to retake the --
10 take the definitions and put them into a sentence
11 to see if it makes reasonable sense that there's
12 coverage under the policy.
13     And that's, right there, that's a path to
14 coverage. "Migration of viruses in a building or
15 structure, or the ambient air within such building
16 or structure."
17     Q. So the italicized language is not a direct
18 quote from the policy or any endorsement, is it?
19     A. Well, it's using the words out of the
20 policy and putting them into a sentence. So I
21 guess it's my own quote.
22     Q. Listen to my question. Please try to
23 answer the question.
24     This is not a direct quote from any
25 provision of the policy, correct?

189

1     A. Correct.
2     Q. And it's your interpretation and selection
3 of words to try to create a path to coverage; is
4 that right?
5     A. Correct.
6     You can do that. If it makes reasonable
7 sense when you read it, then that's the path to
8 coverage. And that's what an adjustor is supposed
9 to do. He's supposed to try to find a reasonable
10 path to coverage.
11     Q. But you will agree -- and I think you've
12 said it before -- you agree that the language of
13 the policy controls, correct?
14     A. Except for when the endorsement is issued
15 after the loss. So that's the problem you have
16 here. I'm not saying that -- I'm not saying the
17 language doesn't apply. I'm just saying it opens
18 it up to question.
19     Q. And then let's look at Paragraph 32.
20 "Tulane's damages can also be categorized in a
21 reasonable manner that meets the policy definition
22 of 'remediation costs' as follows," and then you
23 have some italicized language.
24     Same question as before. This italicized
25 language is not a direct quote from any provision

190
1 of the policy, correct?
2    A.  Yes, same thing.  I'm trying to put it in a
3 sentence and use it to see if it makes sense.
4        Q.  So is it your opinion that Tulane's damages
5 constitute remediation costs under the policy?
6    A.  It's my opinion that yes.  You know, The
7 Court has already ruled on that, so I don't know.
8        MS. CURTIS:
9           Object.  They've only ruled as to
10          certain costs.
11       THE WITNESS:
12          Well, yeah, I mean --
13       MS. CURTIS:
14          It's limited to testing and
15          vaccination, quarantine, meals and hotels.
16       THE WITNESS:
17          Let me put it this way.  From an
18          insurance-industry perspective, I can use
19          those words in a sentence that makes sense
20          and leads to coverage so -- I'll stop
21          there.
22 BY MR. CARRUTHERS:
23       Q.  While it may make sense, it's not the
24 policy language, right?
25       MS. CURTIS:

191
1          Object to the form.
2     THE WITNESS:
3          Well, it's -- it's using the policy
4        terms and putting it into a sentence.  I'm
5        not -- I'm not twisting anything.  I'm
6        using everyday words, and I'm using the
7        words out of the policy and finding a path
8        to coverage.
9 BY MR. CARRUTHERS:
10      Q.  Let's look at Paragraph 33.  You say,
11 "Chubb misrepresented coverage," and then you quote
12 certain language.
13      And when you say, "Chubb misrepresented
14 coverage," where and when did it do that?
15   A.  Well, I already talked about that.  Both
16 Denial letters.
17      Q.  So that's what you're referring to, the two
18 Denial letters?
19   A.  Yes.
20      Q.  Paragraph 34 you talk about the mere
21 ability of a virus to spread from human to human
22 serves to exclude coverage.
23      And when you're talking about Chubb's
24 interpretation, you say, "...this would mean that
25 the policy provisions" -- I'm sorry -- "policy

192
1 provides illusory coverage."  Do you see that?
2    A.  Correct.
3        Q.  So explain to me what you mean by "illusory
4 coverage."
5    A.  You're showing coverage where none exists.
6        Q.  So is it your position that the policy
7 issued by Chubb, including Endorsement 44, provides
8 what you call "illusory coverage"?
9    A.  No, because my opinion is that Chubb's
10 misrepresenting the provision.  It's not what it
11 says.
12      Q.  Well, are you saying that Chubb's
13 interpretation of the policy and its Denial letter
14 creates a situation where it's providing what you
15 deem illusory coverage?
16   A.  Yeah, I think -- I think Chubb is trying to
17 apply the limitation much more broadly than it's
18 written.  And any reading of it supports that.  And
19 if they're correct in their interpretation of it,
20 then I think they're selling illusory coverage.
21      But I don't think they're correct.  I think
22 they're wrong.  I think they're trying to apply
23 their exclusion more broadly -- or the limitation
24 more broadly than it's written.
25      Q.  And at the very end of Paragraph 34, you

193
1 say, "Since all viruses can be transmitted from
2 human to human or through bodily fluids," again,
3 you're not qualified to give that opinion.  You're
4 not a medical expert.  How is it that you're
5 opining on viruses?
6    A.  I'm talking about their interpretation of
7 their exclusion.  I'm not trying to be a medical
8 expert.  You could twist -- the way they're trying
9 to interpret their coverage, you could twist those
10 words into excluding any claim for any virus is
11 what they're trying to do.
12      Q.  Well, I'm not talking about their
13 interpretation.  I'm talking about your affirmative
14 statement that, "Since all viruses can be
15 transmitted from human to human or through bodily
16 fluids," that's a medical opinion.  Who are you --
17   A.  That's not what I'm doing here.  I'm
18 talking about the way they're interpreting their
19 provision, their policy limitation.
20      And I'm saying what they're -- if they're
21 allowed to twist the words in the way they're
22 trying to do it, they would never pay any claims
23 for viruses under this policy.
24      So, I mean, you could twist what I'm saying
25 in I'm trying to make a medical conclusion, and I'm

194

1 not. You know, I saw you got a -- you've got some
2 expert on germs, and I'll let them talk about it.
3 Even reading that opinion, I noticed that that
4 expert was a little equivocal about -- all he said
5 was hasn't been proven yet so -- so whatever.
6 I mean, if you want to take that sentence
7 out, I'm okay with that, too. But the intent of
8 the paragraph is that Chubb is trying to apply the
9 language more broadly than it's actually written.
10 **Q. Okay. So you agree that this last phrase**
11 **that you have in there probably shouldn't be**
12 **included; is that right?**
13 A. I'll agree to take it out, that last -- the
14 last part. Yeah, I don't have any heartburn over
15 that. I think I still get my point across, that
16 they're trying to apply the exclusion more broadly
17 than it's written -- or the limitation more broadly
18 than it's written. I think I get my point across.
19 **Q. Okay. Paragraph 35 you talk about**
20 **Endorsement 44 and Section 3. You say it was added**
21 **after the loss, and you say that may have been a**
22 **post-loss alteration of coverage.**
23 **Now, you've mentioned this post-loss**
24 **underwriting concept previously. Is this the same**
25 **post-loss alteration of coverage?**

195

1 A. Yes.
2 **Q. The same, same thing?**
3 A. Same thing.
4 **Q. And in here you say it may have been a**
5 **post-loss alteration of coverage. Again, you're**
6 **not saying it was, right?**
7 A. Well, I don't think that's for me to
8 decide.
9 **Q. Okay. And at the very end, you're talking**
10 **about burden of proof. You're saying it would be**
11 **Chubb's burden to show that the coverage limitation**
12 **applies. And where you make that statement, you**
13 **reference industry standards.**
14 **You're not saying legally it's Chubb's**
15 **obligation, right?**
16 A. No, just from an insurance standpoint.
17 **Q. Okay. Paragraph 36 you say, "It also**
18 **appears that, when discussing this coverage prior**
19 **to agreeing to the premium, that Chubb [sic]**
20 **specifically asked if an Eboli outbreak would be**
21 **covered under the policy. In exchange, Tulane**
22 **documented it on a copy of a proposal during the**
23 **procurement meeting."**
24 **Let's talk about this procurement meeting.**
25 **You obviously weren't present, correct?**

196

1 A. Correct.
2 **Q. You've never heard any recording of any**
3 **discussions at the meeting, correct?**
4 A. Correct.
5 **Q. You've never spoken to anyone who attended**
6 **that meeting, correct?**
7 A. Correct.
8 **Q. So this whole Paragraph 36 is based on your**
9 **reading of those two worksheets or proposal sheets**
10 **that you referenced earlier, right?**
11 A. Correct.
12 **Q. Kate, could you -- do you have the**
13 **worksheet, those two worksheets, Kate?**
14 MS. MATTA:
15 With the notes on them?
16 MR. CARRUTHERS:
17 Yeah.
18 MS. MATTA:
19 The John Hadden, Joyce Fred. I've also
20 got Diane Sola; is that correct?
21 MR. CARRUTHERS:
22 Those three, yes.
23 MS. MATTA:
24 Yes.
25 MR. CARRUTHERS:

197

1 Could you please mark those. I guess
2 we should mark them -- I guess let's mark
3 them separately.
4 MS. MATTA:
5 I also have a version that has all of
6 their notes in one document if that makes
7 it easier.
8 MR. CARRUTHERS:
9 Let's do them separately. Thank you.
10 MS. MATTA:
11 Understood.
12 MS. CURTIS:
13 Tom, what I think she was saying is not
14 all three people's notes in one document.
15 It's the full 82-page proposal, because
16 there's not just notes on that one page.
17 MR. CARRUTHERS:
18 Okay.
19 MS. CURTIS:
20 Do you understand? I just wanted to
21 make sure you understood what Kate was
22 saying.
23 MR. CARRUTHERS:
24 Okay.
25 MS. CURTIS:

198

1      It's an 82-page color-bound proposal.
2  We have the originals and, you know, at
3  first, we just gave you the page the
4  coverage appeared on.
5  MR. CARRUTHERS:
6      Right.
7  MS. CURTIS:
8      But then we gave you the full 82 pages
9  because there may be notes on other pages.
10     MR. CARRUTHERS:
11      Well, let me ask Mr. Fey a question
12  first.
13 BY MR. CARRUTHERS:
14     Q.  At the time you wrote your report, had you
15  seen just the two-page -- two pages of proposal
16  notes?
17     A.  Well, there were two pages of proposal
18  notes plus a comparison chart.
19     Q.  And the comparison chart was on the same
20  page as the notes, right?
21     A.  Yeah, I think that's right, yeah so...
22     Q.  Could you read the two pages that you're
23  referring to?  In the lower right-hand corner there
24  should be three initials before the numbers at the
25  end.

