# EXPERT REPORT OF
# LOUIS G. FEY JR, CPCU, CIC, CRM, AIC
# FEY CONSULTING LLC

JUNE 2, 2022

THE ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND

PLAINTIFFS,

VERSUS

ILLINOIS UNION INSURANCE COMPANY; WILLIS TOWERS WATSON SOUTHEAST, INC. F/K/A WILLIS OF TENNESSEE, INC.; AND ABC INSURANCE COMPANY,

DEFENDANTS.

---

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO.: 2:21-cv-00820

**EXHIBIT A**

1. I will act as an expert witness regarding the insurance industry standards, customs, and practices applicable to insurance underwriting and claim handling. Specifically, I have been retained by counsel for The Administrators of The Tulane Educational Fund ("Tulane"), to evaluate the handling of its underlying claim ("the claim") under a policy issued by Illinois Union Insurance Company (hereinafter referred to as "Chubb") as well as the involvement or culpability of Willis Towers Watson Southeast, Inc. F/K/A Willis of Tennessee, Inc. (hereinafter referred to as "Willis") in Chubb's denial of coverage. In doing so, I am comparing the positions and actions of these companies to the universally accepted insurance industry standards and practice that apply to the handling of property insurance claims and the procurement of insurance by an insurance producer.

2. I have been asked, based upon my review, and with the benefit of my qualifications and expertise, whether I have certain opinions, as will be more fully set forth below. Where such an opinion is stated, it is based upon information provided to me that I consider reliable and which is the type of information reasonably relied upon by one in my profession. All of my opinions are expressed with a reasonable degree of professional certainty based upon the use of a reliable methodology, which includes applying my 40 years of experience and training in insurance as a licensed insurance adjuster and insurance producer, along with my experience in claim, underwriting, and risk management, to my review of the documents listed below, and by then comparing my findings to the applicable insurance industry standards, customs, and practice applicable to insurance claim handling. I have previously been found qualified (many times – see a <u>partial list</u> on Exhibit A) to testify as an expert on insurance industry standards, custom and practice in both Federal and State courts.

MY QUALIFICATIONS IN THE FIELD OF INSURANCE:

3. Attached as "Exhibit A" to this opinion is my curriculum vitae, which contains my work history, positions held on various state boards, accomplishments in the field of insurance, continuing education, a partial list of courts in which I have been deemed qualified to testify on insurance matters based upon *Daubert,* a partial list of seminars I have given, and what I believe to be a complete list of my past testimonies over the past four years.

4. I have over forty (40) years of practical experience handling complex claims and related litigation, directing, and overseeing insurance company defense

counsel, managing, as well as directing claim, underwriting, and agency operations. As Vice President of Risk Management at the 2nd largest bank owned U.S. insurance agency, I assist insurance carriers and insured entities by intervening and/or advising on complex or problematic situations or issues. I assist insurance producers with insurance coverage analysis, insurance program analysis, and clients with regard to the management of corporate and personal risk. I have also spent many years instructing and training insurance company and insurance agency personnel. My opinions are also based upon information contained in industry textbooks I have studied, have used to teach other adjusters, and to which I often refer. A partial list of those textbooks may be found on Exhibit A. Where I rely on a specific passage from these textbooks in my report, I so indicate by footnote or otherwise. Italicized words or phrases in my report is quoted language, and I try to emphasis key points through the use of bold type.

5. In my role at Fey Consulting LLC, I advise clients (insureds, insurance agents, brokers, and insurance companies) and consult with their respective attorneys where appropriate. I assist with insurance claims, coverage issues or disputes, and improper denials. I evaluate and provide litigation support and/or expert testimony addressing claim handling, allegations of errors and omissions, underwriting disputes, and a variety of other insurance related issues. I also regularly advise industry representatives and legislative authorities on insurance matters, and I am deeply involved in legislative initiatives related to the Insurance industry on both the state and federal level. I regularly conduct seminars for the insurance industry, which are recognized for continuing education credits, which include seminars at the request of the Louisiana Department of Insurance at Southern University.

6. The summer 2009 edition of the ABA Tort Trial Insurance Practice Insurance Coverage Litigation Committee Newsletter contained an article entitled "The Use of Experts in Insurance Bad Faith Litigation." The article concludes that the most effective experts are those who are qualified by true experience in the insurance industry and who support their position with case facts. I have ample industry experience, and I base all my opinions on the documented facts of the case along with my industry experience.