199

1      A.  DRS.
2      Q.  What's the other one?
3      A.  JCH.
4      Q.  Okay, so those are the only -- those are
5  the only two that you reviewed before you wrote
6  your report, right?
7      A.  Yeah.  It seems like there was another
8  document, too, but I don't have it.
9      Q.  Let's just mark the three, and let's mark
10  them separately, individually please.  Exhibit #15,
11  Exhibit #16 and Exhibit #17.
12      (Whereupon, the documents were duly marked
13      for identification as "Exhibits #15, #16
14      and #17" and attached hereto.)
15      Mr. Fey, do you have before you what's been
16  marked as Exhibit #15.  You previously referred to
17  proposal notes and the spreadsheet.  Is this what
18  you were referring to, at least one of the
19  documents?
20      A.  Yes.
21      Q.  Okay.  Kate, can you expand the view a
22  little bit now.
23      What's your understanding of what this
24  document is?
25      A.  This is the part of the proposal that

200

1  Willis would have laid out for Tulane at the
2  presentation showing the differences in coverage
3  between the expiring XL policy and three quoted
4  options.
5      Q.  So how do you know that was prepared by
6  Willis?
7      A.  It's just the standard way that
8  presentations are made by agents.
9      Q.  But you don't know for a fact that this
10  particular worksheet was prepared by Willis,
11  correct?
12      A.  More probable than not.
13      Q.  Yes or no?  Do you know one way or the
14  other?
15      A.  I think it's more probable than not that
16  this was prepared by Willis.
17      Q.  So the answer is no, you don't?  Correct?
18      A.  The answer is --
19      MS. CURTIS:
20      I object to the form in that we just
21      discussed that this is just one page within
22      an 82-page bound document.  And we can look
23      at the cover of the document.
24      MR. CARRUTHERS:
25      Mr. Fey said that he only looked at two

201

1      pages before he wrote the report.  So I'm
2      asking him about the two pages.
3  BY MR. CARRUTHERS:
4      Q.  So Mister --
5      A.  I knew that it came from Willis, because
6  it's a typical proposal that an insurance broker
7  would offer his client.
8      And then now I have the full thing which is
9  "Environmental Liability Quotes, Administrators of
10  Tulane Educational Fund, Stewardship Report dated
11  February 27, 2019.  Willis Towers Watson."
12      Q.  That's February 27th, right?
13      A.  February 27th, correct, 2019.
14      Q.  That's the day the policy incepted, right?
15      A.  That's the date -- yeah, that's the policy
16  effective date.  It's actually says "2019/2020" so
17  it's for that policy period.  So I don't know what
18  the date of the actual presentation -- oh, here it
19  is -- 2/12/19.
20      Q.  Okay.  And what you're reading from was not
21  what you reviewed prior to preparing your report,
22  correct?
23      A.  Correct.
24      Q.  Okay, let's just focus on what you reviewed
25  prior to your report.  This is one of the two pages

202

1  you referenced I believe.
2       So my question is, You don't know who
3  prepared it, right?
4       A.  I do.
5       Q.  Okay, so now you know.  Who prepared it?
6       A.  I knew all along.  There was no question in
7  my mind, but if I'm going in a vacuum just using
8  that one document, I'm not going to say absolutely
9  but more probable than not.
10      But now I have the actual proposals, the
11  whole thing, and just as I knew, it was prepared by
12  Willis.
13      Q.  Mr. Fey, we keep going back and forth on
14  this.  I'm only asking you about documents that you
15  reviewed before you prepared your report.
16      A.  Right.
17      Q.  This was one of them, correct?
18      A.  Right.  Correct.
19      Q.  And do you know who prepared it?
20      A.  Willis.
21      Q.  Okay.  Who at Willis prepared it?
22      A.  I don't know.
23      Q.  When did they prepare it?
24      A.  Probably February of 2019.
25      Q.  Do you know what documents they relied upon

203

1  in preparing this?
2       A.  Well, the quotes from the three different
3  carriers that were quoting it.  And then they used
4  the expiring XL policy.
5       Q.  So, again, do you know what documents that
6  person relied upon in preparing this chart?
7       A.  Yeah, the quotes from the three carriers
8  and the expiring policy.
9       Q.  And how do you know that?
10      A.  Because I'm in the business.  I know how
11  this is done.
12      Q.  Okay, all right.
13      A.  I've been in the business for over
14  40 years.  I've seen this.
15      Q.  Mr. Fey, you're making it more difficult
16  than it need be.  I'm just asking about this one
17  document.  Either you know who prepared it and what
18  they used to prepare it, or you don't.  It's very
19  simple.
20      A.  I've already told you I don't know who put
21  it together, but I do know what they used to
22  prepare it.  The three quotes from the three
23  carriers and the expiring XL policy.
24      Q.  And the basis for knowing that is what?
25      A.  My 40 years of experience in insurance

204

1  business.  And now I have the proposals that
2  they're part of, the actual proposals themselves,
3  but I knew what it was before.
4       Q.  Which you didn't have when you prepared
5  your report?
6       A.  I didn't need it.  I understood what this
7  was saying.
8       You're not in the business so you probably
9  don't understand it like I do.  But I see these all
10  the time.  I see them almost every day.  I know
11  exactly what a proposal is.
12      Q.  All right.  Let's look at the headings.
13  "Modifications to form," and going across the top,
14  "Expiring XL, AWAC, Chubb, Allianz."
15      Then under "Modifications to form," there
16  are different boxes.  And what do those boxes
17  represent based on your extensive experience?
18      A.  Different coverages under the policy.
19      Q.  Okay.  Let's scroll down to disinfection
20  costs and communicable diseases.  Do you see those
21  two boxes?
22      A.  I do.
23      Q.  Let's start with disinfection costs.  And
24  under the first box which is XL I believe -- just
25  scroll up, Kate -- yeah, that's the Expiring XL,

205

1  and next one is AWAC, and then Chubb and Allianz.
2       So on this one page for "Expiring XL,"
3  what's your understanding of the words in that box
4  next to "disinfection costs"?
5       A.  Under --
6       MS. CURTIS:
7            Under "Expiring XL."
8       THE WITNESS:
9            Oh, expiring XL?
10           "Coverage not included."
11  BY MR. CARRUTHERS:
12      Q.  Does that mean it is excluded or just not
13  included?
14      A.  Well, there's no coverage for disinfection
15  costs under the policy.
16      Q.  Okay.  And then going to the AWAC, it says
17  "excluded."  What's your understanding of that?
18      A.  It would be an exclusion in the policy.
19      Q.  And then under "Chubb," can you read that
20  language?
21      A.  "Coverage included for cleaning and
22  disinfection expenses, abatement of facility-borne
23  infectious virus or bacteria that requires
24  reporting to any governmental or healthcare
25  oversight agency."  And then handwritten "Ebola."

206

1    Q.  Okay.  That language, the typewritten
2  language, do you know who prepared that?
3    A.  Same answer.  I don't know who prepared the
4  document.  I can take a guess at who prepared the
5  document if you want me to guess.
6    Q.  Unless you're going to guess at trial, I
7  would prefer you not guess.
8    A.  All right.  You keep asking me the same
9  question --
10      MS. CURTIS:
11          I'll object.  He might, based on parts
12      of the policy -- parts of the proposal that
13      he has, who do you think more likely than
14      not prepared that?
15      THE WITNESS:
16          Donna Bell.
17      MR. CARRUTHERS:
18          That not the question.  That's not the
19      question.
20      THE COURT REPORTER:
21          Sorry, I didn't hear his answer.
22          What was your answer, sir?
23      THE WITNESS:
24          Donna Bell
25      THE COURT REPORTER:

207

1          Thank you, sir.
2  BY MR. CARRUTHERS:
3    Q.  So that's your testimony?  That Donna Bell
4  prepared that language, correct?
5    A.  Well, that's who I think prepared it.  You
6  know, I'd have to go back and review.  I didn't
7  even think about who prepared it.  I wasn't really
8  focused on that.
9        But, generally speaking, what happens is
10  the account managers put them together.  And then
11  they provide them to the producer to take out and
12  conduct the presentation.
13    Q.  Okay.  Next to the typewritten language is
14  the word -- can you read that?
15    A.  "Ebola."
16    Q.  Do you know who wrote that?
17    A.  Yeah.  My understanding is Joyce wrote it.
18      MS. CURTIS:
19          They pulled up -- they pulled up a
20      different one.  They didn't pull up
21      Joyce's.  They pulled up Diane's.
22      THE WITNESS:
23          Oh.
24      MS. CURTIS:
25          Diane is "DRS"; Joyce is --

208

1      THE WITNESS:
2          I got you, yeah, Diane.  And I don't
3      know her full name.
4  BY MR. CARRUTHERS:
5    Q.  Okay.  So it's your understanding that she
6  wrote that word "Ebola," correct?
7    A.  Correct.
8    Q.  Now, if we -- I want to go back to your
9  report, Paragraphs 36 and 37.  And Paragraph 36,
10  you say, "It also appears that, when discussing
11  this coverage..."
12      Who participated in the discussion that
13  you're talking about?
14    A.  Well, Willis, and then I think there were
15  three people from Mr. Tulane there -- Joyce, John
16  and -- I keep forgetting -- Diane.  I told you I'm
17  horrible with names.
18    Q.  Who from Willis was at the meeting?
19    A.  The producer on the account which -- what's
20  his name?  McBride?  Let me see.
21    Q.  And you're reading off the presentation
22  that you didn't have when you wrote the report?
23    A.  No, I'm just -- the producer of the account
24  would have been there to present.
25    Q.  That's the normal procedure.  I'm asking

209

1  you who was there; not who generally would be
2  there, but who was there?
3    A.  Well, I wasn't at the meeting but I'm
4  assuming the insurance producer was there.
5    Q.  Okay.  But you don't know for a fact who
6  was there, correct?
7    A.  I wasn't at the meeting.  But it would be
8  very unusual on an account this size for the actual
9  producer on the account not to be there.
10    Q.  Okay.  Can you tell me exactly what was
11  discussed?  You're referencing in Paragraph 36
12  "...when discussing this coverage..."
13      Who said what about the coverage?
14    A.  Well, there is obviously a discussion about
15  communicability of the viruses because two of the
16  three sheets, they wrote down "Ebola disinfect --
17  disinfection, sublimit.  Ebola" -- well, there's
18  another one.
19      MS. CURTIS:
20          Look at the bottom.
21      THE WITNESS:
22          This is Joyce's sheet.  Same sheet from
23      Joyce.
24  BY MR. CARRUTHERS:
25    Q.  Well, you didn't have that when you wrote

210

1  your report, did you?
2     A.  No.
3        MS. CURTIS:
4           I think you had Joyce's but not
5  Diane's.
6        THE WITNESS:
7           I had Joyce's but I never had Diane's.
8  I don't know.
9        MR. CARRUTHERS:
10          It's all right.
11          Martha, why don't you just tell us
12  which ones he had.
13       MS. CURTIS:
14          He had Joyce's and John's; not Diane's.
15  We just got Diane's recently.  At the time
16  we got it, we circulated it to everyone,
17  and then we circulated to everyone the full
18  copies in color of the full proposals.  We
19  have the originals, as I said, if anyone
20  wants to come inspect them.
21       MR. CARRUTHERS:
22          Okay.  I just want to ask Mr. Fey
23  questions about the two documents he had
24  when he prepared the report.  So it sounds
25  like Joyce Fred's and John Hadden's,

211

1     correct?
2        MS. CURTIS:
3           That's correct.
4  BY MR. CARRUTHERS:
5     Q.  All right.  So let's just go to those two.
6  So what was Exhibit #15?
7        MS. CURTIS:
8           Exhibit #15 was Diane.
9  BY MR. CARRUTHERS:
10    Q.  Skip that one, so let's go to the next one.
11  And this is Mr. Hadden.  So can you expand the
12  bottom two boxes a little bit?
13       Okay, so you had this document when you
14  prepared your report, correct?
15    A.  Correct.
16    Q.  And you reviewed it?
17    A.  Correct.
18    Q.  So can you make out the handwritten notes?
19    A.  Yeah.  I spent some time trying to figure
20  that out when I saw it.  So it says, "Not BI/PD,"
21  and then at the bottom my interpretation of that is
22  "sublimit."
23    Q.  Okay.  So with the top notation, "Not
24  BI/PD," do you know what was discussed?  Not what
25  you think was discussed or what probably was