**BASIS OF MY OPINIONS**

7. My Opinion(s) are based on my review of the following documents:

- Chubb PPL Final Quote #4 2-26-19

- Chubb PPL Binder 3-5-2019

- Chubb PPL Policy Transmittal to Tulane from Willis 5-17-19

- Chubb PPL Email Chain Regarding Endorsement 3-31-20 to 4-2-20

- Tulane Chubb PPL COVID-19 Notice of Claim 4-7-20

- Chubb PPL Indoor Environmental Conditions Amendatory (Bacteria and Virus) Endorsement No. 44 with edition date 04/20 delivered to Tulane 5-7-20

- The Chubb denial of May 27, 2020

- The Chubb denial of July 24, 2020

- The Chubb Haas denial letter of January 15, 2021

- The Petition

- The Chubb Premises Pollution policy

- Chubb's June 2020 Communicable, Infectious Or Contagious Diseases Exclusionary Endorsement

- Various Invoices for remediation expense incurred supporting documentation filed with Tulane's 2nd proof of loss and letter sent to Kevin Haas on April 17, 2021
- Tulane's letter to Chubb dated November 14, 2020

- Tulane's letter to Chubb dated April 7, 2020

- Chubb's letter to Tulane dated May 27, 2020

- Tulane's letter to Chubb dated July 28, 2020

- Chubb's letter to Tulane dated July 14, 2020

- Judge Guidry's Order dated May 16, 2022 (Document 68)

- WTW_0000001 - WTW_0004851

- CHUBB000001 - CHUBB002775

- Chubb's MSJ filed March 1, 2022

- Tulane's Motion for Partial Summary Judgement of February 1, 2022

- Chubb's Memorandum of Law In Opposition To Plaintiff's Motion For Partial Summary Judgment

- Chubb's Response To Plaintiff's Statement Of Material Facts Which Present No Genuine Issue

8. My opinions are based upon a broad spectrum of education, training, research, and over four (4) decades of experience. I also have access to various industry databases such as Sage, Silver Plume, Fidelity Casualty and Surety ("FC&S"), and the International Risk Management Institute ("IRMI"). I research industry writings, white papers, and textbooks daily. I apply and draw from my actual multi-line claim handling, underwriting, agency, and risk management experience in arriving at my conclusions.

**INDUSTRY STANDARDS - THE ROLES OF AGENTS AND WHOLESALE BROKERS**

9. These industry standards can be seen in various industry documents, books, and white papers. For the sake of brevity, I will merely refer the reader to Exhibits

5

B & C for a more detailed discussion of the standards that apply to both insurance companies and insurance agents.

10. To be clear, where I comment on coverage or the obligations of the various parties in this report, I do so only to discuss the industry's standard custom and practice. Likewise, where I discuss particular policy provisions, or the intent behind coverage forms or exclusions, I do so from an insurance industry perspective in order to discuss the issues or to illustrate the application of industry standards to the adjusters evaluation of coverage, which must be examined to determine if the claim was handled appropriately. **To the extent that there are any coverage disputes in this matter, my opinion should not be viewed as an attempt to declare or disclaim coverage for the underlying claim.**

11. Any discussion of coverage is merely to evaluate and explore whether the actions and coverage positions taken by Chubb are reasonable and in keeping with insurance industry standards and common practice. Likewise, I do not opine on state law nor do I discuss common law or attempt to apply state law. My opinions are solely discussing insurance industry standards and practice.

12. My intent is to assist the court by explaining certain underwriting considerations, by perhaps highlighting some important policy provisions, issues, or certain claim handling activities, as compared to the standard insurance industry practice and applicable standards. I also sometimes discuss of the industry's intent behind certain policy provisions, claim handling procedures, Best Practices, the standards that apply to an adjuster's evaluation of coverage, and the constraints or expectations applicable to adjusters. These are all important considerations when evaluating claim handling. In fact, a close reading of my opinion will reveal that I do not mention any applicable law, only claim handling, industry expectations, and underwriting practice, These are processes and procedures that are not easily recognized by those outside these professions.