212

1  discussed, do you know for a fact what was
2  discussed about those BI/PD notations?
3     A.  Yes.  From my reading of that and the other
4  one, they discussed whether or not cleaning/
5  disinfection expenses of a facility would be
6  covered under the policy.
7        And they said, Well, bodily injury and
8  property damage would not be covered.  Disinfection
9  of viruses such as Ebola would be covered.
10    Q.  So who said that?
11    A.  That was the discussion.  And I'm putting
12  that together from the two slides.  And then I have
13  the Affidavits to back it up.  And I have the
14  actual proposals, too.
15    Q.  Well, my question is a little bit
16  different.  What exactly was discussed including
17  who said what?  Not what the note notations say.
18  We've already determined that.
19    A.  Okay.  Well, you know I wasn't at the
20  meeting, so I don't understand what you're asking
21  me.
22    Q.  Well, how could you write Paragraph 36?  It
23  said, "Tulane specifically asked if an Ebola
24  breakout would be covered under the policy."
25  Where is --

213

1     A.  That is my reading --
2     Q.  Where is it at on there?
3     A.  -- on the chart.
4        Well, these documents clearly show "Ebola"
5  clearly on there.  And there wouldn't be any reason
6  to put "Ebola" on there if they didn't discuss it.
7     Q.  Well, does it mean Ebola is covered?  Ebola
8  is not covered?  Ebola may be covered?  What --
9     A.  My understanding was -- and I think I got
10  this from Martha -- was that they discussed whether
11  or not Ebola would be covered.  And the answer was
12  yes.  And she wrote "Ebola" on there to show that
13  that's what they were discussing.  And they also
14  discussed that BI and PD would not be covered.
15    Q.  This is pure speculation on your part,
16  Mr. Fey --
17    A.  No, I got it from Martha.  And I'm allowed
18  to take information provided to me by counsel and
19  consider it.  It makes perfect sense.  I mean, if
20  you look at them, it makes perfect sense.
21    Q.  Whether it makes perfect sense or not is
22  not the question.  The question is, You weren't
23  there.  How do you know what was said?
24       And you just told me that Martha told you
25  what they said.  Now, that's not a factual basis to

214

1 make the opinion that you wrote in Paragraph 36.
2     A.  I disagree.  I think I'm allowed to take
3 information given to me by counsel.
4     Q.  Was Martha at the meeting; do you know?
5     A.  No, but I've got these documents that show
6 the notations.
7         So take their -- take their deposition.
8     Q.  We plan to, but you --
9     A.  And look at the Affidavits that have been
10 submitted.
11     Q.  I've looked at them --
12     A.  You can beat me up all day on this if you
13 want.  But when I reviewed the documents, that's
14 what I took away from it.
15     Q.  And those Affidavits that you -- one of
16 them you didn't even have when you wrote your
17 report -- say that I understand, my understanding.
18 It doesn't say here is what was discussed.
19         How could you possibly write Paragraph 36
20 saying what was discussed --
21     A.  I just told you that's what was discussed.
22     Q.  What's that?
23     A.  Because I was told what was discussed at
24 the meeting.
25     Q.  You were told by Martha what was discussed,

215

1 and that formed the basis for your expert opinion?
2     MS. CURTIS:
3         I'm going to object to the line of
4     questioning, too, because the Petition also
5     has that information in it.
6     MR. CARRUTHERS:
7         Well, that's not what he's saying,
8     Martha --
9     MS. CURTIS:
10         You know, you want to pull up one thing
11     out of one thing, and it's his overall
12     opinion.  He wasn't at the meeting.  I
13     wasn't at the meeting.  Depose the people
14     who were at the meeting.
15     MR. CARRUTHERS:
16         That is our plan.  But how could he
17     possibly say that his report says --
18     MS. CURTIS:
19         Okay, he gave you who they are several
20     times, and you keep saying you can't do
21     them.  So depose the people at the meeting.
22     I gave you a Declaration when it wasn't
23     asked for them.  We're trying to help you
24     set -- to get the case going.  We're
25     trying.  I went and found these full copies

216

1     and told you about the originals.  You can
2     come inspect them.  We're trying to get
3     this done.  He's not going to be able to
4     say what happened in the meeting.
5     MR. CARRUTHERS:
6         Well --
7     MS. CURTIS:
8         It's his experience because he wasn't
9     there.
10     MR. CARRUTHERS:
11         He said it in Paragraph 36, and he says
12     it in Paragraph 37 --
13     MS. CURTIS:
14         -- no, based on his industry knowledge,
15     the Petition, the -- everything that he's
16     reviewed.  I think you just need to go on,
17     Tom.  I don't know if Willis is going to
18     want to ask any questions, but this
19     deposition is only going seven hours.  So I
20     hope y'all made a deal with each other on
21     how much time you're each going to spend,
22     but I would be concerned about it if I was
23     Willis.
24     MR. BAINES:
25         I would be concerned, Martha, if we

217

1     could just let the witness talk and you not
2     have you make speeches.  So why don't we
3     just ask questions and proceed, please.
4     MR. CARRUTHERS:
5         Yeah.
6 BY MR. CARRUTHERS:
7     Q.  So it's clear to me, Mr. Fey, and you can
8 confirm it, you weren't there.  You have no basis
9 to say what was discussed at the meeting.  You
10 don't know who said it, what exactly they said.
11         So this Paragraph 36, you have no factual
12 basis upon which to say this?
13     MS. CURTIS:
14         Object to the form.
15     THE WITNESS:
16         I disagree with you.
17 BY MR. CARRUTHERS:
18     Q.  Okay.  Now, in Paragraph 36, you also say,
19 "The proposal used the term 'silent' in the blocks
20 discussing if communicable diseases were excluded
21 by all three policies."
22         And then you say, "...which, from an
23 industry perspective, would be an indication that
24 the proposed policies were all intended to provide
25 coverage for communicable disease."

218

1        So basically, so I understand, if I
2  understand your opinion, the word "silent" means
3  there was coverage?
4     A. Yeah -- well, let me modify that somewhat.
5  Not all policies but the policy we're talking
6  about. Because there was no coverage provided by
7  the other two policies --
8     Q. Well --
9     A. -- for disinfection costs, so I don't --
10  I'd have to have more information on the other two
11  policies. If they provided coverage for viruses,
12  then the policies being silent would mean that it
13  would be covered.
14        But since they're saying "excluded" and
15  "coverage not included" on the other two policies,
16  then that may not be the case.
17        But as far as the policy we're talking
18  about, the Chubb policy, "silent" would mean it is
19  not limited or excluded.
20     Q. My question is, Does "silent" mean it's
21  included?
22     MS. CURTIS:
23        Object to the form. Asked and
24        answered.
25     THE WITNESS:

219

1        Yeah, if the coverage is provided and
2     there's no exclusion for communicable
3     diseases, "silent" means that there's no
4     exclusion, so it would be covered.
5  BY MR. CARRUTHERS:
6     Q. So in your vast experience, does the use of
7  the word "silent" typically mean there is coverage?
8     A. Yes. Well, it means that there's no
9  exclusion for it. Let's put it that way.
10     Q. But it doesn't mean that there is coverage,
11  does it?
12     MS. CURTIS:
13        Object to the form.
14     THE WITNESS:
15        Well, if you start out and you have
16        coverage for viruses and it's silent
17        regarding communicability, then, yes, it
18        means it's covered.
19  BY MR. CARRUTHERS:
20     Q. Paragraph 37, you say, "There's evidence to
21  support the notion that coverage limitations 3.1
22  and 2 were never intended to be included as part of
23  the endorsement."
24        What's the basis for that statement?
25     A. I need to look at the exclusion. Coverage

220

1  limitations 1 and 2? Well, I need to see which
2  ones are 1 and 2.
3        So "1" is in regard to fungi bacterial
4  viruses not naturally occurring. And "2" is the
5  human to human.
6        I think what I was referring to there was
7  the fact that the block was silent, marked "silent"
8  on the Chubb proposal.
9     MS. CURTIS:
10        When you pull up his report on the
11        screen, you can't see the far right because
12        of people's pictures from the video. So
13        that's why he's trying to look it up on his
14        other computer.
15     MR. CARRUTHERS:
16        Okay. Well, you can just change the
17        view.
18     THE WITNESS:
19        Yes, so I think what I was talking
20        about was 3.2 rather than 3.1 and .2 but
21        the communicability issue is what I'm
22        getting at there where it's marked
23        "silent."
24        I think "1" -- I think actually I was
25        probably trying to say 2A and B if I'm not

221

1        mistaken. Let me back up a little. Yes,
2        so what I was trying to say was 2A -- I was
3        trying to reference 2A -- 2B was on the --
4        on the chart. So it should have just said
5        "2A" instead of 3.1 and 2.
6  BY MR. CARRUTHERS:
7     Q. Kate, can you pull up that worksheet or
8  comparison chart for Joyce Fred, please?
9     MS. MATTA:
10        On the screen.
11  BY MR. CARRUTHERS:
12     Q. Can you just expand it and zoom in a
13  little? All right.
14        Now, what you told me before, there were
15  two of these proposal worksheets. We've talked
16  about one already for Mr. Hadden. This one is from
17  Joyce Fred.
18        Now, you had this one when you prepared
19  your report, correct?
20     A. Right.
21     Q. And in the box that says "disinfection
22  costs," there's typewritten language. And is it
23  your testimony that Donna Bell prepared that
24  language? That's what you said with the other one.
25     A. I said that was who I assumed did it.

222
1 Producers usually don't do it. They have their
2 account managers do it.
3  Q. Okay. And then the handwritten language,
4 can you read that to me?
5  A. Yeah. "Ebola disinfections. Sublimit, 5
6 mill."
7  Q. Okay. So do you know -- just as I asked
8 you about the other one -- do you know specifically
9 what was discussed and by whom with respect to
10 Ebola disinfection, sublimit 5 million?
11  A. I believe I do, but I'll let you guys take
12 the depositions of the parties and see if they
13 don't support what I'm saying.
14  My interpretation of everything I reviewed
15 including the Petition and these documents and the
16 e-mails and all the materials that I reviewed in
17 the case lead me to believe that Tulane was
18 specifically asking about disinfection for Ebola.
19 And at that point, they were talking about a
20 $5 million sublimit but that was eventually changed
21 to 10 million.
22  Q. But you don't know that for a fact, right?
23 That's what you assume, correct?
24  A. That's what I've been told. That's what
25 I've read in documents. That's what I believe to

223
1 be true. So I'll let you guys take the depositions
2 of these parties. And then if I'm wrong, so be it.
3  Q. Okay, so when you say you were told, that's
4 what you referred to before? Martha told you that?
5  MS. CURTIS:
6  Object to the form.
7  THE WITNESS:
8  Yeah, Martha told me that. The
9  Petition told me that. These documents
10  told me that.
11 BY MR. CARRUTHERS:
12  Q. Okay.
13  A. I believe that to be the facts of the case.
14 And, you know, like I said -- see, the weird part
15 about this case is usually I'm given the
16 depositions to read before I render my opinions.
17 In this case, I had to render my opinions before
18 the depositions were taken.
19  So I'm at kind of a disadvantage here, and
20 I think you're trying to take advantage of that.
21  Q. No, I'm not trying to take advantage. I'm
22 just trying to find out, you rendered opinions, and
23 you made factual statements, and I'm trying to
24 figure out where you got that information without
25 having depositions or anything else.