**OPINION**

- Chubb's three-year policy, effective February 27, 2019, was issued over a year prior to Covid-19 impacting New Orleans;

- Willis Towers Watson Southeast, Inc. F/K/A Willis Of Tennessee, Inc. ("Willis") acted as Tulane's insurance agent;

- Willis likely operates under an agency agreement with Chubb;

- Chubb's final quote dated February 26, 2019 ("the quote" or "the final quote"), documents the coverage accepted by Tulane and bound by Chubb, and shows that it was Chubb's underwriting intent to provide coverage for Indoor Environment Conditions (Bacteria and Virus);

- **The final Chubb quote reflects that Chubb agreed to expand coverage for losses caused by Indoor Environment Conditions caused by virus** as defined by the policy on page 7 of 16 of form PF-44887a (01/17). The endorsement expands coverage to include virus remediation; whereas Chubb failed to add that agreed upon coverage via endorsement No. 44;

- After receipt of the policy from Chubb upon issuance, Tulane's producer/agent Brian Smith ("Smith") of Willis, discovered that the coverage was not added as agreed upon, and immediately requested Chubb correct the policy by deleting Endorsements #27 and #29 and by adding manuscript endorsement #44 so that the policy would mirror the terms of Chubb's final quote dated February 26, 2019, the terms accepted by Tulane and bound by Chubb;

- On May 17, 2019, Donna Bell, a Willis Senior Account Manager forwarded the Chubb policy to Tulane and documented Smith's[1] request;

- While Chubb was asked by Smith to correct the policy in May 2019, it failed to do so **until after the loss was submitted by Tulane**, almost a year later;

- In March 2020, Covid-19 was declared a Pandemic by the World Health Organization;

- On April 7, 2020, Tulane submitted a claim for losses related to the Covid-19 pandemic ("the claim");

- **One month after Tulane filed its claim**, Chubb amended its policy by endorsement adding endorsement MS-300274.1(04/20) ("the endorsement" or "endorsement 44");

---

[1] TULANE/CHUBBPPL/5-17-2019/POLICYTRANSMITTAL/00001.

- While Endorsement 044 expands the policy definition of **Indoor Environment Conditions it also alters and narrows the existing coverage provided by the policy to limit coverage;**

- While on the surface it would appear that Chubb merely corrected the policy to add the "Indoor Environmental Conditions," coverage it previously agreed to provide, upon which the premium was calculated and agreed to by Tulane subject to a $10,000,000 sublimit, **it was not the virus coverage originally agreed upon;**

- **A closer reading of the endorsement reveals that Chubb unilaterally changed the definition of "Indoor Environmental Condition" by adding the following limiting language through a change to the definition of "Indoor Environmental Condition":**

   *Solely with respect to coverage for: a) "claims" seeking "remediation costs"; and b) "first party remediation costs", the discharge, dispersal, release, escape, migration or seepage of bacteria (exclusive of legionella pneumophila)* **or viruses in a building or structure, or the ambient air within such building or structure, provided that:**

   *Such "fungi", bacteria or viruses are not naturally occurring in the environment in the amounts and concentrations found within such building or structure; and*

   *Such bacteria and viruses:* **a) are not the result of communicability through human-to-human or bodily fluid contact;** *and b*) **are required to be reported** *to any Federal, state, commonwealth, municipal or* **other local government agency** *or body with regulatory jurisdiction over the "covered location";*

- As one can see, Chubb altered the definition that was included in its quote to add a proviso **that covered "first party remediation costs" do not include viruses that are the result of communicability through human-to-human or bodily fluid contact; and are required to be reported to any Federal, state, commonwealth, municipal or other local government agency;**

- While Chubb added the endorsement that should have been on the policy at inception, coverage for virus as agreed, when it bound coverage, it altered the terms of the coverage actually provided by the endorsement, a serious

deviation from insurance industry standards and practice known as "post loss underwriting";

- While an insurer can agree to expand coverage after a loss unilaterally, it can't narrow coverage unilaterally. By narrowing coverage after a claim had already been submitted, Chubb engaged in post loss underwriting;

- Chubb misrepresented coverage in its initial denial;

- Chubb misrepresents coverage after altering the definition of what constitutes an Indoor Environmental Condition;

- Chubb added additional limitations onto it definition of what constitutes an Indoor Environmental Condition post loss;

- The addition of additional limitations onto it definition of what constitutes an Indoor Environmental Condition actually removes some coverage the pre-existed the endorsement which was designed to provide additional coverage;

- In the title to Endorsement 44 MS-300274.1 (04/20), the (04/20) denotes the month and year the endorsement was developed, i.e., April 2020, the month Tulane submitted its claim. The insurance industry always denotes the month and year endorsements are written so that updates or changes can be easily tracked and different variations of coverage can be identified;

- In short, we know that Chubb did not complete its drafting of the endorsement until after Tulane's claim had already been submitted (WTW_0000106), and therefore the documents give the appearance that Chubb intentionally altered its coverage after a claim had been submitted to exclude coverage, a serious deviation from insurance industry standards.