224
1  A. I think I have explained it.
2  Q. That's fine. I mean, Paragraph 39, you
3 say, "Chubb attempted to deny coverage."
4  Chubb didn't attempt to deny it; it denied
5 coverage, right?
6  A. Well, they're attempting to deny coverage.
7 I don't think it's over yet.
8  Q. Chubb has taken the position that it has
9 denied coverage. They're saying there's no
10 coverage, right?
11  A. Yeah. And I'm saying that the case isn't
12 over yet. So until it's closed and there's a
13 determination that they don't have coverage, my
14 view is they're attempting to deny coverage.
15  It's not a forgone conclusion. They did
16 issue Denial letters and, yes, they did deny
17 coverage. Whether or not that denial is going to
18 be upheld or not is a different issue.
19  Q. Now in Paragraph 40, you're talking about
20 the fact that Chubb has started using revised
21 endorsements that you claim broadens coverage,
22 correct?
23  MS. CURTIS:
24  Object to the form.
25  THE WITNESS:

225
1  Yeah, they broaden the language to
2  limit the coverage even more.
3 BY MR. CARRUTHERS:
4  Q. So halfway through this, you say, "In my
5 opinion, this endorsement revision documents, that
6 Chubb understood that the application of
7 Endorsement 44 was not as broad as it suggests."
8  The fact -- so you're saying the fact that
9 they have a later endorsement with different
10 language is somehow evidence that Chubb understood
11 that Endorsement 44 was not as broad as it claims?
12 Is that what you're saying?
13  A. That's what I'm saying.
14  Q. So I understand it, this later endorsement
15 somehow imputes knowledge to Chubb that its prior
16 endorsement, whatever version of Endorsement 44
17 there was, was somehow not as broad as it's
18 claiming in its Denial letter; is that what you're
19 saying?
20  A. Yeah. I think Chubb understood that the
21 language that they were using was not as broad as
22 they thought it was so, therefore, they drafted a
23 new endorsement that makes it clear that it
24 includes language about from any surface -- I'm
25 trying to find the exact language here.

226
1    Q.  Are you suggesting that Chubb should have
2 used that endorsement instead of Endorsement 44?
3    A.  No --
4       MS. CURTIS:
5          Object to the form.
6       THE WITNESS:
7          -- I'm saying that they shouldn't have
8       denied coverage by trying to assert human
9       to human, the human-to-human limitation
10      because they knew it wasn't as broad.  And
11      they knew the claim was broader than that.
12 BY MR. CARRUTHERS:
13   Q.  Okay.
14   A.  So they were trying -- they're trying to
15 exclude coverage for this claim.  And they're trying to
16 manufacture a basis for denial.  And they're trying
17 to apply that limitation more broadly than it
18 should have been applied.
19      And they knew that they were doing it
20 because then they drafted this new endorsement that
21 makes it clear that transmission from or to any
22 surface or object is also not covered by the policy
23 on the new endorsement.
24      So I don't think they -- I think as a
25 result of COVID, almost every insurance company out

227
1 there went back and reexamined their virus
2 exclusions and limitations, so that's what my
3 opinion is.
4    Q.  Well, let's turn to paragraph -- I think
5 there was some misnumbering with your report.  On
6 Page 17 you go from 44 and back to 43 and then back
7 to 44.  I'm looking at the last page.  It's
8 numbered "45" but at least to me it appears that it
9 should be Paragraph 47.
10      Do you see that one?
11   A.  Forty-five, yeah.  Plexiglass?
12   Q.  Right.
13   A.  Yeah.
14   Q.  So here you're talking about Tulane's
15 remediation costs, correct?
16   A.  Right.
17   Q.  And in your report that you prepared for
18 the mediation, you had a list of remediation costs,
19 and it was a little more extensive than this and it
20 included quarantine costs and testing costs, and it
21 looks like you deleted these.
22      And did you delete them because of The
23 Court's ruling?
24   A.  I don't remember today.
25   Q.  So in paragraph -- your numbered 46; I

228
1 think it's 48 -- immediately after this, these four
2 itemized costs, you say, "It's reasonable to
3 conclude that all categories and damages claimed
4 within -- claimed fall within the definition of
5 'first-party remediation costs.'"
6      So are you opining that these damages are
7 properly considered remediation costs?
8    A.  I think it says exactly what I meant it to
9 say.  It's reasonable to conclude that they would
10 fall under the definition of first-party
11 remediation costs.
12   Q.  Well, "reasonable to conclude" isn't an
13 opinion on whether they are or not.  So are you
14 saying they are properly --
15   A.  I'm not opining on coverage.  We have
16 talked about that ad nauseam.
17   Q.  This is opining on whether something
18 constitutes remediation costs.  Are you opining on
19 whether these things that you've listed constitute
20 remediation costs under the policy?
21   A.  I'm saying that it's reasonable to conclude
22 that there were first-party remediation costs.  And
23 it's also reasonable to say that these expenses
24 were in an attempt to neutralize the virus.
25      Once again, I'm talking about a path to

229
1 coverage.  So it's up to The Court to decide
2 coverage.  I'm just laying it out there, that
3 there's a reasonable way of stating the claim that
4 results in coverage.
5    Q.  What do industry standards have to do with
6 remediation costs?
7    A.  The industry standard is that if there's a
8 reasonable way to -- a path to coverage, then you
9 have to apply it to the claim.  And I think there's
10 a reasonable path to coverage.
11      So from an insurance perspective, if I was
12 handling the claim, I would say, Well, there's
13 coverage for at least some of these expenses.
14   Q.  That's what you would have done?
15   A.  Yeah.  I would never have denied this claim
16 flat out.  And I never would have misrepresented
17 the human to human as a complete bar to coverage.
18 And I would never have included the extra
19 exclusions.
20      I would never have written that first
21 Denial letter, because I would have talked to all
22 the parties involved and known about the
23 endorsement before I even attempted to deny
24 coverage.
25   Q.  Kate, could you please mark number 33,

230

1 please?
2     THE COURT REPORTER:
3     That's Exhibit #18.
4     (Whereupon, the document was duly marked
5     for identification as "Exhibit #18" and
6     attached hereto.)
7 BY MR. CARRUTHERS:
8     Q. Mr. Fey, on the screen is an e-mail dated
9 September 18, 2020, from Robin Killiher to John
10 Hadden, Meredith Whitten, and cc'd to Bert McKeand
11 and Brian Smith.
12     Have you seen this document before?
13     A. Yes.
14     Q. And have you reviewed the attached
15 endorsement?
16     A. I have.
17     Q. Do you know what the purpose of this e-mail
18 was?
19     A. I don't know what the -- what the reason
20 behind sending it was. But they sent Tulane copies
21 of three different endorsements that they used in
22 the past.
23     Which is where my opinion of regarding the
24 listing of the endorsement on the quote comes in.
25 They had these endorsements. All they had to do

231

1 was list it on the quote.
2     Q. Were the attached endorsements manuscript
3 endorsements?
4     A. They are. They're marked "MS" so I'm
5 assuming they are.
6     Q. So that would indicate they're not a form
7 as you talked about before that, right, a standard
8 form?
9     A. Well, one of them is a standard form, the
10 PF. PF-45042 42A.
11     Q. So looking at this e-mail, the last --
12     A. Sorry.
13     Q. -- the last sentence, it says, "Chubb's
14 language adding Bacteria and Virus has been
15 consistent across their entire product line since
16 2017."
17     What's your understanding of what
18 Ms. Killiher was saying in that sentence?
19     A. Well, I think she's trying to say that
20 that's the only bacteria-and-virus-coverage
21 language that Chubb uses.
22     Q. Well, isn't she saying that's the same
23 language they've used since 2017?
24     A. Well, that's what she's saying.
25     Q. Do you have some reason to doubt that?

232

1     A. No. I mean, like I said, I think they were
2 manuscripting coverage specifically for Tulane.
3 And I think Tulane had the conversation with the
4 agent. And they asked whether or not the disease
5 such as Ebola would be covered for disinfectant
6 costs. And they were led to believe that that
7 would be the case. And then the endorsement wasn't
8 issued.
9     They could have -- they could have used
10 this PF form that they had since 2017 and merely
11 listed it on the quote, but they didn't do it.
12 They could have put it on the dec page, but they
13 didn't do that either so...
14     Q. So what's your point?
15     A. That's where the post-loss underwriting
16 comes in.
17     MR. CARRUTHERS:
18     Chris, can you give me a count, please?
19     THE VIDEOGRAPHER:
20     Sure, stand by; 5 hours and 25 minutes.
21     MR. CARRUTHERS:
22     Okay, thank you.
23     THE VIDEOGRAPHER:
24     We have about ten minutes to a media
25     change.

233

1     MR. CARRUTHERS:
2     Let me know when you need to change.
3     THE VIDEOGRAPHER:
4     I will. Thank you.
5 BY MR. CARRUTHERS:
6     Q. Now, as part of your retention, you said
7 you were retained to evaluate handling of the claim
8 by Chubb and certain actions by Willis.
9     As part of your evaluation, did you
10 consider at all the sophistication of the insured,
11 in this case Tulane?
12     A. Sure.
13     Q. Sorry. I didn't hear you?
14     A. Sure. Yes.
15     Q. And what did you consider about the
16 sophistication of Tulane?
17     A. Well, I think they've got a Risk Management
18 Department, so they're fairly sophisticated.
19     Q. Pursuant to industry standards, are there
20 typically certain levels of knowledge imputed to
21 sophisticated insurers?
22     MS. CURTIS:
23     Object to the form.
24     THE WITNESS:
25     Well, I think it makes a difference

234

1    when you're talking about whether or not an
2    insured can understand coverage. But if
3    they don't have the endorsement at the time
4    prior to a loss, there's no way that they
5    can read the policy basically is what we're
6    talking about.
7  BY MR. CARRUTHERS:
8    Q. Well, in this case, Tulane, they had their
9  own Insurance and Risk Management Department,
10  correct?
11    A. Correct.
12    Q. And they had lots of properties to cover
13  and lots of types of liabilities to insure,
14  correct?
15    A. Sure.
16    Q. And prior to this 2/27/19 policy that Chubb
17  issued, Tulane had a PPL with XL, correct?
18    A. Correct.
19    Q. Did you review that policy?
20    A. I don't think I looked at the policy. I
21  know about the prior claim, though.
22    Q. Is it your understanding that that XL
23  policy did not provide coverage for disinfection
24  costs and had the communicable-disease exclusion?
25    A. Correct.