- To add to the appearance of impropriety, Chubb quickly denied Tulane's claim 10 days after endorsement #44 was issued.

- Regardless, the coverage provided by the endorsement is not what was sold to Tulane and represented by Chubb's binder of coverage. The binder included a copy of the main policy form reflecting the original definition of Indoor Environmental Condition that was quoted in Chubb's initial denial letter, as follows:

> *Z. "Indoor environmental condition" means:*
>
> *The presence of "fungi" in a building or structure, or the ambient air within such building or structure; or*
>
> *The discharge, dispersal, release, escape, **migration** or seepage of legionella pneumophila **in a building or structure, or the ambient air within such building or structure**,*
>
> *provided that such "fungi" or legionella pneumophila are not naturally occurring in the environment in the amounts and concentrations found within such building or structure.*

- Note that under this definition, Chubb does not have the policy defense it now asserts **that covered "first party remediation costs" do not include viruses that are the result of communicability through human-to-human or bodily fluid contact; and are required to be reported to any Federal, state, commonwealth, municipal or other local government agency.**

**HISTORY**

13. Chubb issued a Premises Pollution Liability Insurance Policy (PPL) No. PPL G71496776 001 ("the policy") to The Administrators of the Tulane Educational Fund ("Tulane") effective 02/27/2019 to 02/27/2022, a three-year policy. The policy provides $25,000,000 in coverage for Indoor Environmental Conditions as defined, subject to a $250,000 self-insured retention. The policy was endorsed to add coverage for "Indoor Environmental Conditions Amendatory (Bacteria and Virus) "Endorsement 044", which expanded coverage for "Indoor Environmental Conditions" caused by virus or bacteria, subject to a $10,000,000 sublimit.

14. On May 17, **2019**, Willis[2] forwarded the Chubb policy to Tulane by email and informed it that Willis producer Brian Smith spotted errors in the policy as issued, and had therefore asked Chubb to delete Endorsements #27 and #29 and to add manuscript endorsement No. 44 so that the policy would conform with Chubb's final quote to provide Virus/Bacteria coverage.

---

[2] Willis Towers Watson Southeast, Inc. F/K/A Willis Of Tennessee, Inc. "Willis" was acting as Tulane's insurance broker. Its employee Donna Bell sent the referenced email and policy to Tulane.

15. On April 7, 2020, as a direct result of a severe outbreak of Covid-19 in the New Orleans area, Tulane University evacuated its students from campus and began remediation efforts to decontaminate. At the same time, Tulane placed Chubb on notice of its claim and advised it that Tulane had identified several Covid-19 cases on its campus.

16. Since the claim was reported timely, there does not appear to be any coverage defense asserted by Chubb related to prompt reporting or with regard to the policy retro date under this claims-made policy. I will, therefore, not address those provisions other than to state that the claim fell within the policy period and was reported timely. For brevity, I will focus solely on the policy provision Chubb relied upon in its denial.

17. While the policy provides multiple coverages, the coverage at issue is the *"Indoor Environmental Conditions"* coverage as outlined by Endorsement 044. The phrase *"Indoor Environmental Conditions"*, the phrase *"Fist Party Remediation Costs"* and the phrase *"Remediation costs"* are all defined by endorsement 044. Interestingly, endorsement 044 is a manuscript endorsement drafted by Chubb **after the loss,** in April 2020, and was not delivered to Tulane until May 7 2020, **a full month after the claim was initially reported**. While the policy was issued effective **February 27, 2019,** and while Willis specifically requested the endorsement on **May 17, 2019**, the endorsement wasn't produced or provided to Tulane until over a year later, and **over a month after Tulane's claim had been reported**.

18. On May 27, 2020, just 10 days after providing Tulane with the endorsement, Chubb denied coverage, misrepresenting the definition of an "Indoor environmental condition" **after failing to apply the new definition outlined on the new manuscript endorsement #44**. Since this the claim was on hold while the adjuster was waiting for Chubb's underwriter to draft the new endorsement, Chubb's failure to quote the new language in its denial is disturbing. Obviously, the adjuster was aware of the new provision. In issuing its denial, Chubb also included a litany of inapplicable provisions, such as its Contractual, Employers Liability and Workers Compensation exclusions.