235

1    Q. So when Tulane learned that it was not
2  going to be renewed by XL, as a sophisticated
3  insured, what sort of steps should Tulane have
4  taken to make sure it got the type of IEC coverage
5  that it wanted?
6    A. Well, I think it did exactly what it should
7  have done. They talked with Willis and had them
8  get quotes. And then when Chubb came back and said
9  they weren't going to cover the Primate Center,
10  they got an alternative quote to cover the Primate
11  Center.
12    Q. So do you think as a sophisticated insured
13  Tulane should have asked to see the language for
14  this bacteria/virus coverage that it wanted?
15    A. Well, I think -- I think Willis, being a
16  consultative broker, or agent, they could rely on
17  his expertise and advice.
18    Q. So other than contacting Willis, there's
19  nothing else that you think Tulane should have
20  done?
21    A. Well, they had conversations with them
22  clearly. And there were conversations at the
23  presentation.
24    Q. And those discussions you believe took
25  place in mid February 2019?

236

1    A. I can't remember the date, but that's about
2  right.
3    Q. And the then-existing XL policy expired in
4  late February 2019, correct?
5    A. Sure. But the conversations started long
6  before that, as much as three months before that.
7    Q. Well, when did they start?
8    A. I don't know. I didn't really check when
9  they -- the whole process started. But it would
10  have been, you know, as early as, like, August of
11  2018 I guess. Somewhere in the latter part of
12  2018. Probably once they realized that XL wasn't
13  going to renew the policy.
14    Q. So that's what you would expect from a
15  sophisticated insured pursuant to industry
16  standards, correct?
17    A. Well, sophisticated insured is not --
18  doesn't have anything to do with industry standards
19  but some people are more sophisticated than others.
20  Tulane is fairly sophisticated. They have their
21  own Risk Management Department, and they were
22  having discussions with Willis to go out to market,
23  to get them quotes. And they obviously had
24  discussions about the quotes once they came in.
25    Q. As an experienced insurance person, would

237

1  you have expected Tulane to have started
2  discussions about a new policy much sooner than
3  February of 2019?
4    A. Well, I don't think that -- I think this
5  was the end of the process. That wasn't the
6  beginning of the process.
7    Q. Well, that's not my question. When would
8  you have expected them to start searching for a new
9  policy when their old policy was expiring on or
10  about February 26th or February 27, 2019?
11    MS. CURTIS:
12      Objection. Asked and answered.
13      You can answer it again.
14    THE WITNESS:
15      Yeah, I think they would have gotten
16    Notice of Nonrenewal probably 60 days out.
17    And the typical starting time to look at
18    renewals or the quotes would be 60 to
19    90 days out.
20  BY MR. CARRUTHERS:
21    Q. Now, you said the XL policy did not have
22  IEC coverage, correct --
23    A. Correct.
24    Q. -- for bacteria virus?
25      Why was Tulane looking for that sort of

238

1 coverage; do you know?
2     A. Well, they had a claim at the Primate
3 Center, so I think they found out they had
4 weaknesses in their insurance as a result of that
5 loss. And they were trying to beef it up. That's
6 my impression.
7     Q. And the Chubb policy didn't cover, and it
8 specifically excluded the Primate Center, correct?
9     A. We actually had an alternative quote for
10 that facility.
11     Q. You talked about this a little bit earlier.
12 But underlying opinions set forth in your June 2nd
13 report have a couple of major premises, you know,
14 as we talked about.
15         Number one, what Tulane told Willis, and
16 then what Willis told Chubb, correct?
17     A. I think the underlying theme of the whole
18 thing is that there was a loss under binder, and
19 that Chubb should have followed the binder
20 procedure and investigated the claim --
21     Q. No, I don't --
22     A. -- and that would have taken all the
23 guesswork out of all this right now. We would've
24 had statements from each involved party stating
25 exactly what their recollection of the process was.

239

1     Q. Well, maybe I asked my question improperly
2 or awkwardly.
3         What I'm trying to get at is what was
4 discussed earlier, your report, basically makes two
5 -- it's based on a couple of premises. One, Tulane
6 told Willis exactly what it wanted for bacteria/
7 virus coverage, and that coverage was broader in
8 your view than what was set forth in Endorsement
9 44, correct?
10     A. Well, what I'm saying is that the way Chubb
11 handled the underwriting of the account and the
12 issuance of the endorsement after the claim is
13 opening the door to questions about the under-
14 writing intent and the endorsement that was issued
15 after the fact which I have characterized as
16 post-loss underwriting.
17         So that's kind of opened the Pandora's box
18 on all these questions. And the standard practice
19 in the industry is you base your coverage on what's
20 on the binder at that point; not on something
21 that's issued after the loss. Because it gives the
22 appearance of impropriety.
23     Q. Again, you know, maybe it was an inartful
24 question, but I'm trying to get at the fact that --
25     A. Well, you're saying I'm basing my opinions

240

1 on certain facts, and that's not really true.
2     Q. Well, you must be basing it on the fact
3 that Tulane told Willis about what coverage it
4 wanted and what type of coverage and the scope of
5 that coverage. That's one of the fundamental
6 premises underlying your opinions.
7     A. No, see, I disagree with that.
8     Q. Okay.
9     A. I totally disagree with that.
10         My foundation of my opinion is Chubb should
11 have investigated, under binder procedure, when the
12 claim happened --
13     Q. I'm talking about --
14     A. And also screwed up by not issuing the
15 endorsement at the time the policy was issued.
16     Q. I'm asking you something totally different.
17         Before the policy was issued -- let's focus
18 on that period -- Tulane, you're asserting Tulane
19 told Willis what coverage it wanted and what the
20 scope of that coverage is it wanted, correct?
21     MS. CURTIS:
22         Object to the form.
23     THE WITNESS:
24         I'm saying that there's indications in
25         the documents that they wanted coverage for

241

1     disinfection -- disinfection --
2     disinfecting the surfaces from things such
3     as Ebola.
4         But that's really inconsequential to
5     the bottom basis of my opinion which is
6     Chubb didn't put the endorsement on the
7     policy. They issued it after loss. It's
8     post-loss underwriting. We don't know what
9     the policy could have said when it was
10     issued originally, and the binder procedure
11     applies. Chubb didn't do that
12     investigation.
13         Coverage should be based upon the
14     binder, what's included on the binder since
15     that's the only thing that was in existence
16     at the time of the loss.
17 BY MR. CARRUTHERS:
18     Q. In your report -- and we talked about it a
19 little while ago -- you discussed what transpired
20 at the February 12, 2019, meeting between Willis
21 and Tulane, correct?
22     A. Yeah. My impressions of what transpired at
23 that meeting, which you guys will pin down when you
24 take the depositions, but putting all of that
25 aside, you've got all these missteps by Chubb.

242
1    Q.  You've already told us all about this --
2    A.  Right, so you want -- you're trying to get
3 to the basis of my opinions, and that's the basis
4 of my opinion.
5    Q.  I'm not trying to get to the basis of your
6 opinion.  What I'm trying to do is to find out what
7 if, let's assume the discussions that you recounted
8 in your report prove after deposition and other
9 testimony turn out to be not true, the discussions
10 you attribute to the February 12th meeting, what if
11 they turn out that they didn't discuss what you
12 have assumed they discussed.
13    A.  Well, the Affidavits pretty much confirm
14 what I thought they discussed from the documents I
15 had prior to my opinion.
16    Q.  Again, that's not my question.
17        What if it turns out that what you assumed
18 they discussed wasn't, in fact, discussed?  Would
19 that change your opinion?
20    A.  No.  Because that's really kind of an aside
21 to my opinion.  Because my real opinion has to do
22 with binder procedures, and the fact that coverage
23 ought to be based on the information contained in
24 the binder.
25    Q.  That's after the claim.  I'm talking about

243
1 before the issuance of the policy.
2    A.  Well, you're talking about my opinion.  And
3 my opinion is that.  So if you want me to change my
4 opinion --
5    Q.  I'm not asking you to -- I'm trying to find
6 out.  You're assuming certain discussions took
7 place on or about February 22nd --
8    A.  But that -- but they really don't matter to
9 the whole bottom line of the claim.  The bottom
10 line of the claim is the endorsement wasn't issued
11 until after the loss was submitted.  At that point,
12 it's binder procedure.
13    Q.  So it doesn't --
14    A.  That's the bottom line in my whole thing.
15 The rest of it's all he said, she said.  And we'll
16 take the depositions, and we'll find out --
17    Q.  So in your opinion --
18    A.  -- if my opinion is what it is.
19    Q.  So in your opinion, it doesn't matter what
20 Tulane told Willis about what it wanted as far as
21 coverage?  Is that what you're saying?
22        MS. CURTIS:
23            Object to the form.
24        THE WITNESS:
25            It only matters from the perspective of

244
1    what their reasonable expectations were.
2    But even putting that aside, you've got to
3    look at what the binder said.  And that's
4    really what it should be based on, the
5    binder.
6 THE VIDEOGRAPHER:
7    Is this a good time to go off the
8    record?
9 MR. CARRUTHERS:
10    Yeah.  And subject to the production of
11    additional documents, et cetera, I am
12    finished for the day.
13    And, thank you, Mr. Fey.
14 MS. CURTIS:
15    Is Willis counsel going to have
16    questions?
17 MR. BAINES:
18    I am.  Why don't we go off the
19    record.
20 THE VIDEOGRAPHER:
21    Thank you, very much.  The time is
22    4:30 p.m.  We're going off the record.
23    This ends media file four.
24    (Brief recess was taken.)
25        The time is 4:40, and we're back on the

245
1    record.  This begins media file five.
2        * * * * *
3        EXAMINATION
4 BY MR. BAINES:
5    Q.  Mr. Fey, my name is Ted Baines.  We were
6 introduced off the record.  I'm counsel for Willis
7 Towers Watson Southeast.  If it's okay with you,
8 we've been referring to the Willis entity -- Willis
9 Towers Watson Southeast as "Willis."
10        Does that work for you?
11    A.  Yes.
12    Q.  All right.  And the only instruction I have
13 for you is if at any time you don't understand a
14 question that I ask you, just let me know and I'll
15 be happy to rephrase it; otherwise, I'm going to
16 presume you understood the question that I asked
17 and I'm going to hold you to your answer.  Is that
18 fair?
19    A.  Fair.
20    Q.  All right.  Do you have any professional
21 interaction with Willis whether at your current
22 position or in prior jobs?
23    A.  Willis?  I don't think so.
24    Q.  Okay.  Well --
25    A.  Well, I mean, I think Willis writes

246
1 business with Travelers, and so from that
2 perspective, probably so, yeah.
3     Q.  Right.  And essentially now that, in a
4 sense, they're a business competitor of yours; is
5 that fair?
6     A.  Sure.  Well, a competitor of Cadence but
7 not Fey Consulting.
8     Q.  Right.  I want to talk a little bit about
9 your background.  And if you want to, you can look
10 at your C.V. in Exhibit #2.  But I just had a few
11 follow-up questions on that.  I know that you had
12 obtained your CBCU and your CIC and your CRM over
13 the years.
14        When you took the CBCU test, was it -- was
15 it at a time like they had the ten tests you had to
16 sit for?
17     A.  Exactly.
18     Q.  All right.  And did you pass all those
19 tests on the first attempt?
20     A.  I did.
21     Q.  And did you have to take tests for the CIC
22 and CRM?
23     A.  I did.
24     Q.  Same thing, did you have to -- did you pass
25 the test on the first attempt on those, as well?