19. The insurance industry requires that an insurer must thoroughly investigate all claims and that a claim should never be denied unless or until the insurer is confident in its position, exhausting every possible means to *"read in"* coverage.

11

20. An adjuster is required to *"read in"* coverage whenever possible giving all provisions the broadest possible reasonable meaning that results in coverage. An adjuster is required to look for coverage, not coverage controversy.

21. An insurer is required to get a denial right the first time, and once denied, an insured cannot add to its basis for denial, defenses that it could have identified had it completed a thorough investigation and evaluation of coverage before issuing its denial. The insurance industry instructs adjusters to get any denial right the first due to a concern that inaccurate denials may be deemed a waiver any policy defense not cited. The fact that Chubb's May 27, 2020 denial letter contains misrepresentations of coverage and inapplicable exclusions, only serves to document Chubb's attempt to manufacture its bases for denial.

22. On July 14, 2020, in response to Tulane's letter of July 8, 2020 objecting to Chubb's denial, Chubb issued a second denial letter. Importantly, rather than withdraw its first letter, Chubb reasserted its initial denial, and supplemented it.

23. While Chubb corrected the definition of the term *"indoor environmental condition"*, it reiterated its intial denial and **went on to misrepresent the facts surrounding the claim by stating that the claim was not covered because:** *"Subparagraphs 1 and 2"* of endorsement 44 *"are not exclusions or exceptions; rather, they define the limited viruses that are covered,"* and that *"COVID-19 does not meet the requirements of subpart 2.a., which requires that the virus not be the result of communicability through human-to-human or bodily fluid contact."*

24. Importantly, since Chubb errored in issuing its policy, Tulane was not given an opportunity to read Endorsement 44 to make sure that it provided the coverage for which it bargained prior to the loss. Additionally, **since the endorsement was not issued until a month after it was placed on notice of Tulane's claim, Chubb had an opportunity to add whatever language its desired in order to defeat coverage knowing that a claim had already been asserted**. Therefore, this claim could be considered to be a loss under binder, and coverage would therefore need to be evaluated based upon Tulane's reasonable expectations after reviewing the information listed on the binder. Chubb's claim department should have investigated this loss using "the binder procedure". While **Tulane** knew that endorsements 27 and 29 were to be deleted, it **was not able to review endorsement 044 prior to the loss, yet Chubb had the ability to draft the endorsement in a way that would limit or defeat coverage for Tulane's claim.**

25. Here is the endorsement that is at the core of this dispute. Endorsement 044 states (in pertinent part emphasis added):

Endorsement 044

*INDOOR ENVIRONMENTAL CONDITIONS AMENDATORY (BACTERIA AND VIRUS) ENDORSEMENT*

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

*The "insured" and the Insurer hereby agree to the following changes to this Policy:*

*b. Section **V., DEFINITIONS**, Subsection **AA.**, of this Policy is hereby deleted in its entirety and replaced with the following:*

**AA. "Indoor environmental condition"** *means:*

*1. The presence of "fungi" in a building or structure, or the ambient air within such building or structure;*

*2. The discharge, dispersal, release, escape, migration or seepage of legionella pneumophila in a building or structure, or the ambient air within such building or structure; or,*

***3. Solely with respect to coverage for: a) "claims" seeking** "remediation costs"; and **"first party remediation costs", the discharge, dispersal, release, escape, migration or seepage of** bacteria (exclusive of legionella pneumophila) or **viruses in a building or structure, or the ambient air within such building or structure,***

*provided that:*

*1. Such "fungi", bacteria or **viruses are not naturally occurring** in the environment in the amounts and concentrations found within such building or structure; and*

*2. Such bacteria and viruses: **a)** are not the result of **communicability** through **human-to-human or bodily fluid contact;** and b) are required to be reported to any Federal, state, commonwealth, municipal or other local government agency or body with regulatory jurisdiction over the "covered location".*

13

26. Here is the definition of the phrase *"First-party remediation costs"* as defined by the policy (in pertinent part emphasis added):

> *V. **"First-party remediation costs" means reasonable and necessary "remediation costs"** incurred by an "insured" resulting from a "first-party claim".*
>
> *"First-party remediation costs" also means reasonable and necessary expenses required to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of responding to a "pollution condition" or "indoor environmental condition."*

27. Here is the definition of the phrase *"Remediation costs"* as defined by the policy:

> *NN. **"Remediation costs" means expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize** "pollution conditions" or **"indoor environmental conditions"**…*

28. In keeping with industry standards, coverage for Tulane's Covid-19 remediation costs under endorsement 44 is triggered by this insuring agreement to the extent that Tulane's remediation efforts were in an effort to **investigate, quantify, monitor, remove,** dispose, **treat, neutralize,** or **immobilize viruses in a building** or structure, or the ambient air within these buildings.