247
1     A.  Well, yes.  Except on the CRM I started to
2 take a course, and I was in the process from moving
3 from Georgia to Louisiana and I had to -- I
4 basically withdrew from the course so I had to
5 start over again.  But other than that, yeah.
6     Q.  All right.  So you had to start over again,
7 but that isn't because you didn't pass testing; is
8 that right?
9     A.  Yeah, I didn't sit for the test.  I just
10 had to leave because of things that were happening.
11     Q.  Why did you make that move from Georgia?
12     A.  I met a girl in Baton Rouge.
13     Q.  That's always the story, "I met a girl."
14        So tell me about licenses.  Do you
15 currently hold any professional licenses?
16     A.  So I'm a licensed life and health producer.
17 I'm a licensed property casualty producer.  I'm a
18 licensed adjustor.  I'm FEMA certified.  It used to
19 be called "licensing" but now it's called
20 "certification."
21        I'm also -- I sit on the commissioner --
22 Insurance Commissioner of Louisiana's Agency
23 Advisory Council.  I'm Chairman of the State of
24 Louisiana Property Casualty Commission.  I'm
25 co-chair of the Professional Insurance Agents of

248
1 Louisiana Government Affairs Committee.  I'm a Past
2 President of the Professional Insurance Agents --
3     Q.  What I was asking about was licenses.  Are
4 those -- are those -- licenses that you just
5 mentioned?
6     A.  Well, the first half was.  And the second
7 half were boards and things like that.
8     Q.  Okay, let's talk about the licenses, then.
9        Are there licenses that you've had in the
10 past that have expired?
11     A.  Probably some adjustor licenses in some
12 states that I used to reside in that have expired.
13 But the way it works is you get -- well, I don't
14 adjust claims on a day-to-day basis anymore because
15 I'm not working for an insurance company.
16        So what I do now is intervene on claims,
17 and I don't need to be licensed to do that other
18 than as an insurance agent or consultant.  But I'm
19 an insurance agent, a licensed insurance agent.
20 But my adjustor's license is in Louisiana.  And I
21 would suspect that all of the other states have
22 expired.
23     Q.  Have you ever had any adverse action or
24 claims, you know, made against your license or you
25 on any professional activities?

249
1     A.  No.
2     Q.  I want to talk a little bit about your past
3 testifying history.  And in your C.V. which goes
4 back four years, there's a lot of cases.  I think
5 you said in excess of forty.  I didn't count them,
6 but I only counted a few of them that involved -- I
7 think I counted four where the words, you know,
8 "errors or omissions" were listed.  So that would
9 be four out of forty plus.
10        Is that about, like, the normal percentage
11 you had; that about maybe 10 percent of the expert
12 matters that you have are -- involve errors and
13 omissions?
14     A.  No.  I mean, what you've got to remember
15 with that list is that's just where I've testified.
16 So there's a lot of cases that I get involved in
17 where I don't end up giving a deposition or trial
18 testimony --
19     Q.  Okay.
20     A.  -- so you can't really tell much from that.
21        It also looks like, I think it's weighted
22 pretty heavily on the plaintiff's side because the
23 defense tends to take my deposition more than the
24 plaintiffs do because of the costs involved.
25     Q.  Right, okay.  So even though -- because

250

1 that did catch my eye, that there were more. You
2 said you were about 50-50, and it did look more
3 plaintiff oriented.
4       But what you would say if there's other
5 matters that aren't listed that are defense but no
6 one took your deposition, and so that would explain
7 the disparity in the split?
8    A. Yeah. I think you can go on my website and
9 probably see a more comprehensive list. And I
10 think if you look at it, it's pretty much 50-50. I
11 try to keep that up to date.
12    Q. I didn't see any matters over the last four
13 years where you testified at trial in an errors and
14 omissions type matter. But can you think of any
15 that you've testified in over the last four years
16 that involved errors and omissions as part of your
17 opinion?
18    A. At trial?
19    Q. At trial.
20    A. Yeah, I don't think any of them reached
21 trial. I've got one coming up, though, in Georgia
22 next month so we'll see.
23    Q. How many times have you testified, say, in
24 the last four years? How many times have you
25 testified over the years as to insurance errors and

251

1 omissions matters?
2    A. You mean deposition, or testified at trial?
3    Q. I mean testified at trial.
4    A. Well, I remember one, one case over in
5 Alabama, Berman Brothers. It should be on that
6 list still. That was an errors and omissions case.
7    Q. How do you spell that?
8    A. Berman, B-E-R-M-A-N, Berman Brothers. If
9 you get it on your screen, you can edit and search.
10 I don't know what to tell you.
11    Q. Yeah. I'm flipping through it and I don't
12 see it yet, but let me keep flipping.
13    A. Yeah. It might be Bronco. It was in
14 Alabama, yes.
15    MS. CURTIS:
16       Maybe you can just search for
17    "Alabama."
18    MR. BAINES:
19       Kim, could you take a look at that?
20    We're talking about Exhibit #2. Attached
21    to it, there is a C.V. that has his
22    testifying history. I mean, I'm doing it
23    the manual way, looking through all 40 of
24    them and I haven't seen that one, but we'll
25    see if maybe Kim can find it for us.

252

1    MS. CRAMPTON:
2       I have the Exhibit #2 up. Which one?
3    His C.V.?
4    MR. BAINES:
5       Yeah, Kate, are you able to search
6    that? Maybe throw the term "Alabama" into
7    it.
8    THE WITNESS:
9       I've got it. Berman Brothers Iron and
10    Metal Company d/b/a Bronco versus Harmon
11    Davis Bradshaw --
12 BY MR. BAINES:
13    Q. What page is that on?
14    A. Well, I'm looking at my website.
15    Q. Oh, okay. Can you see what year it is?
16    A. Well, the court case is 2015, but I'm not
17 sure when it was -- let me see pull up the C.V. and
18 if I can find it there.
19    Q. Yeah, your C.V. doesn't go back quite that
20 far, but that's why I didn't see it, maybe.
21    A. That was the filing date. Let me see.
22 "Edit find." So it must be more than four years,
23 so it's off of there.
24    Q. Okay. Why don't you tell me about that
25 matter.

253

1    A. It had to do with equipment-breakdown
2 coverage. I was on the stand for eight hours.
3    Q. And would you --
4    A. And I was on the -- I was on the plaintiff
5 side. We got a verdict against the agency.
6    Q. Yeah, what was the type of coverage
7 involved in that case?
8    A. Equipment breakdown.
9    Q. Okay. Aside from that matter, are there
10 any other matters that you can recall where you've
11 ever testified at trial on an insurance broker's or
12 agent's errors and omissions matter?
13    A. I mean, it's a memory test now. I don't
14 know. Let me see if --
15    Q. Well, you think it would stand out. It
16 sounds like there's only -- there's only one you've
17 named so far.
18    A. Well, they don't really stand out believe
19 it or not.
20       Okay, so there was a case, a Stephanie Leon
21 versus Freeway Insurance Services. I was the
22 defense expert; testified out in -- how can I
23 forget that? -- Compton, California.
24    Q. Okay. When was that?
25    A. A couple of -- a few years ago. July of

254
1 2019. It might show up on my -- it should show up
2 on the C.V.
3    Q. Anything else?
4    A. There's a Richards Clearview versus Sears
5 Roebuck. That was more of a -- had to do with
6 premium allocation.
7    Q. I'm just looking for errors-and-emissions
8 matters that you testified to.
9    A. Those are the only two I'm coming up with.
10    MS. CURTIS:
11       Just at trial, right?
12    MR. BAINES:
13       Correct, just trial testimony.
14    THE WITNESS:
15       Yeah. The cases don't get to trial
16    that often. I mean, I had -- I had
17    something like eight cases scheduled for
18    trial in, like, a three-week period back in
19    January. And only one of them actually got
20    to trial so -- and I had two coming up in
21    one week, and one of those just settled so
22    -- and that was an actual agency -- that's
23    still an agency, you know, case but it is
24    being -- they settled with the insurance
25    company and now it's just going to be an

255
1    E & O case.
2 BY MR. BAINES:
3    Q. Is that the one in Georgia?
4    A. No, that's another one. This one is over
5 in South Carolina.
6    Q. Do any of them involve pollution policies?
7    A. Boy, now you're getting real specific. An
8 agency E & O involving pollution?
9    Q. Yeah, that you testified at trial.
10    A. I don't think so.
11    Q. You had spoken before -- and I want to make
12 sure I have the terminology right about Willis's
13 role here -- you had termed him as "agent" in some
14 circumstances and "broker" in others, and it seemed
15 like in your report a few times you use those a
16 little intermittently.
17       But was Willis a broker, insurance broker
18 for Tulane in your view?
19    A. So okay, here's the way that breaks down.
20 You've got -- Willis is acting as a wholesale and
21 surplus-lines broker on one end of the spectrum of
22 this case. And on the other end, it was acting as
23 Tulane's broker.
24       The difference between a broker and an
25 agent is an agent represents one insurance company.

256
1 Brokers represent multiple insurance companies.
2       So in this case, Willis was Tulane's
3 broker, insurance broker. And on the other end of
4 the spectrum was Chubb's wholesale and surplus-
5 lines broker.
6    Q. I want to direct you to your report, you
7 know, Exhibit #2. And I noted in your report, you
8 know, you've got different headings. You know,
9 there's kind of the first couple of paragraphs is
10 your introduction. And then you've got a heading
11 about your qualifications that begins on Page 2.
12       And the basis of your opinions, you know,
13 are as of at least June 2nd, these were the
14 materials that you have reviewed, you know, coupled
15 with the things that you list in Paragraph 8,
16 right?
17    A. You're talking about my report?
18    Q. Yeah, I am. Yeah, do you want me to pull
19 it up?
20    A. No. The basis of my opinion are the
21 documents listed under Paragraph 7.
22    Q. Yeah, you have the documents listed in
23 Paragraph 7 coupled with, you know, you mentioned
24 some things in Paragraph 8 as well, right?
25    A. Yeah, sure.