29. While Chubb attempts to make a distinction between exclusions and qualifiers, claiming that the two requirements of the subsection *3. 1&2 of section AA. "Indoor environmental condition"* are not exclusions, but qualifiers of coverage, both would be considered coverage limitations from an insurance perspective.

30. Chubb's reliance upon the human-to-human or bodily fluid transmission limitation as a basis for its denial was inappropriate and **misrepresents the provision**. Since we are dealing (at least in part) with property transmission, human to property transmission, or property to human transmission, not human to human and not bodily fluid transmission, this coverage limitation does not apply.

31. Tulane's claim can easily be described in a reasonable manner which results in a path to coverage via Endorsement 44's insuring agreement as follows:

*The migration of viruses in a building or structure, or the ambient air within such building or structure.*

32. Tulane's damages can also be categorized in a reasonable manner that meets the policy definition of "remediation costs", as follows:

*Expenses incurred by Tulane to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize "indoor environmental conditions."*

33. Clearly, Chubb misrepresented coverage when it stated: *"COVID-19 does not meet the requirements of subpart 2.a., which requires that the virus not be the result of communicability through human-to-human or bodily fluid contact."*

34. To accept Chubb's assertion that the mere ability of a virus to spread from human-to-human serves to exclude coverage, would mean that the policy provides illusory coverage. While that alone is a deviation from insurance industry standards, the standard practice applicable to insurance coverage interpretation is that <u>all words must be given their common meaning</u>, that <u>all terms must be interpreted broadly to provide the broadest coverage possible</u>, and that <u>any interpretation applied can't lead to an absurd result.</u> **Accepting Chubb's coverage interpretation would lead to an absurd result** since it would mean that a policy that was intended to cover virus remediation does not cover virus remediation if the virus is **capable** of human-to-human transmission **since all viruses can be transmitted from human to human or through bodily fluids**.

35. **While the addition of section 3. to the definition of *"Indoor environmental condition"* after the loss may have been a post loss alteration of coverage,** the endorsement's limitation doesn't say anything about limiting coverage just because a virus is **capable** of human to human transmission, **the limitation only applies if the virus to be remediated, resulted from human to human transmission, not from human to air transmission, air to surface transmission, surface to human transmission or human to surface transmission, as with Covid-19. According to insurance industry standards, Chubb would need to show that its coverage limitation applies.**

36. It also appears that when discussing this coverage prior to agreeing to the premium, that **Tulane specifically asked if an Eboli outbreak would be covered under the policy**, an exchange Tulane documented on a copy of the proposal during the procurement meeting. Notably, the coverage comparison chart provided as part

15

of **the proposal used the term "silent" in the block discussing if communicable diseases were excluded by all three policies being proposed**, as compared to "excluded" for the expiring policy, which from an insurance industry perspective would be an indication that the proposed policies were all intended to provide coverage for communicable disease, a change from the prior term, and that limiting language such as human to human transmission or mandatory reporting to regulatory authorities were not anticipated when this discussion took place while reviewing the proposal.

37. There is evidence to support the notion that coverage limitation 3. 1 & 2 were never intended to be included as part of the endorsement, since the coverage comparison chart was marked "silent." In short, it appears from my review that Tulane specifically asked for virus coverage during the meeting, there is evidcne to suggest that Chubb intended to provide that coverage.

38. Since endorsement 44 was not issued until after the loss, based only upon information contained in the binder, Tulane could be deemed to have had a reasonable expectation to assume that it had purchased coverage that would respond to cover its cost to remediate its campus in the event of a Pandemic such as Covid-19.

39. Chubb attempted to deny coverage based upon a misrepresentation of coverage and inapplicable exclusions, contrary to insurance industry standard practice. Chubb failed to get its denial right the first time, and created coverage controversy by adding limitation to an endorsement after a loss had already bee reported.