257
1    Q. Yeah. And then we went through the
2 industry-standards piece and the discussion
3 vis-a-vis those attachments to your report that are
4 kind of generic that you probably use in other
5 matters; is that fair?
6    A. Yeah. The exhibits you're talking about,
7 the standards?
8    Q. Correct, that's it.
9    A. Correct.
10    Q. Okay. And then, from that point forward,
11 there are -- I think I just see two more sections
12 in your report. There are the opinions that begin
13 on Page 6, and then there's the history that begins
14 on Page 10; is that fair?
15    A. Correct.
16    Q. Is this a format that you typically use in
17 your report? Or did you make it specifically for
18 this case?
19    A. Basically it's the format I use. Down to
20 paragraph 12 is almost boilerplate. I'll tweak it
21 a little here and there depending on the case.
22       Like the industry standards, roles of
23 agents and wholesale brokers, that section would be
24 handling E&O cases. And, you know, I have
25 different wordings for claim cases, cases involving

258

1 claims. But I try to stick to the case I'm
2 handling.
3     Q. Obviously the opinion section is intended
4 to address your opinions, correct?
5     A. Correct.
6     Q. Yeah. And I believe that, you know, we
7 had a -- there was a numbering that we did on the
8 -- there was I guess Exhibit #4.
9     Kate, could I bother you to pull up Exhibit
10 #4, please? And what I would like to do on Exhibit
11 #4 -- and, Kate, maybe you can take me to Page 6 of
12 that if you don't mind. If you can get it up on
13 the screen there and get us to Page 6. I just want
14 to make sure that I've addressed, you know, those
15 categories as relates to Willis.
16     I think actually you just kind of -- I'm
17 looking at Paragraph 2. I think we just talked
18 about that a moment ago, but the Paragraph 2 on
19 Page 6, you've concluded that Willis Towers Watson
20 acted as Tulane's insurance agent.
21     I suspect you probably would say "insurance
22 broker" would probably be the proper term?
23     A. Yeah, I agree with that.
24     Q. And then on 3, your opinion on Willis about
25 operating under an Agency Agreement with Chubb, I

259

1 think there was some back and forth about that.
2 But I think where that landed is you -- you
3 strongly suspect there's an agreement out there,
4 and that's why you believe that's so?
5     A. Correct. It just hasn't been produced yet.
6     Q. Yeah, I think there was a request for it
7 awhile ago.
8     And then the next specific reference I see
9 to "Willis" is at 6, paragraph -- that's No. 6 in
10 Exhibit #4. And that makes reference to Willis,
11 and Mr. Smith in particular, identifying that
12 Endorsement 44, you know, was -- was not attached
13 to the policy.
14     So I know we saw some e-mails on that
15 before. I want to show you just a few more e-mails
16 on that just to help us with the timing there.
17     And so the e-mail, Kim, that I would like
18 you to put up if you can is the e-mail -- oh, I'm
19 sorry, Kim, the one I actually want to put up is
20 the one that's dated April 8, 2019. That's the one
21 I want to see. I mean, you may have it as tab 7.
22     MR. BAINES:
23     And, Tammy, that's going to be, what?
24     Exhibit #19?
25     THE COURT REPORTER:

260

1     Yes, Exhibit #19.
2     (Whereupon, the document was duly marked
3     for identification as "Exhibit #19" and
4     attached hereto.)
5 BY MR. BAINES:
6     Q. Can you maybe make that a little bigger if
7 you can.
8     So I believe we saw a -- the delivery of
9 the policy. I think it was Exhibit #6. If you
10 recall, Mr. Fey, that the policy had been delivered
11 on March 29, 2019. Is that your recollection?
12     A. What was the date?
13     Q. March 29, 2019.
14     A. I think that was the date it was delivered
15 to Willis.
16     Q. Yeah, that's right, yeah.
17     And so I wanted to look at this exhibit.
18 We were just trying to figure out when Willis first
19 spoke out about this. So again there it is, right,
20 the initial e-mail there at the bottom --
21     A. Right.
22     Q. -- do you see that on the bottom of the
23 Exhibit #19?
24     A. Sure.
25     Q. All right. And then let's scroll up and

261

1 maybe go -- so if we go to the very top, do you see
2 that e-mail from Mr. Smith that's dated April 8th
3 which is, you know, a little more than a week later
4 back to the folks at Chubb, Mr. Thompson that says,
5 "We also seem to be missing the Virus and Bacteria
6 Coverage Endorsement from the policy. Thanks,
7 Brian."
8     When you looked at e-mails about the
9 timing, about the timing of what happened and
10 Willis raising the issue of the endorsement, was
11 this one of those that you came across?
12     A. Sure.
13     Q. Yeah. And so the -- and just to set the
14 timing. I mean, within ten days of receiving the
15 policy from Chubb, Willis had raised that the issue
16 of the virus exclusion being -- excuse me -- the
17 virus endorsement being missing with Chubb,
18 correct?
19     A. Correct.
20     Q. Yep. And then, Kim, if you could put up
21 the e-mail June 4, 2019. I think that will be
22 Exhibit #20.
23     (Whereupon, the document was duly marked
24     for identification as "Exhibit #20" and
25     attached hereto.)

262

1    And I wanted to complete the universe of
2 some of these e-mails that address the status of
3 the endorsement.  So if we could go -- maybe if we
4 could scroll to the top, maybe the first page of
5 that.  You know, why don't we go down to the bottom
6 of the page.
7    So there's an e-mail there that is dated
8 May 17th from Mr. Smith of Willis to Mr. Thompson
9 of Chubb.  It begins, it makes reference to, you
10 know, "Good morning.  Following up on a few
11 endorsements for the attached policy.  Deletion of
12 Endorsement 27 and 29.  Addition of Virus Bacteria
13 Coverage Endorsement."
14    And then if you could scroll up, Kim,
15 please.  And then again on June 4th, there's
16 another e-mail from Mr. Smith to Mr. Thompson that
17 day that says, "Good morning.  Following up on the
18 request below and also need to add another couple
19 from Tulane."
20    And then it -- it makes reference to
21 change the retro for Endorsement 44 and 45 to full
22 retro.  Do you see that?
23    A.  Yeah.
24    Q.  So are these part of those e-mails that you
25 had looked at that -- that led you to believe that

263

1 there had been followup between Willis and Chubb
2 regarding the missing endorsement, you know, prior
3 to the endorsement being issued in 2020?
4    A.  Yeah.  I probably looked at these links 20
5 different times.
6    Q.  Yeah.
7    A.  They're documents.  They're repeatable.
8    Q.  Yeah.  So now if you go back to Exhibit #4,
9 item 6, we had -- those are further exchanges that
10 relate to the requesting of the -- that Chubb add
11 the Manuscript Endorsement 44, correct?
12    A.  Right.
13    Q.  And then the next reference I see to
14 Willis is your opinion that's dated No. 7, and I
15 think we talked about that.  That's just that
16 e-mail that Ms. Bell sent to the folks at Chubb.  I
17 think that was marked as an exhibit.  I think it
18 was Exhibit #8.
19    And then I'm looking through those next
20 items, and if you can walk with me.  But as I walk
21 through items 8 all the way down from that point, I
22 don't see any specific reference to Willis in your
23 opinions.  You let me know if I have that right.
24    A.  Well, that's right.  The issue is because
25 of the missing endorsement.  It's kind of hard to

264

1 tell whether or not Willis did anything wrong or
2 not because if the coverage is there, then
3 obviously there's no E&O.  But if the coverage is
4 determined not to be there, then it's going to be a
5 matter of what the conversations were between
6 Tulane and Willis.
7    And I haven't seen those depositions yet.
8    Q.  Okay.  And you don't address that?  You
9 haven't seen those depositions yet, and you don't
10 address that in this report, correct?
11    A.  Yeah, there's nothing I can address
12 because, I mean, all our e-mails are from Willis to
13 Chubb asking for the endorsement.  And then once
14 they got it, they delivered it to Tulane so...
15    Q.  The next section that begins at Page 10, we
16 can just stay on -- maybe, Kim, let's go to Exhibit
17 #2, please.  While Kim is pulling this up, it's
18 that section that you have the history.
19    Would it be fair to say that history is
20 kind of the facts as you know them or understand
21 them to be?
22    A.  Yeah.  Just a recap, yeah.
23    Q.  And that's based on I think your
24 review of the documents, I think.  And some
25 instances there are things that I think Ms. Curtis

265

1 shared with you, as well; is that fair?
2    A.  I'm sorry?  The review of the documents,
3 and what?
4    Q.  Yeah.  Your review of the documents and at
5 least, in an instance, Ms. Curtis telling you about
6 a conversation that occurred?  For example, that
7 February 12, 2019, meeting where she gave you a
8 description of what we understood was discussed
9 there?
10    A.  Yeah.  I mean, she -- she gave me her
11 understanding of what was discussed, and then I --
12 the other documents, of course, that we've talked
13 about ad nauseam.
14    Q.  Yeah.
15    A.  That document what happened there.
16    Q.  Yeah.  Aside from the documents you looked
17 at and conversations that you had with Ms. Curtis,
18 are there any other things that are a source of
19 this "History" section that is in -- that begins on
20 Page 10?
21    A.  Well, I mean, it's kind of hard to say that
22 it's confined to a certain documents, you know.
23 It's, you know, part and parcel of the whole thing
24 that I reviewed.
25    I will say there were some -- there were

266

1 some e-mails between Willis and Chubb that gave me
2 pause --
3    Q. Yeah.
4    A. -- for example, the -- I think it was Smith
5 indicated that the coverage should have BI and
6 PD --
7    Q. Okay.
8    A. -- and they were trying to get the
9 endorsement so...
10    Q. Yeah. But what I'm trying to zero in on is
11 not any specific communications you had. What I'm
12 trying to zero in on, I'm just trying to make sure
13 that the universe of things that form that
14 "Background" section are either documents that you
15 looked on a computer screen or held in your hand
16 and talked to Ms. Curtis, and there's not some
17 other, you know, bucket three or bucket four.
18       So I'm asking about: Is there another
19 bucket?
20    A. I don't believe so.
21    Q. Right.
22    A. I mean, very little of it came from
23 Ms. Curtis.
24    Q. Okay. And, in fact, aside from what you
25 already testified about, you know, with respect to

267

1 Ms. Curtis and her description of the February 12th
2 meeting, is there anything else from Ms. Curtis
3 that serves as a basis for facts that you included
4 in the "Background" section beginning at Page 10?
5    A. I don't believe so.
6    Q. You know, I know you're not an
7 epidemiologist. I know you're a 40-year insurance
8 person, right?
9    A. Correct.
10    Q. But what I would -- we all kind of went
11 back and forth a little bit about -- we all know
12 what we know about COVID from -- from the media and
13 maybe we've even heard things about Ebola from
14 media, and maybe we've all read articles about it.
15       But you don't profess to have any
16 specialized knowledge about Ebola and COVID and how
17 they're transmitted, do you?
18    A. No. I mean, just, you know, common sense,
19 common knowledge.
20    Q. I would like to pull up what was previously
21 marked as -- why don't we pull up Exhibit #17,
22 please, Kim. Maybe make that a little bit bigger
23 for us here. That would be great.
24       So I've already talked about this one so I
25 don't want to belabor it, but there is language in

268

1 the "Communicable Disease" section -- and by that I
2 mean in the column that's, you know, "Modifications
3 to Form," you know, we discussed that.
4       There's language under the expiring XL that
5 says "excluded," right?
6    A. Correct.
7    Q. And I think you had testified that would
8 indicate to you that there's an exclusion in the XL
9 policy as to communicable diseases, right?
10    A. Correct.
11    Q. Right. And you've never looked at that XL
12 policy, have you?
13    A. No. The only policy I've looked at is the
14 Chubb policy.
15    Q. Yeah. But you would feel comfortable
16 looking at this, you know, page that's Exhibit #17,
17 that that's an indication that, if you did look at
18 that XL policy, you would see an exclusion for
19 communicable diseases, right?
20    A. I would expect to see one, yes.
21    Q. Yeah. And I think you testified earlier, I
22 mean, you've seen these proposals. I bet you've
23 prepared these proposals, right?
24    A. Well, I don't prepare them. I have people
25 that do that.