40. Interestingly, since the Pandemic struck, and since the issuance of endorsement #44, Chubb has started using a revised endorsement broadening the above limiting language to include *"airborne transmission, bodily fluid or discharge transmission, or transmission **from or to any surface, object,** solid, liquid or gas, or between or among humans and other organisms."* In my opinion, **this endorsement revision documents that Chubb understood that the application of Endorsement 44 was not as broad as it suggests, and obviously, had Chubb wished to exclude virus remediation for any *"transmission from or to any surface"* or *"object,"* it could have easily done so. In view of the broadened language of its new endorsement, I question exactly what virus coverage Chubb is selling at this point since this new endorsement appears to provide illusory coverage for virus.**

16

41. While not part of its original basis for denial, Chubb also now argues that *"Willis is very familiar with the coverage grant and limitations in"*[3] this endorsement. Of course, this argument has no bearing on coverage for Tulane's claim, and is total nonsense from an insurance industry claim handling perspective. The issue is simply: What coverage is triggered by endorsement #44 given a reasonable interpretation, or in the alternative, since the endorsement was not issued until after the loss, was it reasonable for Tulane to have expected coverage for its remediation costs related to the Covid-19 virus? The deposition testimony of the Chubb Underwriters and those involved in developing endorsement #44 should be very enlightening.

42. Chubb argues: *"Here, Willis is Tulane's broker, and Willis knew the terms and limiting language of the Endorsement. Any failure on Tulane's part to understand the meaning of Endorsement 44 rests with Willis and Tulane, not with Chubb."* Chubb's insistence that Tulane's standing and rights under its policy as an insured are somehow altered or impacted by Willis' knowledge is not supported by any insurance industry standard.

43. While the question of whether or not an insurance agent's knowledge of a policy is imputed to an insured is a legal question, it is also very fact specific, and Chubb's insistence that the Tulane - Willis relationship conveyed legal agency upon Willis is moot since Willis never saw the endorsement prior to the loss. **Regardless, the term "agent" as used in the retail insurance business should not be confused with the legal concept of agency.**

44. From an insurance industry perspective, Willis was acting as Tulane's insurance broker, not as its insurance agent. In the insurance industry, an agent represents just one insurance company or insurance market, whereas **a broker like Willis represents multiple markets**[4]**.**

43. While Chubb attempts to argue that Willis is Tulane's agent, **Chubb ignores the Willis - Chubb relationship and the terms of the agency agreement or contract between them,** one which undoubtedly outlines Willis's duties and responsibility to Chubb **as Chubb's agent;**

44. While Chubb argues that endorsement 44 is a coverage grant, not an exclusion, once coverage is triggered under that endorsement the language places numerous restrictions on coverage. According to insurance industry standards and

---

[3] See Chubb's (Kevin Hass) January 15, 2021 reassertion of its denial.
[4] In the insurance industry, an insurance company is often referred to as a "market" by insurance agents and brokers.

practice, policy limitations, restrictions, and exclusions are treated the same way when evaluating coverage, that is, it is the insurers burden to prove that a limitation applies to reduce or exclude coverage[5].

45. As I understand it, Tulane's remediation costs have been categorized as follows:

>  (1) Plexiglass Barriers and Fastenal Air Filters2

>  (2) Personal Protective Equipment ("PPE")

>  (3) Environmental Remediation Consultants Woodard & Curran & JS Held

>  (4) Janitorial/Enhanced Cleaning/Facility Services (*e.g.*, A&L, Sodexo, BMS CAT, ServPro)

46. Using the previously cited insurance industry standards to evaluate these categories, it is reasonable to conclude that all categories and damages claimed fall within the definition of *"First party remediation costs,"* that is: **_expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize_** the virus. Since it is reasonable to say that these expenses were in an attempt to neutralize the virus, there is a path to say that these are *"First party remediation costs."*

47. My compensation is based on an hourly rate. My hourly compensation is $450 per hour.

48. I reserve the right to supplement this disclosure with additional opinions, or to update these opinions to the extent new information is discovered or disclosed. I reserve the right to rebut the opinions and testimony of other experts and witnesses presented at trial.

June 2, 2022  
Date:   *Louis G. Fey Jr.*  
Louis G. Fey Jr. CPCU, CIC, AIC

---

[5] See Exhibit B – Burden of Proof