269

1    Q. But you present them, though, I bet.
2    A. Yeah, I present them, correct.
3    Q. Yeah, right.
4    A. That's why I thought Donna Bell did it.
5    Q. Yep. And there's, in addition to that
6 language, you know, "excluded," if we go to the
7 right, there's language for Chubb that says
8 "silent," right?
9    A. Correct.
10    Q. And then, but there's also language, for
11 example, just look at the line below that for
12 "Products Liability" for Chubb where it says,
13 "excluded," right?
14    A. For Chubb?
15    Q. Yeah, for Chubb for Products Liability.
16 I'm just using this by an example. I know what --
17    A. You're talking about the next page?
18    Q. No, it's right there on that page at the
19 bottom. Oh, this is a different version. Yeah, I
20 got it. Let me go up. I can go up.
21    A. I got it here. I see it. It's excluded.
22 I've got it on my screen.
23    Q. Yeah, that's fine, yeah.
24       And if we look at this page on Exhibit #17,
25 for example, if we look next to "Illicit

270

1 Abandonment," there's a reference to "Included,"
2 right?
3     Do you see that? Kind of in the middle of
4 the page if we go to Chubb --
5   A. "Included" all the way across, correct.
6   Q. Yeah. "Included" all the way across.
7     And maybe even below that for aboveground
8 storage tanks, there's language that says "coverage
9 included," right?
10   A. Correct.
11   Q. So, I mean, the nomenclature that we see
12 here just on those few examples are the chart can
13 say "silent." The chart can say "excluded." The
14 chart can say "coverage included." And in some
15 instances it says "included."
16     And in some instances, it lists, like,
17 something substantive like, for example, under
18 Chubb for "disinfection costs," it lists some
19 language, right?
20   A. Correct.
21   Q. Yeah. So when you see -- you wouldn't
22 equate "silent," just the use of that term for
23 purposes of nomenclature, as being the same thing
24 as "excluded," would you?
25   A. No. And you wouldn't expect, by the same

271

1 token, "silent" for someone to interpret that as to
2 be included, would you?
3     MS. CURTIS:
4       Object to the form.
5     THE WITNESS:
6       The way I would phrase it is there's no
7     discussion at all in the policy about it.
8 BY MR. BAINES:
9   Q. Oh, right, but I'm not talking about -- I'm
10 not talking the -- let's, if you just -- you mean
11 if you just looked at the chart, you would infer
12 from "silent" that there's not a discussion in the
13 policy about it?
14   A. Correct. So, for example, if you've got
15 pollution coverage for viruses and it doesn't say
16 anything about communicable diseases, then you
17 would assume that you had coverage for
18 communicable -- communicable diseases. You would
19 have virus and bacteria coverage.
20   Q. And for the category, you see all these
21 places on this sheet that have the word "included,"
22 right?
23   A. Right.
24   Q. And you see all these places on the sheet
25 that say "coverage included," right?

272

1   A. Correct.
2   Q. Yeah, those are -- those have a different
3 meaning than the word "silent," don't they?
4   A. Correct. I mean, so you can have -- you
5 can have policies that don't have pollution
6 coverage. And they could enter the word "silent."
7 Or you could have policies with pollution coverage,
8 and they could enter the word "silent."
9     And then in the Chubb situation, you've got
10 coverage for virus and bacteria so it's silent so,
11 you know, it would infer that there's no exclusion
12 or policy provision regarding communicable disease
13 in the policy at all.
14   Q. Yeah, that would be -- right, so "silent"
15 would mean certainly there's not an exclusion. And
16 if someone wanted to indicate that there was
17 coverage there, they could have put "included" or
18 "coverage included," right?
19   A. Correct.
20   Q. And that's what you would expect to see if
21 there was coverage or coverage included, correct?
22     MS. CURTIS:
23       Object to the form.
24     THE WITNESS:
25       No. "Silent" means there's no language

273

1     in the policy about it.
2 BY MR. BAINES:
3   Q. Right, right. But if it said, for example,
4 "coverage included," that would lead you to believe
5 that there is language in the policy, right?
6   A. Correct.
7   Q. Right. That's not -- but here "silent" is
8 listed, correct? For communicable diseases for
9 Chubb, the terminology that was put in this chart
10 was "silent," right?
11   A. Correct. So I take it to mean there's no
12 discussion of communicable disease in the policies
13 at all.
14   Q. Okay.
15   A. So, I mean, I don't know what other
16 coverages are involved in the --
17   Q. Yeah.
18   A. I guess it's a AWAC coverage and Allianz.
19 So, I mean, there could be a reason why it says
20 "silent" instead of "not covered."
21   Q. And you haven't looked at the Allianz or
22 AWAC policies, have you?
23   A. Correct.
24   Q. Okay.
25   A. I don't know what's in there other than

274

1 what's on this chart.
2    Q. So I certainly don't want to belabor the
3 discussion because -- about what happened on
4 February 12th, because I know that you were neither
5 at the meeting, that you haven't spoken to anyone
6 who was at the meeting, and that you've looked
7 at -- I guess you had access to Exhibits #16 and
8 #17 but not Exhibit #15.
9     Exhibit #15 being -- Exhibit #15 being
10 Ms. Sirlo's notes. And I understand at the time
11 you prepared your report, you had seen the
12 Affidavit of Mr. Hadden?
13     Is that kind of a fair capture of what you
14 knew then when you prepared your report on
15 June 2nd?
16    A. Well, I had the -- I had these documents,
17 and then I had the Petition. And I had discussed
18 it with Ms. Curtis. But I did not have the
19 Affidavits, and I did not have the full stewardship
20 reports at that point.
21    Q. I want to focus just for a minute on what
22 you recall about the Hadden Affidavit. I just --
23 do you believe that you read in an Affidavit that
24 Mr. Hadden said that Tulane asked for Ebola
25 coverage?

275

1    I mean, I'm trying to figure out if you
2 believe that's what he said in his Affidavit, or
3 that's just an inference you've made based on
4 everything you've seen or you're discussing with
5 Ms. Curtis --
6    MS. CURTIS:
7     I'm just going to object that I don't
8    think he ever said Mr. Hadden said that.
9    MR. BAINES:
10     No, no, no. I'm not asking -- I'm
11    asking whether he believes that's something
12    that he read in Mister -- Mr. Hadden's
13    Affidavit, if he has a recollection of
14    reading that, because he has made the
15    statement that --
16 BY MR. BAINES:
17    Q. Well, let me ask you this. Am I correct
18 that it's your belief that Tulane had asked Willis
19 to -- about Ebola coverage for disinfection costs?
20    A. Ask the question again.
21    Q. Yeah. Do you believe, as you sit here
22 today, that someone at Tulane asked Willis at the
23 February 12th meeting about coverage for
24 disinfection costs that would respond to Ebola?
25    A. Yeah.

276

1    Q. And what I'm trying to learn is whether,
2 you know, that was solely based on your review of
3 the notes or your conversation with Ms. Curtis?
4 And right now I'm trying to rule out that you
5 didn't see that in the Affidavit of Mr. Hadden
6 because that's all you had seen on the --
7    A. I didn't have either Affidavit when I did
8 my report, so correct.
9    Q. So it would have had to have been either
10 looking at this exhibit that's on the screen,
11 Exhibit #17, Exhibit #16, or your conversation with
12 Ms. Curtis?
13    A. Or the Petition.
14    Q. Or the Petition, right.
15     And you understand that the Petition is,
16 you know, a legal pleading that's neither -- you
17 know, it's not testimony and it's not a document in
18 the case for allegations --
19    A. Correct.
20    Q. -- it's just allegations.
21     If you can give me one more moment to look
22 at my notes, I think I might be done. But if you
23 can indulge me for one minute.
24     I know that you have formed -- you have
25 seen some additional documents and you've indicated

277

1 that, you know, if asked you may have more
2 opinions. You know, do you have a present intent
3 to prepare a supplemental report? Or have you been
4 asked to do that?
5    A. Not as of today. But, you know, like I
6 said, none of the depositions have been provided
7 yet so I'm eager to see what's going to be in
8 there. I reserve the right at the bottom of my
9 opinion.
10    Q. That's all the questions I have for you,
11 sir. Thank you.
12    A. Okay, thanks.
13    MS. CURTIS:
14     I don't have any questions.
15     Any follow-up, Tom?
16    MR. CARRUTHERS:
17     No.
18    THE VIDEOGRAPHER:
19     Thank you, Counsel. This is the
20    videographer. The time is 5:26. This ends
21    media file five, and that concludes this
22    deposition.
23    THE WITNESS:
24     I'll read and sign.
25

278

1
2          I, LOUIS G. FEY, JR., the undersigned, do
3  hereby certify that I have read the foregoing
4  deposition taken on July 19, 2022, and it contains
5  a true and accurate transcript of the testimony
6  given by me, before Tamra K. Kent, CCR.
7
8      (    )  Without Corrections
9
10     (    )  With corrections as reflected on
                the Errata Sheet(s) prepared by
11              me and hereto attached consisting
                of      pages.
12
13
14
15          WITNESS SIGNATURE
            LOUIS G. FEY, JR.
16
17
18          DATE SIGNED:
19
20
21
22
23
24
25

279

1          C E R T I F I C A T E
2
3          This certification is valid only for a
4  transcript accompanied by my original signature and
5  original required seal on this page or by my
6  certified digital signature on this page.
7
8          I, Tamra K. Kent, Certified Court Reporter
9  in and for the State of Louisiana, as the officer
10 before whom this remote testimony was taken, do
11 hereby certify that LOUIS G. FEY, JR., to whom the
12 oath was remotely administered, after having been
13 first duly sworn by me upon authority of RS
14 37:2554, did testify as hereinbefore set forth in
15 the foregoing 277 pages;
16          That this testimony was reported by me in
17 stenographic machine shorthand, was prepared and
18 transcribed by me or under my personal direction
19 and supervision, and is a true and correct
20 transcript to the best of my ability and
21 understanding;
22          That the transcript has been prepared in
23 compliance with transcript format guidelines
24 required by statute or by rules of the board, and
25 that I am informed about the complete arrangements,

280

1  financial or otherwise, with the person or entity
2  making arrangements for deposition services; that I
3  have acted in compliance with the prohibition on
4  contractual relationships, as defined by Louisiana
5  Code of Civil Procedure Article 1434 and in rules
6  and advisory opinions of the board; that I have no
7  actual knowledge of any prohibited employment or
8  contractual relationship, direct or indirect,
9  between a court reporting firm and any party
10 litigant in this matter, nor is there any such
11 relationship between myself and a party litigant;
12
13          That I am not related to counsel or to the
14 parties herein, nor am I otherwise interested in
15 the outcome of this matter.
16
17
18
19 Tamra K. Kent  83070
   Certified Reporter in and for
20 the State of Louisiana
21
22
23
24
25

281

1  Errata Sheet
2
3  NAME OF CASE: The Administrators of Tulane Ed Fund V Illinois Union Ins. Co., et al
4  DATE OF DEPOSITION: 07/19/2022
5  NAME OF WITNESS: Louis G. Fey, Jr.
6  Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25          _____